**THOMAS P. SMITH, JR.**
**CO-ACTING REGIONAL DIRECTOR**
**Jack Kaufman**
**Elizabeth Butler**
**Tiantong Wen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0106 (Kaufman)**
**kaufmanja@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | **22 Civ. _____ (     )** |
| -against- | |
| **THEODORE J. FARNSWORTH, J. MITCHELL LOWE, and KHALID ITUM,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Theodore J. Farnsworth ("Farnsworth"), J. Mitchell Lowe ("Lowe"), and Khalid Itum ("Itum") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      On August 15, 2017, Helios and Matheson Analytics Inc. ("HMNY") announced that it had agreed to acquire a majority interest in MoviePass, Inc. ("MoviePass"), a movie subscription service (the "Acquisition"). From August 2017 to at least March 2019, Farnsworth and Lowe, the CEOs of HMNY and MoviePass, respectively, intentionally and repeatedly disseminated to the public materially false or misleading statements concerning MoviePass and key aspects of

MoviePass's business model.

2.      Farnsworth and Lowe made misstatements in HMNY Commission filings, press releases, and in the press (including during in-person media appearances) regarding whether MoviePass could be profitable at its new, $9.95 per month subscription price (which MoviePass introduced in connection with the Acquisition); purported ways in which MoviePass could become profitable (including through HMNY's purported data analytics capabilities); and HMNY's ability to fund MoviePass's operations.  Faced with debilitating negative cash flows—rather than tell the public the truth—Farnsworth and Lowe devised fraudulent tactics to prevent MoviePass's heavy users from using the service, and falsely and misleadingly informed the public that usage had declined naturally or due to measures the company had employed to combat subscribers' purported violations of MoviePass's terms and conditions of service.

3.      Ultimately, MoviePass's business model proved unsustainable, resulting in HMNY and its subsidiaries, including MoviePass, filing Chapter 7 liquidation bankruptcy petitions in January 2020.

4.      In addition to the above fraud, between January and April 2018, Farnsworth and Lowe approved false invoices that Itum, a MoviePass executive, submitted to HMNY and MoviePass.  Consequently—and through Itum's submission of additional false documents—Itum wrongfully obtained more than $310,000 from HMNY and MoviePass for his personal benefit.

## VIOLATIONS

5.      By virtue of the foregoing conduct and as alleged further herein, Defendants Farnsworth and Lowe have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Defendant Lowe further aided and abetted Farnsworth's and HMNY's violations of Section 17(a) of the Securities Act [15 U.S.C.

§ 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6.     By virtue of the foregoing conduct and as alleged further herein, Defendants Farnsworth, Lowe, and Itum have violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2] thereunder and aided and abetted HMNY's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

7.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

9.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon pursuant to Sections 21(d)(3) [15 U.S.C. § 78u(d)(3)], 21(d)(5) [15 U.S.C. § 78u(d)(5)], and 21(d)(7) [15 U.S.C. § 78u(d)(7)] of the Exchange Act; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Farnsworth and Lowe from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act

Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];
(e) permanently enjoining Farnsworth and Lowe from directly or indirectly promoting any issuer of
any security, causing the promotion of any issuer of any security, or deriving compensation from the
promotion of any issuer of any security; and (f) ordering any other and further relief the Court may
deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a)
[15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

11.     Defendants, directly and indirectly, have made use of the means or instrumentalities
of interstate commerce or of the mails in connection with the transactions, acts, practices, and
courses of business alleged herein.

12.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and
Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses
of business alleged in this Complaint occurred within this District, where HMNY and MoviePass
maintained their principal places of business.

## DEFENDANTS

13.     **Farnsworth**, age 60, is a resident of Miami, Florida.  Farnsworth was the CEO and
Chairman of HMNY from January 2017 until his resignation in September 2019.

14.     **Lowe**, age 70, is a resident of Miami Beach, Florida, and Puerto Vallarta, Mexico.
From 2016 to 2020, Lowe was the CEO of MoviePass.

15.     **Itum**, age 42, is a resident of Los Angeles, California.  In approximately October
2017, Itum was hired by MoviePass as Vice President, Business Development.  As Vice President,
Business Development, Itum was part of MoviePass's leadership team.  In October 2018, Itum, was
promoted to Executive Vice President.  As Executive Vice President, Itum was responsible for

MoviePass's day-to-day operations.  Itum resigned from MoviePass effective as of March 19, 2019.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

### A.  HMNY

16.     HMNY is a Delaware corporation with its principal place of business in New York, New York.

17.     HMNY's common stock is registered pursuant to Section 12(g) of the Exchange Act. Until January 2019, HMNY's stock traded on the Nasdaq; today, it is quoted on OTC Link, operated by OTC Markets Group Inc., under the ticker symbol "HMNY."

18.     HMNY filed a Chapter 7 bankruptcy proceeding in January 2020.

### B.  MoviePass

19.     MoviePass is a privately held Delaware corporation with its principal place of business in New York, New York.  MoviePass is a subsidiary of HMNY, and MoviePass's financial statements were consolidated into HMNY's financial statements.

20.     MoviePass's primary product offering was a movie subscription service, whereby subscribers could pay a fixed monthly fee to see a certain number of movies each month. Subscribers were issued a MoviePass debit card that would be credited with the funds to buy one ticket for a specific movie, theater, and show time that they selected through the MoviePass application on their phones.

21.     MoviePass filed a Chapter 7 bankruptcy proceeding in January 2020.

### C.  Kaleidoscope

22.     Kaleidoscopic Ventures, LLC ("Kaleidoscope") is a California limited liability company with its principal place of business in Los Angeles, California.  Until July 2021, the company was known as Kaleidoscope Productions, LLC.

23.     Kaleidoscope describes itself as an experiential marketing firm.

24.     Itum founded Kaleidoscope in approximately March 2017 and is Kaleidoscope's sole officer and owner.

25.     Kaleidoscope has no employees.

## FACTS

### I.     FARNSWORTH AND LOWE MADE MATERIALLY FALSE OR MISLEADING STATEMENTS REGARDING MOVIEPASS'S SUBSCRIPTION PRICE

26.     On August 15, 2017, HMNY and MoviePass announced the Acquisition.

27.     For at least a year prior to the Acquisition, MoviePass had been in desperate need of financing to continue its operations.  During that time period, Lowe had unsuccessfully attempted to raise financing for MoviePass from more than 120 potential investors and, before being introduced to Farnsworth and HMNY, had been ready to give up on MoviePass and shut down the business.

28.     The Acquisition closed in December 2017.  Prior to that date, HMNY already had begun making additional investments in MoviePass, and it continued to do so in 2018.  By the time HMNY filed its Form 10-K for the 2017 fiscal year, in April 2018, HMNY owned approximately 92% of MoviePass's outstanding common stock.  After the Acquisition, MoviePass became HMNY's core business and was responsible for the vast majority of HMNY's revenue.

29.     In November 2017, HMNY issued $100 million in convertible notes and, in January 2018, an additional $60 million in convertible notes.  In February 2018, HMNY also conducted a public offering of warrants, which raised approximately $97 million.  These HMNY securities offerings coincided with Farnsworth's and Lowe's materially false and misleading public statements regarding MoviePass, and HMNY used the proceeds of the offerings to finance its investments in both HMNY and MoviePass.

30.     Prior to the Acquisition announcement, the price of a MoviePass monthly subscription varied over time and by geographical location—between $12.95 and $89.95. Simultaneous with announcing the Acquisition, at Farnsworth's and Lowe's direction, HMNY and

MoviePass also announced a single price for all new subscribers:  $9.95 per month.  At that price, MoviePass told subscribers, they could see "Any movie; any theater; any day."

31.     Farnsworth was the impetus for the $9.95 price point and the "any movie; any theater; any day" slogan, which he intended as a marketing gimmick to attract new MoviePass subscribers.  However, Farnsworth and Lowe knew that the $9.95 price was not based on market or subscriber testing, and that, to become profitable, MoviePass eventually would need to raise its subscription price significantly and/or generate significant revenue through advertising and otherwise monetizing the data analytics.

32.     Despite knowing that the $9.95 subscription price had to be a temporary, unprofitable measure, Farnsworth and Lowe publicly claimed that it would allow MoviePass to turn a profit and misleadingly suggested that this key metric was based on rigorous market testing.  For example, in an August 16, 2017 interview with Variety.com, when he was asked whether MoviePass would need to raise its prices or risk going out of business,  Lowe falsely responded, "The answer is no.  [People suggesting that] don't understand our business model."

33.     Similarly, in an interview with Pipeline Data, which HMNY filed with the Commission on September 25, 2017, Farnsworth, citing "historical data," falsely stated that "we think we can be profitable on the subscriptions at $9.95," and also that he was "confident" MoviePass would break even on subscriptions alone.

34.     Farnsworth and Lowe continued to intentionally make similar materially false and misleading statements in subsequent media appearances.  For example, when asked in a January 9, 2018 joint interview with Yahoo Finance (the "January 2018 Yahoo Finance Interview") whether $9.95 was "too low of a price point," Farnsworth misleadingly responded, "No," while Lowe added that the price point attracted moviegoers who only attended movies five times a year.

35.     Also in the January 2018 Yahoo Finance Interview, Lowe falsely and misleadingly

stated that it was "not true at all" that MoviePass needed movie theatres to agree to provide MoviePass with lower ticket prices in order to turn a profit (i.e., to reduce the difference between what MoviePass paid for movie tickets and what MoviePass received in subscription fees).  By that time, however, Lowe knew that the statement was false and, indeed, had been asking MoviePass staff whether MoviePass could remove theatres that charged above $12 or $13 per ticket from its platform.  In response, a MoviePass employee had informed Lowe that it would be "tricky" to do, in part because it would "validat[e] . . . that this is not a sustainable product."

36.     On February 18, 2018, while appearing on an episode of Recode Media (the "Recode Media Podcast"), Lowe falsely stated that MoviePass "tested like crazy until we were ready to roll out the $9.95 plan."  At the time Lowe made this statement, he knew that MoviePass had not tested the $9.95 price point.  Lowe also knew that MoviePass had not determined how to design, let alone implement, a business plan that would allow MoviePass to break even on subscriptions.

37.     In March 2018, MoviePass hired a Chief Product Officer, whose main focus was to identify a break even business model and then explore how MoviePass could generate additional revenues outside of subscriptions.  The Chief Product Officer quit less than six months later, after realizing that MoviePass's business model would not work.  The Chief Product Officer communicated his views to Lowe.

38.     In addition, while Farnsworth and Lowe publicly claimed that the $9.95 price point supported MoviePass's mission—which purportedly included supporting the viewing of smaller, independent films in movie theaters—they knew or recklessly disregarded that, in fact, MoviePass was taking steps contrary to those stated missions.  For example, in an October 13, 2017 interview with CNBC, Lowe stated that MoviePass "actually want[s] you to go a lot to the movies."  Around this time, however, Lowe was directing MoviePass employees to create a new plan to get to "the desired profitable model in the future," which included attracting subscribers who saw fewer than 10

movies in the prior year, and subscribers who saw blockbusters rather than small films.  Days before the CNBC interview, Lowe told Farnsworth that "while this is a bit off our messaging to the industry[,] our most profitable subscribers are those that see mostly films that gross over $50m.  Our least profitable are those that see films $10m and less in Box Office."

## II. FARNSWORTH AND LOWE MADE MATERIALLY FALSE OR MISLEADING STATEMENTS THAT DATA ANALYTICS WERE A REVENUE SOURCE FOR MOVIEPASS

39.     In periodic filings with the Commission that Farnsworth signed, HMNY made materially false and misleading statements regarding the very nature of its capabilities, including that it possessed technology platforms focused on "big data" and "artificial intelligence," among other things.  Farnsworth further falsely and misleadingly claimed that HMNY's data analytics capabilities would improve MoviePass's service and, when applied to the data MoviePass collected on its subscribers, allow MoviePass to generate significant revenues beyond subscription revenue.

40.     For example, on September 14, 2017, HMNY filed a Form 8-K with the Commission, which attached a joint HMNY-MoviePass press release.  Farnsworth contributed to and approved the press release before it was issued.  He also signed the Form 8-K.  The press release stated that MoviePass used HMNY resources to "analyze[ ] consumer trends, patterns and activities," and that HMNY's technology "learns individual moviegoer's tastes and makes recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings."  The press release further quoted Farnsworth as stating, "This explains our sustainable business model:  [HMNY] is incorporating advertising models with the MoviePass application using artificial intelligence, algorithms, and machine learning so we can provide studios with more precise data for their advertising efforts."

41.     As Farnsworth knew or recklessly disregarded, these statements were false.  In fact, at the time, HMNY did not possess the type of data analytics capabilities that it described in its

September 14 press release, and HMNY had not incorporated any of its platforms or models into the MoviePass app.  Moreover, HMNY had no plan to incorporate any purported data platforms into the MoviePass app, or to use HMNY's technology to analyze MoviePass's subscriber data or behavior.

42.     Farnsworth signed multiple other filings with the Commission that contained similar false or misleading statements regarding HMNY's purported data analytics capabilities and how they would contribute to MoviePass, including a press release attached to an October 24, 2017 Form 8-K; a January 25, 2018 Form S-3; an April 17, 2018 Form 10-K; and a May 15, 2018 Form 10-Q.

43.     In addition, when asked in the January 2018 Yahoo Finance Interview, "So, what does Helios and Matheson do?"  Farnsworth falsely and misleadingly responded, "Helios is really a data analytics company, which really made the perfect marriage of MoviePass and the data analytics of how we're driving the revenues of the company right now."  In fact, for the fiscal year that ended nine days prior to that interview, MoviePass would report only subscription revenue, and in the first quarter of 2018, it likewise reported revenues composed overwhelmingly of subscription revenue.

44.     In his own media appearances, Lowe further supported the false narrative that HMNY was a data analytics company.  For example, in an October 2017 CNBC interview, Lowe agreed that "a huge amount of [what MoviePass offers] is about the data," and that this was why HMNY, "a data analytics firm," bought a majority share of MoviePass.  Lowe, however, knew or recklessly disregarded at the time that HMNY was not a "data analytics firm."

45.     In February 2018, MoviePass still was not monetizing subscriber data and did not have information regarding specific users' movie habits sufficient to undertake the type of data analysis described in its September 14, 2017 press release.

46.     On March 2, 2018, Lowe spoke at the Entertainment Finance Forum, giving a speech titled, "Data is the New Oil: How Will MoviePass Monetize It?"  Even though MoviePass

was not collecting basic demographic information for all of its subscribers, Lowe falsely and misleadingly stated that MoviePass collected "an enormous amount of information" regarding its subscribers, and that it even tracked its subscribers through their phones. The following week, on March 12, 2018, Lowe issued an email apology to MoviePass's subscribers, partners, and employees, saying that "through a mix of exuberance about our future and joking around" he "mischaracterized how MoviePass locates [its] members" and explaining that MoviePass did not "track" its subscribers. On March 13, 2018, Farnsworth sent Lowe a text message that HMNY's stock was "tanking," and that investors were "saying the exact thing I was afraid of that we are not a big data company and we just admitted it . . . ." While Lowe's apology acknowledged that MoviePass gathered a more limited universe of data than it had previously led the public to believe, the March 12 apology did nothing to correct the misimpression that MoviePass was using HMNY technology and capabilities to analyze the subscriber data in MoviePass's possession.

### III. FARNSWORTH AND LOWE MADE MATERIALLY FALSE OR MISLEADING STATEMENTS REGARDING NON-SUBSCRIPTION REVENUE

47. In their media appearances, Farnsworth and Lowe made materially false or misleading statements regarding the effect that MoviePass's purported non-subscription revenue streams were having on its profitability and future prospects. For example, in the January 2018 Yahoo Finance interview, Farnsworth stated that, "within the next sixty days, [MoviePass] should be self-sufficient on its own." When asked what revenue streams would make that possible, Lowe stated, "Multiple revenue streams," and he went on to provide, as examples, deals with studios and exhibitors.

48. At the time of the January 2018 Yahoo Finance Interview, Farnsworth and Lowe knew that MoviePass would not be self-sufficient within the next 60 days. Although MoviePass was earning small amounts of revenue from studios, and was receiving discounts from some smaller theater chains, those amounts were not close to the level that would be required for MoviePass to be

self-sufficient.

49.     In March 2018, MoviePass announced that it was lowering its subscription price to $6.95 per month, provided subscribers pay for the entire year's subscription up front.  The joint HMNY-MoviePass press release containing that announcement quoted Lowe as saying, "With the current growth and support that we've seen within the last several months, our studio and exhibitor revenues and other marketing partnerships have motivated us to lower the price once again, offering movie lovers greater access to MoviePass."  However, this statement was false and misleading because Farnworth and Lowe knew that the reason for lowering the price was not MoviePass's ability to generate non-subscription revenue but, rather, its need to receive the full year's subscription payments up front in order to try to ease its and HMNY's immediate cash pressures, including MoviePass's financial obligations to its vendors.

50.     On April 12, 2018, in a joint Yahoo Finance interview with Lowe, Farnworth falsely and misleadingly stated that MoviePass could generate $6 a month in non-subscription revenue from each subscriber "right now."  Lowe agreed with Farnworth's claim during the interview and repeated it in an April 17, 2018 Variety.com article.  In making these claims, Farnworth and Lowe knowingly or recklessly disregarded MoviePass's internal projections, which estimated that, in fact, MoviePass could generate only $0.50 in non-subscription revenue per subscriber in April 2018, and $2 per subscriber by March 2019.  Nor had MoviePass entered into contracts that would enable it to generate non-subscription revenue at the level Farnworth and Lowe were claiming.

51.     Between January and May 2018, HMNY formed MoviePass Ventures LLC ("MPV"), a wholly owned subsidiary, as a purported vehicle for distributing films produced by others; acquired MovieFone ("MF"), an entertainment information and marketing service; and entered into a joint venture with Emmett Furla Oasis Films to form MoviePass Films LLC ("MPF"), a film production company.

52.     Farnsworth publicly claimed that these companies were generating ancillary revenues for MoviePass and were helping to push MoviePass along its path to profitability.  For example, on July 31, 2018, HMNY filed a Form 8-K (signed by Farnsworth), attaching a joint HMNY-MoviePass press release which stated that "[MPV] and [MPF] are contributing to the company's ancillary revenue."  At or about this same time, Farnsworth appeared in broadcast interviews—including a July 25, 2018 interview with Proactive Investors and an August 15, 2018 interview with Fox Business—during which he stated that MoviePass was making money on the alternate revenue streams associated with MPF.

53.     The implication of Farnsworth's statements—that MPF, MPV, and MF were contributing to MoviePass's revenues in the third quarter of 2018—was false and misleading.  In fact, as Farnsworth knew or recklessly disregarded, MPF, MPV, and MF made no payments to MoviePass in 2018 and, to the extent that any revenues had been accrued on MoviePass's books, they were not realized.  Moreover, MoviePass and HMNY were required to expend significant amounts in connection with the operations of MPF, MPV, and MF.

## IV.   FARNSWORTH AND LOWE PREVENTED SUBSCRIBERS FROM USING MOVIEPASS, THEN MISLEADINGLY CLAIMED THAT THE LOWER USAGE WAS THE RESULT OF NORMAL USER BEHAVIOR

54.     From at least September 2017 to November 2018, Farnsworth and Lowe made numerous materially false and misleading public statements to the effect that certain "data" indicated that MoviePass subscriber usage—and therefore, MoviePass's cost of goods sold—would, and did, naturally decline over time as subscribers settled into a predictable, low rate of usage; and that, consequently, MoviePass could at least break even based on its subscription revenue alone.

### A.   The All-You-Can-Eat Buffet

55.     Both Farnsworth and Lowe compared long-term subscriber usage to an all-you-can-eat buffet.  For example, in September 2017, Farnsworth told Pipeline Data:

MoviePass has been around for 5 years, so we have a wealth of historical data. At $39, the average customer would go to 4 movies a month. At $29, the average dropped to 3 movies a month. When MoviePass went to $19, the average customer went to 2 movies a month. So we think we can be profitable on the subscriptions at $9.95 and then make the real money from the additional revenue sources. . . . History tells us that the average customer won't abuse the service. Based on our historical numbers, MoviePass will be similar [to a buffet]. People will use it three times in the first month. The second month, they'll use it twice. Then, in the third month, they'll use it once or less. After that, they'll only use it once in a while.

Farnsworth also told <u>Pipeline Data</u> that he was "confident" that MoviePass would break even on subscriptions alone.

56.     In a February 16, 2018 interview with <u>CNBC,</u> Lowe stated: "Like an all-you-can-eat buffet or any unlimited service, when subscribers first start, they gorge on movies in the first three or four months. Then they slowly but surely settle into a pattern which is still double what they used to do."

57.     In the February 2018 Recode Media Podcast, Lowe made similar representations: "In our customers' behavior, there's two trends. One of them is like if you went to a buffet breakfast every single morning for two or three weeks, the first couple days . . . [y]ou're piling up. By the third or fourth day, you're kind of down to a normal usage. That's exactly how our customers, they start out, they go to a bunch of movies. They slowly edge down. Here's the trick: 89 percent of American moviegoers only go to four or five movies a year. When they join MoviePass, they double their consumption and go to about 10 a year. That's a little bit less than one a month. They balance out the 11 percent of the population that go 18 times before joining MoviePass and then after go three times a month. It works out. Over time, it actually works out to be about one movie per month per subscriber."

58.     As Lowe and Farnsworth knew, these statements were false or misleading because MoviePass had not gathered such historical data, there was not a predictable pattern of usage, and the average users did not "balance out" the heavy users.

**B.  The Removal of Costly Films and Theaters to Reduce Cash Burn**

59.     MoviePass removed from its app films that it expected would have high subscriber demand.  For example, on January 6, 2018, Lowe directed MoviePass employees to block six Bollywood films from the app because Bollywood films were "killing us financially" during a "financially vulnerable time."  Farnsworth knew of the decision prior to its implementation.

60.     Later in January, MoviePass blocked ten AMC theaters from its app.

61.     Farnsworth knew about and, along with Lowe, made the decision to block the AMC theaters.

62.     Lowe and Farnsworth thereafter made misleading public statements to the effect that MoviePass had blocked the AMC theaters because AMC would not work with MoviePass.  For example, in January 2018, various media outlets quoted Farnsworth as stating, "As we've grown our subscriber base, we've seen a dramatic increase in movie theater attendance among our subscribers, which proves to us that MoviePass is working to revitalize a declining industry.  Other theater companies have seen this attendance resurgence and have approached MoviePass to collaborate.  Since the get-go, AMC has not been interested in collaborating with MoviePass—a move that is not in the interest of our subscribers and AMC theater-goers."  In the February 2018 Recode Media Podcast, Lowe likewise explained that MoviePass had removed those theatres to "demonstrate to AMC that really they should be our partner."  This was misleading because, as Lowe texted to Farnsworth prior to the implementation of the decision, the reason MoviePass was excluding theaters from the app was to "impact cash flow needs"—i.e., reduce its cash burn.

63.     Lowe later stated that the purpose of blocking the AMC theaters had been to allow MoviePass to "test" subscriber behavior and that MoviePass turned the theaters back on once the test was over.  For example, in April 2018, Lowe told The Hollywood Reporter that:

> [W]e wanted to understand a few things about our subscribers, so we removed, for a short period of time for a test, 10 of them in order to understand what our

subscribers do.  Do they cancel their service because that was their favorite theater?
Do they go to a competitor like Regal or Cinemark or an independent?  And does
it decrease their moviegoing? . . .

We tested this, we learned a lot, and then the test was over, so we turned them back
on.

64.    When Lowe made these comments to <u>The Hollywood Reporter</u>, he knew they were
false because he knew that MoviePass's decision to block the AMC theaters was done to lower its
cash burn.  Lowe also knew that MoviePass was forced to unblock the AMC theaters by MasterCard
because limiting the service in this way violated MasterCard's terms of service.

**C. Purported Fraud Prevention Measures**

65.    These efforts, however, were not enough to stop the cash burn facing MoviePass,
since the number of subscribers—and their demand for movie tickets—continued to grow.
Consequently, Farnsworth and Lowe intensified their undisclosed efforts to curb subscriber usage.
By April 2018, Farnsworth and Lowe had agreed to implement additional undisclosed tactics,
including "password disruption" and "ticket verification."  MoviePass employees referred to this
initiative as "Project 2%."  These measures prevented MoviePass's subscribers from using their
MoviePass to go to the movies.

66.    Project 2% was designed to curb the purchasing of movie tickets by the MoviePass
subscribers who saw the most movies per month (the "heavy users").  Farnsworth and Lowe
directed MoviePass employees to invalidate the heavy users' passwords under the guise of claiming
that MoviePass had detected suspicious activity or potential fraud in their accounts.  Lowe also
directed MoviePass employees to impose ticket verification on their heavy users, while telling the
subscribers that they had been randomly selected to participate in ticket verification.  As Lowe knew,
these statements were false because MoviePass had not detected any suspicious activity/potential
fraud, and the subscribers were not randomly selected.  Rather, as Lowe knew, both tactics were
designed to target the heavy users in an attempt to reduce the cash burn.

67.     While they were trying to block MoviePass's heavy users, Farnsworth and Lowe falsely and misleadingly stated publicly, including in an April 9, 2018 Yahoo Finance Interview, that they would "never get rid of" their heavy users.  Likewise, HMNY's May 15, 2018 Form 10-Q for the first quarter of 2018, which Farnsworth signed, described measures that HMNY had implemented to reduce usage and ticket costs, while omitting discussion of the tactics that Farnsworth and Lowe had devised to curtail usage by the heavy users.

68.     Farnsworth and Lowe also authorized the issuance of false and misleading joint press releases reporting the claimed "natural" decrease in usage by MoviePass's subscribers.  For example, in May 2018, HMNY and MoviePass issued a joint press release titled "[HMNY] and MoviePass Report First Quarter Earnings."  The press release stated:  "As our [MoviePass] subscriber base matures, we are also naturally seeing significantly reduced usage over time."  In November 2018, HMNY and MoviePass issued a joint press release titled "[HMNY] Reports Financial Results for Third Quarter 2018", which stated that MoviePass's "[a]verage monthly usage per subscriber was dramatically reduced to .77 movies per month in September 2018, as compared to 2.22 movies per month in April 2018."  As Farnsworth and Lowe knew, these statements were false and misleading because MoviePass was, in fact, trying to get rid of its heavy users or forcibly reduce the number of movies seen by its heavy users.

69.     Further, Farnsworth and Lowe attributed the reduction in subscribers' movie consumption to a natural cycle of use, rather than the forced reduction in use resulting from the purported fraud reduction tactics.  These statements were false or misleading.  Farnsworth and Lowe knew that MoviePass was facing debilitating negative cash flows due to the millions of dollars' worth of tickets it needed to buy every week, and that subscribers' usage was not decreasing to a sustainable level naturally.  They also knew that MoviePass's employees had been instructed to devise and/or implement tactics that would enable MoviePass to artificially limit subscribers' use of

the service.  As Farnsworth and Lowe knew, these tactics included inventory suppression, resetting

passwords, ticket verification, and removing films and/or entire theaters from the MoviePass app.

70.      Moreover, while the goal of these tactics was to reduce MoviePass's cash burn,

Farnsworth and Lowe publicly stated that the tactics were being employed to address "fraud" and

"misuse" being perpetrated by large numbers of MoviePass subscribers.

71.      For example, in a June 2018 Reddit Q&A, Lowe stated that MoviePass implemented

these tactics "in order to reduce the amount of fraud and abuse that we identified from customers

who were using MoviePass to scalp tickets, buy non-ticket items, and share the card amongst their

friends."  Similarly, HMNY's Form 10-Q for the first quarter of 2018, which Farnsworth signed,

stated: "The Company has also instituted a policy allowing subscribers to see a movie title only once

per subscriber using the MoviePass subscription which, coupled with its new ticket verification

software, has reduced usage significantly by eliminating suspected fraud and reselling of tickets."

Farnsworth also signed a Form 8-K filed by HMNY on July 31, 2018 that attached a press release

stating: "In an effort to maintain the integrity of the MoviePass mission, to enhance discovery, and

to drive attendance to smaller films and bolster the independent film community, MoviePass will

begin to limit ticket availability to Blockbuster films.  This change has already begun rolling out, with

Mission Impossible 6 being the first film included in the measure.  This is a strategic move by the

company to both limit cash burn and stay loyal to its mission to empower the smaller artistic film

communities."  That same Form 8-K quoted Lowe as saying: "These changes are meant to protect

the longevity of our company and prevent abuse of the service."

72.      Farnsworth went further, claiming that HMNY intentionally slowed the growth of

the company in order to "fix" the "fraud," including at interviews with Proactive Investors on

January 23, 2019 and March 21, 2019 and with Fox Business on March 22, 2019.

73.      The purported "fraud" consisted of potential violations of MoviePass's Terms and

Conditions of Use ("T&C").

74.     As Farnsworth and Lowe knew, the statements in paragraphs 67 through 73 above were false and misleading because the goal of the tactics was to limit use of the app by MoviePass's subscribers in order to save cash, not to address subscribers' violations of MoviePass's T&C. Moreover, the tactics employed by MoviePass at the direction of Lowe and Farnsworth to combat the purported fraud targeted all of MoviePass's heavy users, not only those subscribers who MoviePass had determined were violators of the T&C, and caused the artificial reduction of subscribers' use of the MoviePass app.

## V.     FARNSWORTH AND LOWE MADE MATERIALLY FALSE OR MISLEADING STATEMENTS ABOUT HMNY'S ABILITY TO MEET MOVIEPASS'S FUNDING NEEDS

75.     Despite their knowledge of the company's true financial situation, Farnsworth and Lowe misled the public by saying that HMNY had ready access to the funds it needed to keep MoviePass operating.  For example, in January 2018, Lowe told The Hollywood Reporter that MoviePass had "plenty" of cash.  He also stated that there was no point at which MoviePass would not be able to afford more subscribers because it was buying too many tickets:

> I don't know why everybody believes that our customers are watching so many movies. . . .
>
> The primary subscriber is one of the 200 million people who see four-and-a-half movies a year and when you double four-and-a-half you get nine, and that's three quarters of a movie a month. . . .
>
> We don't need to raise the price.  I spent a year studying how I can get people who spend $50 a year going to movies to spend $120 a year, and $9.95 is the price point that gets them into the theaters more often.

76.     In the February 2018 Recode Media Podcast, Lowe stated that MoviePass had "a deep-pocketed backer that is prepared to fund us all the way."  By this time, however, Lowe and other MoviePass executives were asking HMNY for cash infusions on a weekly basis, while acknowledging that "money [was] tough" for HMNY.  Lowe also knew that HMNY's funders were

demanding "real actual details" and "real data" from HMNY as to how it could fund the MoviePass business, and that HMNY's investment banking consultant was concerned that the funding "spigot" for MoviePass was about to be shut off.  In response to this concern, Lowe and Farnsworth devised a number of undisclosed strategies (which they called "levers") to help slow down the cash burn.  By pulling the various levers, MoviePass believed it would be able to "deterministically achieve" the desired usage rate.

77.    In April 2018, HMNY filed a Form 10-K for 2017.  The 10-K stated that "as a result of our shelf registration in February, the Company has adequate access to capital to fund our operations and capital investment needs for the foreseeable future."

78.    At about this same time, Farnsworth was quoted in Variety.com, stating:  "Since day one, people have been saying we'll run out of money. . . .  I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder, and I've got bankers and debt-financing companies calling me all the time.  They know they're looking at an Uber or an Airbnb. This is a unicorn company."  In May 2018, Farnsworth told the same publication: "We've got 17 months' worth of cash without further raises of capital."

79.    These statements were materially false or misleading.  In fact, on April 13, 2018, in response to a request from MoviePass for a transfer of $2 million to $3 million to "pay Vantiv and the tickets," HMNY's CFO advised Farnsworth and Lowe: "Something has to change, we really need to curtail spending and usage.  I know I am stating the obvious[.]  We cannot survive at this level of burn.  Next week is going to be a challenge, not sure how we get there."

## VI.    FARNSWORTH AND LOWE PROFITED FROM THEIR MISCONDUCT

80.    Farnsworth and Lowe profited from their misconduct described above.  Farnsworth received bonus payments and/or other special compensation.  Lowe received bonus payments. Both executives also received increased compensation.

VII.   **FARNSWORTH AND LOWE APPROVED FALSE INVOICES, ALLOWING ITUM TO MISAPPROPRIATE APPROXIMATELY $310,000 FROM HMNY AND MOVIEPASS**

81.     On or about January 8, 2018, Itum, through Kaleidoscope, entered into a contract with an event production company (the "Event Producer").  Pursuant to the contract, the Event Producer agreed to provide event planning and production services for an event being sponsored by MoviePass in connection with the Sundance Film Festival between January 17 and 23, 2018 (the "Sundance Event").

82.     On or about April 2, 2018, Itum, through Kaleidoscope, entered into a second contract with the Event Producer.  Pursuant to the contract, the Event Producer agreed to provide event planning and production services for an event being sponsored by MoviePass in connection with the Coachella Music Festival between April 11 and 15, 2018 (the "Coachella Event").

83.     While Kaleidoscope was the signatory to the contracts with the Event Producer, HMNY was providing the funds to pay for the events, including by providing funds to its subsidiary, MoviePass.

84.     Neither MoviePass nor HMNY entered into any contracts with Kaleidoscope, including concerning either the Sundance Event or the Coachella Event.

85.     Kaleidoscope was not entitled to any fees in connection with the Sundance Event or the Coachella Event and was not to profit from the funds that HMNY and MoviePass advanced to Kaleidoscope.

86.     By having the Event Producer contract with Kaleidoscope rather than HMNY or MoviePass directly, Itum was able to siphon off funds for his own benefit.

87.     To that end, Itum, submitted a number of false invoices to HMNY and MoviePass, seeking payments for funds allegedly advanced by Kaleidoscope.  However, the invoices did not represent legitimate expenses of HMNY or MoviePass.  Rather, they represented payments made for

Itum's personal benefit.

88.     Farnsworth and Lowe knew that the Kaleidoscope invoices did not represent legitimate expenses of HMNY or MoviePass.  Nevertheless, they approved the invoices for payment, allowing Itum to misappropriate approximately $310,000 and causing the true nature of the payments to be misstated in the companies' books and records.

**A.  Itum Took $10,000 Intended for the Sundance Event**

89.     On January 3, 2018, Itum sent HMNY an invoice from Kaleidoscope, seeking $137,250 to pay expenses incurred for the Sundance Event.

90.     Itum claimed that the funds were needed immediately because vendor invoices needed to be paid in full, given the proximity of the event date.

91.     HMNY's CFO approved the payment, and HMNY, through a subsidiary, wired the money to Kaleidoscope that same day.

92.     Itum used approximately $10,000 of the advanced funds to pay for non-Sundance Event expenses incurred by Itum.

93.     Itum participated in the creation of an itemized final budget concerning the Sundance Event and approved the document before it was sent to HMNY.

94.     The budget purported to demonstrate that Kaleidoscope had used all of the $137,250 advanced to it by HMNY for expenses incurred in staging the Sundance Event.

95.     The final budget falsely stated that Kaleidoscope had used the funds advanced by HMNY to directly pay for $41,659.17 of expenses incurred for the Sundance Event, and that Kaleidoscope had remitted the remainder of the advanced funds to the Event Producer to pay for other Sundance Event expenses.

96.     In fact, the expenses that Kaleidoscope had paid, including amounts it paid to the Event Producer, were overstated by at least $10,000.

**B. Itum Obtained $25,000 by Falsely Claiming that Kaleidoscope Paid for "Overages" In Connection with the Sundance Event**

97.     On January 30, 2018, Farnsworth emailed HMNY's CFO, instructing him to pay Itum a $25,000 bonus.

98.     HMNY's CFO responded to Farnsworth's email and advised Farnsworth that HMNY could not pay Itum a bonus because Itum was a MoviePass employee.

99.     Later that same day, Itum emailed Farnsworth's chief of staff a $25,000 invoice from Kaleidoscope (labeled Invoice #006.002, dated January 30, 2018) to HMNY for "Overages & Performance Bonus," stating that it was being sent "per [Farnsworth]'s direction."  Farnsworth was copied on the communication.

100.     On February 16, 2018, Itum emailed HMNY's CFO an invoice from Kaleidoscope (also labeled Invoice #006.002 and dated January 30, 2018) seeking $25,000 for expense "overages – Sundance Film Festival."  This invoice removed the "bonus" reference and, instead, purported to be only for Sundance Event "overages" due Kaleidoscope.

101.     In fact, Kaleidoscope had not incurred any overages in connection with the Sundance Event, and Itum issued the invoice, even though no "overages" were due Kaleidoscope.

102.     Rather, the invoiced $25,000 represented a bonus to Itum.

103.     After receiving the "overages" invoice, HMNY's CFO instructed that $25,000 be wired to Kaleidoscope.

104.     This payment was memorialized in MoviePass's books as a marketing expense.

105.     Both Farnsworth and Itum knew that the information concerning the Sundance-related expenses had been requested in connection with preparing HMNY's upcoming Form 10-K, as both were copied on emails discussing that HMNY's accountants had requested such information.

106.     The $25,000 payment was not included in an itemized list of bonuses that the CFO

provided to HMNY's auditor in April 2018.

### C. Itum Obtained $150,000 by Falsely Claiming that Kaleidoscope Provided MoviePass with "Production Services"

107.     In approximately February 2018, Itum informed Farnsworth that he owed personal

debts to Individual A (in the amount of $150,000) and Individual B (in the amount of $100,000).

On February 9, 2018, when Itum texted Farnsworth about the debt to Individual B, Farnsworth told

Itum to "relax" and "you got my word" that "we will get him paid."  Later that same day, Itum

texted and emailed Farnsworth about the debt to Individual A, asking "Do you think you can

write [Individual A] and let him know that you've scheduled his payment of $150,000 for no later

than Friday? . . . .  It would get him off my neck!  ☹☹  ☺☹☹☹☹· ☺"

108.     Shortly thereafter, Farnsworth instructed Lowe to pay Itum a $150,000 bonus.

109.     Lowe did not agree that Itum was entitled to such a bonus, but nevertheless

instructed MoviePass accounting to pay the bonus and to not withhold any taxes.

110.     On February 26, 2018, Itum sent MoviePass an invoice from Kaleidoscope seeking

payment of the bonus.  The invoice, however, stated it was seeking payment of $150,000 in

"Production Services."

111.     Kaleidoscope had provided no such "Production Services" to MoviePass.

112.     Lowe approved payment of the invoice, despite the fact that Kaleidoscope had

provided no services to MoviePass, and funds were wired to Kaleidoscope that same day.  Shortly

thereafter, Itum wired the funds to Individual A to repay his personal debt.

113.     This $150,000 payment to Itum was memorialized falsely in MoviePass's books as

"MP Consulting-outside services."

### D. Itum Misappropriated Over $126,000 Intended for the Coachella Event

114.     On March 29, 2018, Itum sent HMNY's CFO an invoice from Kaleidoscope,

seeking an advance of $350,000 for production expenses related to the Coachella Event.  Itum told the CFO that the funds were needed to immediately pay vendors in connection with putting on the event.  After confirming Farnsworth's approval of the transfer, HMNY's CFO caused $350,000 to be wired to Kaleidoscope the next day.

115.    At the time the invoice was submitted to HMNY, Itum intended to use $110,000 of the funds invoiced to repay his personal debt to Individual B, which was unrelated to the Coachella Event.

116.    At the time he authorized the payment, Farnsworth knew that Itum owed Individual B $100,000; that Itum had previously asked Farnsworth for funds to repay Individual B; that Farnsworth had previously assured Itum that the creditor would be paid; and that Itum had previously submitted a false invoice from Kaleidoscope in order to receive a bonus payment from HMNY.

117.    At the conclusion of the Coachella Event, Itum and the Event Producer prepared an itemized budget which purported to demonstrate that all of the funds received had, in fact, been used to pay Coachella Event production expenses.

118.    Itum participated in the preparation of the itemized budget and approved it before it was sent to HMNY.

119.    The itemized budget stated that Kaleidoscope had used $110,000 of the funds to pay a "Hotel Buy-Out Fee."

120.    Itum separately provided HMNY with an accounting which also falsely stated that Kaleidoscope had paid an $110,000 "Buy-Out Fee."

121.    In fact, no "Buy-Out Fee" existed, and Itum used $110,000 of the funds transferred to Kaleidoscope to satisfy a personal debt unrelated to the Coachella Event.

122.    The accounting also overstated the amount that Kaleidoscope had spent on

Coachella tickets by $16,733.

123.     Itum used this $16,733 for his personal benefit.

124.     As a result of the false invoices, Itum received $311,733.

**E.  The False Information Concerning the Payments Was Provided to HMNY's Auditor**

125.     Itum, Farnsworth, and Lowe knew that the services and expenses described in the invoices and related documents did not reflect actual services provided or production expenses incurred by Kaleidoscope for the benefit of HMNY or MoviePass.

126.     Itum, Farnsworth, and Lowe also knew that HMNY's auditor was relying on the information they provided concerning the amounts paid to Kaleidoscope in connection with the auditor's review of HMNY's securities filings.

127.     For example, in late January 2018, HMNY personnel emailed Itum, telling him that information concerning the Sundance Event production expenses was needed to prepare HMNY's Form 10-K for the year ended December 31, 2017.  Farnsworth was copied on that email.

128.     In response, Itum, through the Event Producer, provided HMNY, including Farnsworth, with an itemized budget which, as described above, overstated the production expenses paid by Kaleidoscope in connection with the Sundance Event by at least $10,000.

129.     In early April 2018, Farnsworth texted Itum, advising him that the auditors were reviewing the Sundance Event expenses.

130.     In mid-April 2018, Itum received an email from HMNY personnel, asking Itum to provide HMNY with a detailed breakdown of how Kaleidoscope spent the $350,000 that it had been given for the Coachella Event production expenses.  Itum was told that the information was needed because HMNY's CFO and auditor required the receipts and associated documents to substantiate the production expenses that Kaleidoscope claimed had been paid for the Coachella Event.  Farnsworth was copied on the email.

131.    In response, Itum provided HMNY's CFO the itemized budget and accounting described above, both of which falsely indicated that Kaleidoscope had used $110,000 of the advanced funds to pay a "Buy-Out Fee" purportedly charged by the venue.

132.    In early 2019, HMNY's newly appointed CFO again asked for information concerning Kaleidoscope's $350,000 invoice.

133.    The CFO told Itum that the information was needed to prepare an amendment to HMNY's Form 10-Q for the third quarter of 2018.

134.    Itum responded to the CFO by falsely stating that Kaleidoscope had been used only as a payment vehicle to "pass through" production expenses that were owed by MoviePass, and that neither Kaleidoscope nor Itum had received any compensation for the Coachella Event.

135.    Itum did not tell the CFO that Itum had used $110,000 of the advanced funds to pay off a personal debt, or that Itum had retained nearly $17,000 purportedly spent on tickets for his personal benefit.

136.    Thus, Itum provided false information to HMNY's CFO concerning the Sundance and Coachella Events that he knew would be conveyed to HMNY's auditor, including in connection with preparing HMNY's Form 10-K for 2017, its quarterly filings for the first two quarters of 2018, and an amended quarterly filing in March 2019.

137.    Despite knowing that the documents were false and misleading, Farnsworth and Lowe approved them for payment, causing them to become incorporated into HMNY's books and records.  HMNY's employees, including the CFO, provided HMNY's auditor with the false invoices and other documentation that Itum submitted to HMNY and MoviePass.

138.    Farnsworth and Lowe knew, or were reckless in not knowing, that the auditor was given false and misleading information concerning the invoices and payments described above.

139.    HMNY's auditor relied on the information provided by Itum.

27

140.     Consequently, HMNY's auditor did not understand that Kaleidoscope had received compensation from HMNY and MoviePass, or that Kaleidoscope was receiving funds from HMNY and MoviePass to pay Itum's personal debts that had no connection to HMNY or MoviePass.

141.     None of the payments identified herein were included on an itemized list of bonuses that was provided to HMNY's auditor in April 2018.

142.     During this same period, Farnsworth was copied on emails requesting additional information for HMNY's auditor concerning the expenditures relating to the Sundance and Coachella Events.

143.     Lowe received emails reflecting requests from HMNY's auditor for information concerning MoviePass's related-party transactions and bonus payments.

144.     Despite being included on these communications, neither Farnsworth nor Lowe provided any information concerning the Kaleidoscope invoices and/or payments in response.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Farnsworth and Lowe)

145.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

146.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon the purchaser.

147.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Farnsworth and Lowe)

148.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

149.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

150.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Lowe)

151.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

152.     HMNY and Farnsworth violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

153.     Lowe knowingly or recklessly provided substantial assistance to HMNY and

Farnsworth with respect to their violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

154.    By reason of the foregoing, Lowe is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 78o(b)] for aiding and abetting HMNY's and Farnsworth's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] thereunder and, unless enjoined, Lowe will again aid and abet these violations.

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Lowe)**

155.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

156.    HMNY and Farnsworth violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

157.    Lowe knowingly or recklessly provided substantial assistance to HMNY and Farnsworth with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

158.    By reason of the foregoing, Lowe is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting HMNY's and Farnsworth's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Lowe will again aid and abet these violations.

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)**
**(All Defendants)**

159.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

160.    HMNY failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets.

161.     By reason of the foregoing, HMNY violated Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

162.     By engaging in the conduct described above, Farnsworth, Lowe, and Itum knowingly or recklessly provided substantial assistance to HMNY with respect to its violations of Exchange Act Section 13(b)(2)(A) [15 U.S. C. § 78m(b)(2)(A)].

163.     By reason of the foregoing, Farnsworth, Lowe, and Itum are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting HMNY's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] and, unless restrained and enjoined, Farnsworth, Lowe, and Itum will aid and abet such violations in the future.

### SIXTH CLAIM FOR RELIEF
**Violations of Exchange Act Section 13(b)(5) and Rules 13b2-1 and 13b2-2 Thereunder**
**(All Defendants)**

164.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

165.     As a result of Defendants' conduct, the books, records, and accounts of HMNY falsely recorded improper payments to Kaleidoscope as legitimate business expenses of HMNY and MoviePass.

166.     By engaging in the conduct described above, Farnsworth, Lowe, and Itum knowingly directly or indirectly falsified or caused to be falsified, books, records, or accounts of HMNY, an issuer subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)], in violation of Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.

167.     By engaging in the conduct described above, Farnsworth, Lowe, and Itum made or caused to be made materially false and misleading statements to an accountant in connection with the preparation or filing of documents and reports required to be filed with the Commission in

violation of Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-2 [17 C.F.R. § 240.13b2-2] thereunder.

168.    Unless restrained and enjoined, Farnsworth, Lowe, and Itum will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Farnsworth and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77(a)] and Exchange Act Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2];

## II.

Permanently enjoining Farnsworth and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from aiding and abetting any violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by knowingly or recklessly providing substantial assistance to an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], and that fails to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

**III.**

Permanently enjoining Lowe and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77(a)] and Exchange Act Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2];

**IV.**

Permanently enjoining Lowe and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from aiding and abetting any violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by knowingly or recklessly providing substantial assistance to an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], and that fails to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

**V.**

Permanently enjoining Itum and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2];

**VI.**

Permanently enjoining Itum and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from aiding and abetting any violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by knowingly or recklessly

providing substantial assistance to an issuer that has a class of securities registered pursuant to

Section 12 of the Exchange Act [15 U.S.C. § 78l], or is required to file reports pursuant to Section

15(d) of the Exchange Act [15 U.S.C. § 78o(d)], and that fails to make and keep books, records, and

accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of

the assets of the issuer.

**VII.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly as a

result of the alleged violations, with pre-judgment interest thereon pursuant to Sections 21(d)(3) [15

U.S.C. § 78u(d)(3)], 21(d)(5) [15 U.S.C. § 78u(d)(5)], and 21(d)(7) [15 U.S.C. § 78u(d)(7)] of the

Exchange Act;

**VIII.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d)

[15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IX.**

Permanently prohibiting Farnsworth and Lowe from serving as an officer or director of any

company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or

that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to

Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C.

§ 78u(d)(2)];

**X.**

Permanently enjoining Farnsworth and Lowe from directly or indirectly promoting any

issuer of any security; causing the promotion of any issuer of any security; or deriving compensation

from the promotion of any issuer of any security; and

## XI.

Granting any other and further relief this Court may deem just and proper.

Dated:  New York, New York
         September 26, 2022

                                    /s/ Thomas P. Smith, Jr.
                                    THOMAS P. SMITH, JR.
                                    CO-ACTING REGIONAL DIRECTOR
                                    Jack Kaufman
                                    Elizabeth Butler
                                    Tiantong Wen
                                    Attorneys for Plaintiff
                                    SECURITIES AND EXCHANGE COMMISSION
                                    New York Regional Office
                                    100 Pearl Street, Suite 20-100
                                    New York, NY 10004-2616
                                    (212) 336-0106 (Kaufman)
                                    kaufmanja@sec.gov