# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES & EXCHANGE COMMISSION,** | |
| **Plaintiff,** | Case No. 22 Civ. 8226 |
| | Hon. Katherine Polk Failla |
| **v.** | |
| **THEODORE J. FARNSWORTH, J. MITCHELL LOWE, and KHALID ITUM,** | |
| **Defendants.** | |

## DEFENDANT J. MITCHELL LOWE'S MOTION TO DISMISS

William F. McGovern
Kelly Spatola
Rachel K. Warren
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022

Adriana Riviere-Badell (admitted *Pro Hac Vice*)
Kobre & Kim LLP
201 South Biscayne Boulevard
Suite 1900
Miami, Florida 33131

*Counsel for J. Mitchell Lowe*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................. 1

**BACKGROUND** .................................................................................................... 4

   A.  Mr. Lowe Was Not the Maker of Eleven of the Alleged Misstatements ............................. 5

   B.  Mr. Lowe's Lack of Knowledge of or Substantial Assistance in Any Alleged Securities Violations ............................................................................................................ 5

   C.  HMNY's Books and Records ............................................................................. 6

**ARGUMENT** ...................................................................................................... 9

   I.  **THE COMPLAINT FAILS TO PLEAD ACTIONABLE MISSTATEMENTS BY MR. LOWE UNDER SECURITIES ACT SECTION 17(A) AND EXCHANGE ACT SECTION 10(B) AND RULE 10B-5 THEREUNDER.** .................................. 10

     A.  The Complaint Fails to State a Claim Under Securities Act Section 17(a) .................. 10

     B.  The Complaint Fails to Plead the Alleged Misstatements Were Made "In Connection With the Purchase or Sale of Any Security" as Required by Exchange Act Section 10(b) ..................................................................................................... 11

     C.  The Complaint Fails to Plead With Particularity the Basic Elements of Fraud ............ 12

       1. Mr. Lowe Cannot be Held Primarily Responsible for the Eleven Statements He Did Not Make ....................................................................................... 12

       2. The Complaint Fails to Plead Mr. Lowe Acted With Scienter .............................. 16

         a. Motive and Opportunity ...................................................................... 16

         b. Conscious Misbehavior or Recklessness ................................................. 17

       3. The Complaint Fails to Plead Materiality ...................................................... 19

         a. Mr. Lowe's Statements Did Not Alter the Total Mix of Information Available To Investors ........................................................................................ 19

         b. Mr. Lowe's Statements Were Puffery and are Unactionable as a Matter of Law ............................................................................................... 20

       4. The Complaint Has Not Pled that Certain Statements Were Even False ............... 20

     D.  The Complaint Fails to Plead Scheme Liability ................................................. 22

   II.  **THE SEC FAILS TO ADEQUATELY PLEAD AIDING AND ABETTING SECURITIES FRAUD AGAINST MR. LOWE.** ...................................... 22

     A.  No Primary Violation ............................................................................... 23

     B.  Failure to Plead Mr. Lowe Had Knowledge of the Alleged Violations ...................... 23

     C.  Failure to Allege Mr. Lowe Substantially Assisted in Alleged Violations ................. 24

**III. THE SEC FAILS TO STATE A CLAIM AGAINST MR. LOWE FOR ALLEGED VIOLATIONS OF SECTION 13 OF THE EXCHANGE ACT. ................................... 26**

    A.   Section 13(b)(5)................................................................................................ 26

    B.   Rule 13b2-1 ..................................................................................................... 27

    C.   Rule 13b2-2 ..................................................................................................... 28

    D.   Aiding and Abetting HMNY Violation of Section 13(b)(2)(A) ..................... 28

**CONCLUSION .................................................................................................................. 29**

# <u>TABLE OF AUTHORITIES</u>

Cases                                                                                          Page(s)

*Acito v. IMCERA Grp.*,
   47 F.3d 47 (2d Cir. 1995) ................................................................................. 16, 18
*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 9, 11, 12
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 9, 11
*Blank v. TriPoint Glob. Equities, LLC*,
   338 F. Supp. 3d 194 (S.D.N.Y. 2018) ................................................................ 14
*DiVittorio v. Equidyne Extractive Indus., Inc.*,
   822 F.2d 1242 (2d Cir. 1987) ............................................................................ 13
*Freschi v. Grand Coal Venture*,
   551 F. Supp. 1220 (S.D.N.Y. 1982) .................................................................. 12
*In Re Carter–Wallace, Inc. Secs. Litig.*,
   220 F.3d 36 (2d Cir. 2000) ................................................................................ 17
*In re Express Scripts Holdings Co. Sec. Litig.*,
   773 F. App'x 9 (2d Cir. 2019) ........................................................................... 18
*In re Lululemon Secs. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ...................................................... 20, 21, 22
*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ...................................................................... 13, 14, 15
*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ......................................................................... 16, 17
*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ............................................................................... 9
*Pepsico, Inc. v. W. R. Grace & Co.*,
   307 F. Supp. 713 (S.D.N.Y. 1960) ................................................................... 12
*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .............................................................................. 27
*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ............................................................................... 18
*S.E.C. v. Collins & Aikman Corp.*,
   524 F. Supp. 2d 477 (S.D.N.Y. 2007) ............................................................. 9, 10
*S.E.C. v. DiBella*,
   587 F.3d 553 (2d Cir. 2009) ......................................................................... 23, 29
*S.E.C. v. Ginder*,
   752 F.3d 569 (2d Cir. 2014) .............................................................................. 13

*S.E.C. v. Treadway,*
 430 F. Supp. 2d 293 (S.D.N.Y. 2006) ................................................................ 25
*S.E.C. v. Wey,*
 246 F. Supp. 3d 894 (S.D.N.Y. 2017) .......................................................... 23, 24
*S.E.C. v. Yorkville Advisors, LLC,*
 305 F. Supp. 3d 486 (S.D.N.Y. 2018) ................................................................ 23
*SEC v. Texas Gulf Sulfur Co.,*
 401 F.2d 833 (2d Cir. 1968) ............................................................................... 11
*Shields v. Citytrust Bancorp, Inc.,*
 25 F.3d 1124 (2d Cir. 1994) ......................................................................... 17, 18
*United States ex rel. Ladas v. Exelis, Inc.,*
 824 F.3d 16 (2d Cir. 2016) ................................................................................... 9

Statutes

15 U.S.C. § 77q ............................................................................................... 10, 13
15 U.S.C. § 78j ................................................................................................ 11, 13
15 U.S.C. § 78m ............................................................................................. 26, 28

Rules

Fed. R. Civ. P. 9 ..................................................................................................... 9

Regulations

17 C.F.R. § 240.10b-5 ..................................................................................... 11, 13
17 C.F.R. § 240.13b2-1 ......................................................................................... 27
17 C.F.R. § 240.13b2-2……………………………………………………………..28

Defendant J. Mitchell Lowe respectfully submits this memorandum of law in support of his motion to dismiss the complaint filed by the Securities and Exchange Commission ("SEC") on September 26, 2022 ("Complaint") under Federal Rule of Civil Procedure 12(b)(6).

**PRELIMINARY STATEMENT**

The SEC's claims against Mitchell Lowe fail for multiple reasons. The SEC alleges various violations of the federal securities laws: (1) a claim under Section 17(a) of the Securities Act, which requires the offer or sale of a security; (2) a claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which must be in connection with the purchase or sale of a security; (3) a claim under Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder, which relate to the books and records of the issuer of a security; and (4) various claims for aiding and abetting Helios and Matheson Analytics Inc. ("HMNY"), a publicly-traded company, and its CEO, his co-defendant Theodore J. Farnsworth in their alleged violations of the securities laws. But Mr. Lowe has no affiliation with HMNY or any other company that offered or sold securities during the relevant period: he was never employed by HMNY, he was never compensated by HMNY, and he was never otherwise associated with HMNY.  And the Complaint says nothing to the contrary.

Rather, Mr. Lowe was the CEO of MoviePass, Inc. ("MoviePass"), a privately held corporation (of which HMNY was a majority shareholder), that offered a movie subscription service, which allowed subscribers to see a movie a day for a flat monthly fee.  Mr. Lowe has devoted much of his professional life to the movies and was an executive at Netflix, another subscription-based movie company, earlier in his career.  He saw Netflix's subscription-based model succeed, and he was passionate and optimistic that MoviePass's subscription-based model would also succeed.  As the Complaint details, Mr. Lowe often spoke to the media about his

aspirations and expectations for MoviePass's success.  Under his leadership, MoviePass grew exponentially, reaching as many as three million subscribers.  But despite this initial success, MoviePass ultimately failed, causing both MoviePass and its majority owner HMNY to file for bankruptcy in January 2020.

Now the SEC is trying to label poor business performance and business judgments as securities fraud.  But the Complaint fails to connect Mr. Lowe to the issuance, purchase, or sale of any securities, and instead attempts to mask this shortcoming by lumping MoviePass together with HMNY, lumping him together with HMNY's CEO, and pleading in conclusory fashion the bare bones of each cause of action alleged.  This is insufficient, particularly where, as here, the SEC had the power to subpoena documents and depose witnesses before filing its Complaint.  In fact, Mr. Lowe himself sat for a deposition with the SEC.  Yet, for the reasons described in more detail below, and for the reasons raised in the motions of his co-defendants, Mr. Farnsworth and Khalid Itum, whose separately filed briefs are incorporated herein by reference to avoid duplication per the Court's instruction, the Complaint fails to state a claim for relief (let alone meet the heightened pleading standard governing fraud-based claims), and must be dismissed.

*First*, the SEC failed to plead a violation of Section 17(a) of the Securities Act because Section 17(a) does not reach statements or conduct by a person who is not engaged in either the offer or sale of securities, and the Complaint does not allege that Mr. Lowe made any false or fraudulent statements in the offer or sale of a security.

*Second*, the SEC failed to plead a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder insofar as the Complaint is devoid of any non-conclusory allegations that the alleged misstatements attributed to Mr. Lowe were made in connection with the purchase or sale of any security.

*Third*, the SEC failed to plead with particularity the basic elements of fraud.[1]

- <u>Statements by Mr. Lowe</u>: The majority of the allegedly false statements described in the Complaint were not made by Mr. Lowe or otherwise attributed to him.  He cannot be held liable for something he did not say.

- <u>Scienter</u>:  The Complaint is devoid of any facts from which to infer that Mr. Lowe acted with specific intent to defraud HMNY's investors (the only investors referenced in the Complaint).  He had no motive, as he was not employed by HMNY, and the Complaint does not allege that his compensation was tied to HMNY stock sales.  Nor do the allegations in the Complaint support an inference of conscious misbehavior or recklessness.  At most, the Complaint alleges that Mr. Lowe made poor business decisions, but bad judgment is not actionable as securities fraud under either Section 17(a) or Section 10(b).

- <u>Materiality</u>: None of the alleged misstatements attributed to Mr. Lowe are material as a matter of law.  They: (i) do not alter the total mix of information available to investors and/or (ii) are otherwise nonactionable statements of puffery, opinion, or corporate motive.

- <u>Lack of Falsity</u>: A number of alleged misstatements attributed to Mr. Lowe in the Complaint are patently not false in light of contradictory allegations in the Complaint and the plain language of the statements themselves.

*Fourth*, the Complaint fails to allege scheme liability under either Section 17(a) of the Securities Act or Rule 10b-5 because it fails to plead anything beyond alleged misstatements or omissions, which is required to withstand a motion to dismiss.

*Fifth*, the Complaint fails to state a claim against Mr. Lowe for aiding and abetting Mr. Farnsworth's and/or HMNY's purported securities fraud because the SEC fails to plead with particularity that: (i) either Mr. Farnsworth or HMNY committed securities fraud; (ii) Mr. Lowe knew of these purported violations; and/or (iii) Mr. Lowe substantially assisted Mr. Farnsworth and/or HMNY in their purported securities fraud.

---

[1] For the convenience of the Court, Exhibit 13 to the Declaration of William F. McGovern in support of Mr. Lowe's Motion to Dismiss filed contemporaneously herewith ("McGovern Dec.") contains a chart listing each of the alleged misstatements attributed to Mr. Lowe in the Complaint, which are not separately addressed by Mr. Farnsworth in his contemporaneously-filed motion.

*Finally*, the Complaint fails to state a claim against Mr. Lowe for any recordkeeping violations under Section 13(b)(5) of the Exchange Act, and Rules 13b2-1 and 13b2-2 thereunder, or for aiding and abetting HMNY's purported recordkeeping violations under Section 13(b)(2)(A) of the Exchange Act, because the only allegations against Mr. Lowe related to recordkeeping involve MoviePass's records, and MoviePass is not subject to these recordkeeping requirements.

Accordingly, the Complaint against Mr. Lowe should be dismissed in its entirety.

## BACKGROUND

During the relevant period, MoviePass, a privately held corporation, was a subscription-based movie ticketing service, through which subscribers paid a fixed monthly fee to view a set or unlimited number of movies each month. Compl. ¶¶ 19, 20. From 2016 to 2020, Mr. Lowe served as the CEO of MoviePass. Compl. ¶ 14. Prior to joining MoviePass, Mr. Lowe served as an early executive of Netflix, a leading entertainment streaming service and production company, and the President of Redbox, a video rental company. MoviePass's aim was to develop a model that would allow subscribers access to a wide array of movies at a price lower than they would pay for each individual ticket.

In August 2017, HMNY invested in MoviePass and owned a majority interest by the end of 2017. Compl. ¶ 1. HMNY was a publicly traded company whose common stock traded on Nasdaq until January 2019 and is registered pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"). Compl. ¶ 17. Defendant Farnsworth was the CEO and Chairman of HMNY from January 2017 until September 2019. *Id.* ¶ 13.

Historically, the price of a monthly MoviePass subscription varied over time and by geographical location—ranging from $12.95 and $89.95. Compl. ¶ 30. Following HMNY's

investment, MoviePass lowered its subscription price for all users to $9.95 across the board in an effort to increase the total number of subscribers and ultimately make a profit.  *Id.* ¶¶ 30-34.

Despite Mr. Lowe's best efforts to make MoviePass a success, it ultimately failed to generate the revenue needed to keep up with its growth, and thus, MoviePass was forced to file for bankruptcy in January 2020.  Compl. ¶ 21.

### A.  Mr. Lowe Was Not the Maker of Eleven of the Alleged Misstatements

In its Complaint, the SEC claims that Mr. Lowe, the CEO of a non-public company, committed securities fraud in violation of Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder based on excerpts of select public statements regarding MoviePass's business model and prospects.

Specifically, the SEC alleges that Mr. Lowe and Mr. Farnsworth made false statements regarding the following five categories: (1) MoviePass's subscription price, (2) data analytics as a revenue source for MoviePass, (3) MoviePass's other non-subscription-based revenue streams, (4) MoviePass's efforts to combat fraud by its users, and (5) HMNY's ability to meet MoviePass's funding needs.  The SEC points to excerpts of certain public statements made by Mr. Lowe, and some by HMNY and Mr. Farnsworth, as CEO of HMNY, including those in filings with the SEC that Mr. Lowe did not approve or otherwise participate in drafting, to allege that Mr. Lowe misled HMNY's investors.  The Complaint is devoid of allegations to support that Mr. Lowe was the maker of at least eleven of the thirty-nine alleged misstatements identified therein.

### B.  Mr. Lowe's Lack of Knowledge of or Substantial Assistance in Any Alleged Securities Violations

As set forth above, the Complaint alleges that both Mr. Lowe and Mr. Farnsworth made misstatements falling into five different categories (many of which were not made by Mr. Lowe)— purportedly subjecting them to liability under Securities Act Section 17(a) and Exchange Act

Section 10(b) and Rule 10b-5 thereunder.  Counts Three and Four of the Complaint then allege that Mr. Lowe aided and abetted (i) HMNY's and Mr. Farnsworth's alleged violations of Securities Act Section 17(a), in violation of Securities Act Section 15(b); and (ii) HMNY's and Mr. Farnsworth's purported violations of Exchange Act Section 10(b) and Rule 10b-5(b), in violation of Exchange Act Section 20(b) and Rule 10b-5.

The Complaint does not distinguish between the alleged statements and/or facts that support its aiding and abetting claims against Mr. Lowe and the alleged statements and/or facts that supports its primary liability claims against him.  In its Complaint, the SEC makes blanket statements that Mr. Lowe "knowingly or recklessly provided substantial assistance to HMNY and Farnsworth with respect to their violations of" Exchange Act Section 10(b), Rule 10b-5, and Securities Act 17(a).  The Complaint does not allege, however, that there was a primary violation of the securities laws (as set forth herein and in Mr. Farnsworth's contemporaneously filed motion) or that Mr. Lowe had the requisite knowledge of the purported securities laws violations on the part of Mr. Farnsworth and HMNY.  Nor does the Complaint allege what substantial assistance Mr. Lowe, a non-officer, director, or shareholder of HMNY, provided to HMNY and Mr. Farnsworth in furtherance of those violations.

### C.  HMNY's Books and Records

The Complaint also alleges that Mr. Lowe: (i) aided and abetted HMNY's alleged violations of Exchange Act 13(b)(2)(A), which requires issuers to make and keep accurate books and records (Fifth Claim for Relief); and (ii) violated Section 13(b)(5) and Rule 13b2-1 and 13b2-2, which prohibit falsification of books and records and false statements to accountants arising out of allegedly false invoices submitted to HMNY and MoviePass.  Defendant Khalid Itum, the then-Vice President of Business Development at MoviePass, allegedly submitted the invoices through

his wholly owned marketing firm, Kaleidoscopic Ventures, LLC ("Kaleidoscope").   The

Complaint states:

> Itum[] submitted a number of false invoices to HMNY and Moviepass, seeking
> payments for funds allegedly advanced by Kaleidoscope. However, the invoices
> did not represent legitimate expenses of HMNY or MoviePass. Rather, they
> represented payments made for Itum's personal benefit. Farnsworth and Lowe
> knew that the Kaleidoscope invoices did not represent legitimate expenses of
> HMNY or MoviePass. Nevertheless, they approved the invoices for payment,
> allowing Itum to misappropriate $310,000 and causing the true nature of the
> payments to be misstated in the companies' books and records.

Compl. ¶¶ 87-88.

The Complaint then describes four specific invoices:

*First*, on January 3, 2018, Mr. Itum sent HMNY an invoice from Kaleidoscope for

$137,250 for itemized expenses related to an event being sponsored by MoviePass at the Sundance

Film Festival (the "HMNY Sundance Expenses Invoice"). *Id.* ¶¶ 89, 93-94. HMNY's CFO

approved the payment, and HMNY wired the money to Kaleidoscope. *Id.* ¶ 91. According to the

Complaint, however, the invoice to HMNY overstated Kaleidoscope's expenses by $10,000. *Id.*

¶¶ 92, 96.  The Complaint does not allege that Mr. Lowe was aware of this invoice or involved in

its approval in any way, nor does it allege that Mr. Lowe was aware of, directed, or was involved

in the recordkeeping associated with this invoice.

*Second*, on February 16, 2018, Mr. Itum sent HMNY's CFO an invoice from Kaleidoscope

for $25,000 for expense "overages" related to the Sundance Film Festival (the "HMNY Sundance

Overage Invoice"). *Id.* ¶ 100.  According to the Complaint, however, Kaleidoscope had not

incurred any overages, and the payment was in fact a bonus to Mr. Itum. *Id.* ¶¶ 101-02.  The

payment allegedly was memorialized in MoviePass's books as a marketing expense and was not

included in an itemized list of bonuses that HMNY's CFO sent to its accountants that year.  *Id.* ¶¶

104, 106.  The Complaint does not allege that Mr. Lowe was aware of this invoice or involved in

its approval in any way, nor does it allege that Mr. Lowe was aware of, directed, or was involved in the recordkeeping associated with this invoice.

*Third*, on March 29, 2018, Mr. Itum sent HMNY's CFO an invoice from Kaleidoscope seeking an advance of $350,000 for expenses related to an event MoviePass was sponsoring at the Coachella Music Festival (the "HMNY Coachella Expenses Invoice"). *Id.* ¶ 114.  Mr. Farnsworth allegedly approved the invoice, and the funds were wired to Kaleidoscope the next day. *Id.* The SEC alleges that the invoice, however, overstated the Coachella-related expenses by $126,733. *Id.* ¶¶ 116-123. The Complaint again does not allege that Mr. Lowe was aware of this invoice or involved in its approval in any way, nor does it allege that Mr. Lowe was aware of, directed, or was involved in the recordkeeping associated with this invoice.

*Finally*, the Complaint alleges that in February 2018, Mr. Itum sent MoviePass an invoice from Kaleidoscope for $150,000 for "Production Services" (the "MoviePass Invoice").  The SEC alleges that Mr. Lowe approved the payment of the invoice, despite the fact that Kaleidoscope allegedly provided no such services to MoviePass. *Id.* ¶¶ 110-12.[2]  The payment allegedly was memorialized in MoviePass's books as "MP Consulting-outside services." *Id.* ¶ 113. The Complaint does not allege that Mr. Lowe knew that Kaleidoscope had not provided any production services to MoviePass nor that he was aware of, directed, or was involved in any recordkeeping associated with this invoice.

The Complaint further alleges that Mr. Lowe "received emails reflecting requests from HMNY's auditor for information concerning MoviePass's related-party transactions and bonus payments" but that he never responded. *Id.* ¶¶ 143-144.  The Complaint does not allege that Mr.

---

[2] The Complaint also alleges that Mr. Farnsworth instructed Mr. Lowe to pay Mr. Itum a $150,000 bonus, which he approved despite not believing that Mr. Itum had earned a bonus. *Id.* ¶¶ 108-09.

Lowe was required to provide, provided, or otherwise caused to be provided any information to HMNY's auditors.

## **ARGUMENT**

A complaint must be dismissed for failure to state a claim if it lacks "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a court, in determining whether a complaint sufficiently states a claim for relief, must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)," *Twombly*, 550 U.S. at 555, allegations that are no more than legal conclusions "are not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679. A complaint with "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Id.* at 678.

Where a complaint sounds in fraud, the plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), the complaint must "(1) specify the statements that the [SEC] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016). Here, each of the causes of action in the SEC's Complaint must satisfy Rule 9(b)'s heightened pleading requirement. *See, e.g.*, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (applying Rule 9(b) to claims of aiding and abetting fraud); *S.E.C. v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007) (applying Rule 9(b) to claims under Section 13 of the Exchange Act).

I.     **THE COMPLAINT FAILS TO PLEAD ACTIONABLE MISSTATEMENTS BY MR. LOWE UNDER SECURITIES ACT SECTION 17(A) AND EXCHANGE ACT SECTION 10(B) AND RULE 10B-5 THEREUNDER.**

### A.   <u>The Complaint Fails to State a Claim Under Securities Act Section 17(a)</u>

The SEC fails to plead misconduct in the offer or sale of securities, as required by Securities Act Section 17(a).   Securities Act Section 17(a) prohibits fraud "in the offer or sale of any securities." 15 U.S.C. § 77q(a).  The Complaint alleges three offerings by HMNY—an offering of notes on November 6, 2017, an offering of notes on January 11, 2018, and an offering of warrants and stock on February 13, 2018.  Compl. ¶ 29.  Aside from a single paragraph in the Complaint that briefly addresses HMNY's securities offerings, in which the SEC alleges that these HMNY offerings "coincided" with the alleged material misstatements, the Complaint is otherwise silent as to how statements by Mr. Lowe, who was not an HMNY employee, officer, or director, satisfies this jurisdictional threshold under Securities Act Section 17(a).  *Id.*

In the interest of judicial economy, Mr. Lowe adopts, and hereby incorporates by reference, the arguments set forth in Mr. Farnsworth's contemporaneously filed motion to dismiss that the Complaint fails to state a cause of action under Securities Act Section 17(a), as those arguments apply equally to Mr. Lowe.   Further, in addition to the eight specific alleged misstatements described in Mr. Farnsworth's brief that post-date the HMNY securities offerings, ***twelve*** of the alleged misstatements attributed to Mr. Lowe were made after the last offering and sale on February 13, 2018.  *See* Compl. ¶¶ 36, 46, 49, 50, 56, 57, 62, 63, 71, and 76; McGovern Dec., Exs. 5–12 & 13.  Moreover, ***two*** of the alleged misstatements attributed solely to Mr. Lowe were made weeks before the first HMNY securities offering in November 2017 and at least two months before HMNY took a majority interest in MoviePass in December 2017, and therefore did not "coincide" with any offering as the SEC alleges in conclusory fashion.  *See* Compl. ¶¶ 32, 38; McGovern

Dec., Exs. 1, 2, & 13.  Statements about MoviePass before HMNY even became a majority shareholder or investor are too far removed to meet the "in the offer or sale" requirement under Section 17(a).

Thus, the allegations in Count One of the Complaint against Mr. Lowe should be dismissed for failure to plead that Mr. Lowe's alleged misstatements were "in the offer or sale of any securities," as required by Securities Act Section 17(a).

### B.  The Complaint Fails to Plead the Alleged Misstatements Were Made "In Connection With the Purchase or Sale of Any Security" as Required by Exchange Act Section 10(b)

The SEC similarly fails to plead that the alleged misstatements attributed to Mr. Lowe were made "in connection with the purchase or sale of any security," which is required under Exchange Act Section 10(b) and Rule 10b-5 thereunder.  At best, the SEC pleads conclusory allegations as to this transactional nexus requirement, which is wholly insufficient to state a claim, *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570, let alone satisfy the heightened pleading requirements under Rule 9(b).

Section 10(b) makes it unlawful to "use or employ, ***in connection with the purchase or sale of any security***" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b) (emphasis added).  Rule 10b-5 thereunder provides that it is unlawful to "make any untrue statement of a material fact . . . ***in connection with the purchase or sale of any security***."  17 C.F.R. § 240.10b-5 (emphasis added).  In order to satisfy the "in connection with" requirement of Section 10(b), there must be a causal connection between a defendants' misstatements or omissions and an investor's purchase. *See SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 860 (2d Cir. 1968).  Thus, as courts have regularly held, the fraud practiced must have been prior to or contemporaneous with the sale of securities,

and statements that occurred after the alleged purchase are not actionable. *See, e.g.*, *Pepsico, Inc. v. W. R. Grace & Co.*, 307 F. Supp. 713, 720 (S.D.N.Y. 1960); *Freschi v. Grand Coal Venture*, 551 F. Supp. 1220, 1227 (S.D.N.Y. 1982).

Here, the Complaint's only non-conclusory allegations regarding the purchase or sale of any securities are those outlined above, namely that HMNY issued convertible notes in November 2017 and January 2018 and that HMNY conducted a public offering of warrants in February 2018. But, as set forth above, at least twelve of the alleged misstatements attributed to Mr. Lowe were made after February 13, 2018, and, thus, are not actionable. *See* Compl. ¶¶ 36, 46, 49, 50, 56, 57, 62, 63, 71, and 76; McGovern Dec., Exs. 5–12 & 13. While the Complaint also alleges, without detail or explanation, that Mr. Lowe's statements were "in connection with the purchase or sale of securities" (Compl. ¶ 149), such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory allegations, do not suffice." *Iqbal*, 556 U.S. at 678.

The Complaint is otherwise devoid of the requisite particularized allegations as to the "in connection with" transactional nexus under Rule 10b-5 sufficient to withstand a motion to dismiss. In short, the Complaint in no way connects Mr. Lowe's alleged misstatements to the actual sale of HMNY securities, and thus, it must be dismissed for failure to state a claim under Exchange Act Section 10(b) and Rule 10b-5 thereunder.

C.   <u>**The Complaint Fails to Plead With Particularity the Basic Elements of Fraud**</u>

1.   **Mr. Lowe Cannot be Held Primarily Responsible for the Eleven Statements He Did Not Make**

Mr. Lowe cannot be held primarily responsible for statements made by Mr. Farnsworth, statements not attributed to him in HMNY press releases or SEC filings, or statements in articles that do not actually quote what he said. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5 thereunder provides that it is unlawful to "***make*** any untrue statement of a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (emphasis added).   Section 17(a) similarly requires that a defendant make "an untrue statement of a material fact." 15 U.S.C. § 77q(a)(2); *see also S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

In cases such as this, where there are multiple defendants, the complaint must allege that each particular defendant "'made' the material misstatements." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).  One "makes" a statement by stating it—a defendant does not "'make' a statement" simply by "prepar[ing] or publish[ing] [it] on behalf of another." *Id.* at 142.  Instead, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.*  Thus, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

In its response to Mr. Lowe's pre-motion letter, in which Mr. Lowe asserted that he could not be held responsible for statements he did not make, the SEC stated that it "does not seek to hold Lowe liable as the 'maker' of any statements that he did not make or authorize."  *See* SEC Ltr. at 1 (Nov. 29, 2022), ECF No. 37.  While the SEC appears to concede it is not seeking to hold Mr. Lowe liable for statements he did not make, Compl. ¶¶ 33, 40, 42, 50, 52, 55, 62, 67, 72, 78, it is not clear from the SEC's response exactly which statements it seeks to hold Mr. Lowe accountable for.

*First,* to the extent the SEC seeks to hold Mr. Lowe liable for statements made directly by Mr. Farnsworth, these are not actionable against Mr. Lowe and should be dismissed.  For example,

in Paragraph 72 of the Complaint, the SEC alleges that Mr. Farnsworth "claim[ed] that HMNY intentionally slowed the growth of [MoviePass] in order to 'fix' the 'fraud,' including at interviews with Proactive Investors on January 23, 2019 and March 21, 2019 and with Fox Business on March 22, 2019." Compl. ⁋ 72. There is no suggestion that Mr. Lowe had any authority over alleged statements such as these, let alone the degree of authority required by *Janus*, 564 U.S. at 142, and thus, he was not the "maker" of these statements. As such, Mr. Lowe should not, and cannot, be found liable for alleged misstatements made by Mr. Farnsworth, particularly where the SEC did not plead Mr. Lowe was responsible for—let alone involved in—preparing the content contained therein or communicating that content to the public. *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 213 (S.D.N.Y. 2018) (finding individual defendants could not be held liable for statements on corporation's website where the plaintiffs "adduce[d] no specific allegations that [the individual defendants] were involved with the creation, development, or maintenance of the websites or the information contained thereon.").

*Second,* Mr. Lowe is not liable for statements in articles in which he is not quoted. Specifically, Paragraph 50 of the Complaint alleges that "[o]n April 12, 2018, in a joint Yahoo Finance interview with Lowe, Farnsworth falsely and misleadingly stated that MoviePass could generate $6 a month in non-subscription revenue from each subscriber 'right now.' Lowe agreed with Farnsworth's claim during the interview and repeated it in an April 17, 2018 Variety.com article." Compl. ⁋ 50; McGovern Dec., Ex. 10. However, the SEC does not quote any specific, actionable misstatement by Mr. Lowe set forth during the interview for the Variety.com article referenced therein. Compl. ⁋ 50. Thus, the alleged misstatement set forth in Paragraph 50 cannot be attributed to Mr. Lowe, and he should not be held liable for its contents under Rule 10b-5. *Janus*, 564 U.S. at 142.

*Third,* Mr. Lowe cannot be held liable merely for providing information that made its way into a statement, such as those found in HMNY SEC filings.  A behind-the-scenes contributor to another's statement, such as a speech writer or one who provides false or misleading information that is incorporated into the statement, does not "make" the statement if the actual speaker or author ultimately controls the content and publication of the statement. *Janus*, 564 U.S. at 143.  Rather, "it is the speaker who takes credit—or blame—for what is ultimately said." *Id.*  In *Janus*, the Supreme Court held that a mutual fund—which alone "bears the statutory obligation to file the prospectus with the SEC"—was the sole maker of the alleged misstatements. *Janus*, 564 U.S. at 147.  In so holding, the Supreme Court found relevant that nothing "on the face of the prospectuses indicate[d] that any statements therein came from [the investment adviser] rather than [the investment fund]—a legally independent entity with its own board of trustees." *Id.*

Mr. Lowe was the CEO of MoviePass, a privately held company—legally distinct from HMNY—that had no obligation to file statements with the SEC.  The Complaint does not allege that Mr. Lowe bore any responsibility for HMNY SEC filings or authorized in any way the content set forth therein.  As such, he cannot be held liable for statements made in HMNY's SEC filings, such as Form 8-Ks, 10-Qs, 10-Ks, or press releases issued by HMNY.

Mr. Lowe was not the speaker for purposes of the alleged misstatements set forth in Paragraphs 33, 40, 42, 50, 52, 55, 62, 67, 71 (in part), 72, and 78, which contain alleged misstatements by Mr. Farnsworth, statements in articles that do not directly quote Mr. Lowe, or statements made in HMNY SEC filings, and therefore Mr. Lowe cannot be held liable for their content and should be dismissed for failure to state a claim to the extent the SEC seeks to hold Mr. Lowe liable for them.

### 2.   The Complaint Fails to Plead Mr. Lowe Acted With Scienter

The requisite state of mind, or scienter, that a plaintiff in a securities fraud case must allege is "'an intent to deceive, manipulate or defraud.'"  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  Thus, to state a claim for securities fraud under Securities Act Section 17(a)(1), Exchange Act Section 10(b), and Rule 10b-5 thereunder, the SEC must plead scienter by alleging facts that "give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Grp.*, 47 F.3d 47, 52 (2d Cir. 1995).  While "[t]he requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," the SEC has not—because it cannot—alleged either on the part of Mr. Lowe.  *Id.*

#### a.   *Motive and Opportunity*

*First*, the Complaint does not allege an improper motive—let alone one that is actionable under the circumstances.  The sole alleged motive attributed to Mr. Lowe in the Complaint is his purported receipt of "bonus payments" and "increased compensation."  Compl. ¶ 80.  Notably, the SEC does not allege that these purported bonus payments or increased compensation were tied to HMNY's stock price in any way.  In light of the fact that Mr. Lowe was never an employee of HMNY—let alone an officer, director, or shareholder—this omission is particularly significant.  Even if the Complaint so alleged, however, the Second Circuit has made it clear that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."  *Acito*, 47 F.3d at 54 ("If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *Kalnit*, 264 F.3d at 139 (noting that "the desire to keep stock prices high to increase officer compensation" is an insufficient motive).

16

Moreover, Second Circuit precedent is clear that a generalized desire for the corporation to appear profitable is insufficient motive. *See Kalnit*, 264 F.3d at 139 ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("To allege a motive sufficient to support the inference that optimistic but erroneous statements were fraudulently made, a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."). The SEC fails to allege why a non-officer, director, or shareholder of HMNY would be incentivized to make that corporation (rather than MoviePass) appear profitable.

In light of the above, the Complaint fails to allege facts sufficient to show that Mr. Lowe had both motive and opportunity to commit fraud to support the requisite strong inference of fraudulent intent.

### b. *Conscious Misbehavior or Recklessness*

*Second*, the allegations in the Complaint fall far short of the strong circumstantial evidence needed to support a showing of conscious fraudulent behavior or recklessness. Where, as here, "plaintiff has failed to demonstrate that defendants had a motive to defraud the shareholders, he must produce a stronger inference of recklessness." *Kalnit*, 264 F.3d at 143. As such, to survive dismissal under the "conscious misbehavior" theory, the SEC must allege reckless conduct by Mr. Lowe, which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In Re Carter–Wallace, Inc. Secs. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).

17

In essence, the SEC is challenging whether MoviePass made good business decisions, but that is not the purpose of securities laws.  A retrospective look at a failed business to second guess the choices made by executives is not the inquiry.  *Acito*, 47 F.3d at 53 (holding it is well settled "that section 10(b) was not designed to regulate corporate mismanagement").  The inquiry is whether Mr. Lowe willfully made a material misrepresentation to the public that induced a purchase of securities.

To that end, the Second Circuit "has limited the scope of securities fraud liability based on reckless conduct.  Plaintiffs cannot proceed with 'allegations of fraud by hindsight.'" *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019).  "Corporate officials need not be clairvoyant;" they are only responsible for revealing those material facts reasonably available to them. *Id.* at 15.  While Mr. Lowe allegedly made a number of optimistic statements about the future profitability of MoviePass that turned out to be wrong, "misguided optimism is not a cause of action, and does not support an inference of fraud." *Shields*, 25 F.3d at 1129-30 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."); *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("Generally, poor business judgment is not actionable under section 10(b) and Rule 10b-5.").

Mr. Lowe adopts, and hereby incorporates by reference, the additional arguments set forth in Mr. Farnsworth's contemporaneously filed motion to dismiss as to why the Complaint fails to allege strong circumstantial evidence of conscious misbehavior or recklessness, which arguments apply equally to Mr. Lowe.

Because the SEC's Complaint is devoid of strong circumstantial evidence of conscious misbehavior or recklessness, it should be dismissed for failure to plead scienter.

### 3.   The Complaint Fails to Plead Materiality

For the same reasons as those set forth in Mr. Farnsworth's motion to dismiss, the claims against Mr. Lowe in Count II of the Complaint under Exchange Act Section 10(b) and Rule 10b-5(b) thereunder should be dismissed for failure to plead materiality, as these arguments apply equally to Mr. Lowe, and in lieu of repeating them in light of the Court's instruction at the pre-motion conference, Mr. Lowe incorporates these arguments by reference.   As to the alleged misstatements attributed solely to Mr. Lowe and not specifically addressed in Mr. Farnsworth's brief, the Complaint likewise fails to plead materiality for the following reasons:

> #### a.   Mr. Lowe's Statements Did Not Alter the Total Mix of
> #### Information Available To Investors

There are twelve alleged misstatements attributed to Mr. Lowe identified in the Complaint that are immaterial as a matter of law for the same reasons as those set forth in Mr. Farnsworth's brief:

- MoviePass's Price Point: The statements in Exhibits 1 through 6 of the McGovern Declaration (Compl. ¶¶ 32, 35, 36, 38, 44, 56, 57, and 75) involve alleged misstatements attributed to Mr. Lowe that go towards whether MoviePass could be profitable at a price point of $9.95, which did not alter the total mix of information available to investors for the reasons discussed in Section II.A.1. of Mr. Farnsworth's brief.  *See* McGovern Dec., Ex. 13.  For example, the Complaint references an August 16, 2017 Variety article in which the SEC claims that when Mr. Lowe "was asked whether MoviePass would need to raise its prices or risk going out of business, Lowe falsely responded, 'The answer is no. [People suggesting that] don't understand our business model.'" Compl. ¶ 32; McGovern Dec., Ex. 1.  Given that HMNY's SEC filings provided fulsome and accurate disclosures as to both MoviePass's current and potential profitability at $9.95 per month, the statements in Exhibits 1 through 6 did not—and could not— significantly alter the total mix of information available to investors.

- HMNY's ability to fund MoviePass:  HMNY's ability to meet MoviePass's funding needs was likewise the subject of full and accurate disclosures in HMNY's SEC

filings.  There are two alleged misstatements attributed to Mr. Lowe that go towards whether HMNY was able to fund MoviePass, such as the statement in Exhibit 4 (Compl. ¶ 75), in which Mr. Lowe allegedly stated that "MoviePass had 'plenty' of cash," and the statement in Exhibit 6 (Compl. ¶ 76), wherein the SEC claims Mr. Lowe stated during a podcast that MoviePass had "a deep-pocketed backer that is prepared to fund us all the way."  *See* McGovern Dec., Ex. 13.  In light of the information provided to investors in HMNY's public filings, as described in Mr. Farnsworth's brief, these alleged misstatements are immaterial as a matter of law.

- <u>MoviePass's Non-Subscription Revenue</u>: Two alleged misstatements, specifically the statements in Exhibits 8 and 10 (Compl. ¶¶ 49 & 50), deal with MoviePass's non-subscription revenue streams.  *See* McGovern Dec., Ex. 13.  For example, the purported statement in Exhibit 10 alleges that Mr. Lowe repeated Mr. Farnsworth's claim that "MoviePass could generate $6 a month in non-subscription revenue from each subscriber 'right now.'"  Compl. ¶ 50.  Because HMNY's alternative revenue streams were also the subject of full and accurate disclosures in HMNY's SEC filings, these statements are immaterial as a matter of law.

*b. Mr. Lowe's Statements Were Puffery and are*
*Unactionable as a Matter of Law*

At least six of the sixteen alleged misstatements attributed to Mr. Lowe constitute mere puffery and are not actionable as a matter of law for the reasons set forth in Mr. Farnsworth's brief. Compl. ¶¶ 32, 35, 50, 75, and 76; *see* McGovern Dec., Ex. 13.  For example, statements suggesting that the $9.95 price point was sustainable are puffery and mere expressions of Mr. Lowe's opinion, which do not give a reasonable investor meaningful information on which to rely.  Compl. ¶ 32. Thus, the statements in Exhibits 1, 3, 4, 6, and 10 are statements of general corporate optimism and are therefore immaterial as a matter of law.

## 4.  The Complaint Has Not Pled that Certain Statements Were Even False

At least three alleged misstatements, including the two alleged misstatements attributed to Mr. Lowe in Paragraph 71 and the alleged statement in Paragraph 36, are patently not false.  *See* McGovern Dec., Ex. 13.  To be actionable as fraud, however, "the statement must be false." *In re*

20

*Lululemon Secs. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("[W]ithout contemporaneous falsity, there can be no fraud.").

As to the alleged misstatements in Paragraph 71, the Complaint alleges that the goal of certain tactics like "password disruption" and "ticket verification" "was to reduce MoviePass's cash burn;" however, the SEC alleges that Mr. Lowe and Mr. Farnsworth concealed this motive and instead "publicly stated that the tactics were being employed to address 'fraud' and 'misuse' being perpetrated by large numbers of MoviePass subscribers." Compl. ¶¶ 65, 70. However, in a Form 8-K filed by HMNY on July 31, 2018, which the Complaint directly quotes, HMNY specifically disclosed that MoviePass implemented these tactics to, *inter alia*, "limit cash burn." Compl. ¶ 71. The SEC's allegations with respect to Mr. Lowe's alleged misstatements in Paragraph 71 are therefore contradictory and demonstrably not false.

For example, the SEC quotes Mr. Lowe as saying "[t]hese changes are meant to protect the longevity of our company and prevent abuse of the service." *See* Compl. ¶ 71; McGovern Dec., Ex. 12; *see also* McGovern Dec., Ex. 13. The statement in Exhibit 12 is entirely consistent with the notion of limiting "cash burn," and is thus not false. *See* McGovern Dec., Ex. 13. The same holds true for the alleged misstatement in Exhibit 11, wherein Mr. Lowe explains that "[a]s a startup, we have to make changes to our product and offering in order to find the sweet spot where we're sustainable and still have a product that offers a great value," thereby emphasizing the importance of ensuring MoviePass continues as a going concern. *Id.*, Exs. 11 & 13. Given HMNY's public filings adequately disclosed that limiting cash burn was one of the key drivers of its fraud prevention tactics and the SEC's acknowledgement of the same, neither of Mr. Lowe's alleged misstatements in Paragraph 71 are actionable.

In addition, in Paragraph 36, the Complaint alleges that in a February 18, 2018, Recode Media podcast interview, Mr. Lowe falsely claimed that MoviePass had tested the $9.95 price point.  Compl. ¶ 36.  However, Mr. Lowe did not say that MoviePass tested the $9.95 price point. Rather, the podcast interview quotes Mr. Lowe as saying: "we . . . tested like crazy until we were ready to roll out the $9.95 plan."  *Id.*; McGovern Dec., Exs. 6 & 13.  In full context of the statement itself, Mr. Lowe is explaining that testing was done during the early stages of MoviePass and was continued until they were ready to roll out the $9.95 price point.  McGovern Dec., Exs. 6 & 13. Given Mr. Lowe does not state that the $9.95 price point was tested, the statement in Paragraph 36 of the Complaint is plainly not false.

### D.  The Complaint Fails to Plead Scheme Liability

For the same reasons as those set forth in Mr. Farnsworth's contemporaneously filed motion to dismiss, which are incorporated by reference herein, the SEC's claims under Securities Act Sections 17(a)(1) and 17(a)(3), as well as Exchange Act Rule 10b–5(a) and Rule 10b–5(c) should be dismissed for failure to state a claim.

## II.  THE SEC FAILS TO ADEQUATELY PLEAD AIDING AND ABETTING SECURITIES FRAUD AGAINST MR. LOWE.

The Complaint fails to adequately allege that Mr. Lowe aided and abetted HMNY's and Mr. Farnsworth's supposed violations of Exchange Act Section 10(b), Rule 10b-5 thereunder, and Securities Act Section 17(a), and thus, Counts Three and Four of the Complaint should be dismissed.

To state a claim for aiding and abetting under Exchange Act Section 10(b), Rule 10b-5, and Securities Act 17(a), the SEC must prove: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the

achievement of the primary violation." *S.E.C. v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (citation and quotation marks omitted).

## A. <u>No Primary Violation</u>

As set forth herein and in Mr. Farnsworth's brief in support of his contemporaneously filed motion to dismiss, the Complaint does not allege a primary violation. As such, the SEC cannot satisfy the first element of its claims for aiding and abetting, and thus, Counts Three and Four of the Complaint fail to state a claim against Mr. Lowe.

## B. <u>Failure to Plead Mr. Lowe Had Knowledge of the Alleged Violations</u>

In addition to failure to allege a primary violation, the allegations are insufficient to demonstrate that Mr. Lowe had knowledge of the violation. To state a claim for aiding and abetting, the SEC "must at least demonstrate recklessness to satisfy the knowledge requirement. Mere negligence does not suffice." *S.E.C. v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018) (internal citations omitted).

In the Complaint, the SEC does not identify which primary violations Mr. Lowe allegedly knew about, and the Complaint contains no allegations that would support a strong inference that Mr. Lowe knew of many of these violations. Specifically, there are no allegations that support an inference that Mr. Lowe knew or must have known of HMNY's or Mr. Farnsworth's allegedly false and misleading statements to the SEC and others, and the fact that Mr. Lowe made statements of his own is not enough to show that Mr. Lowe had actual knowledge of any alleged violations aside from his own. *See S.E.C. v. Wey*, 246 F. Supp. 3d 894, 927 (S.D.N.Y. 2017) ("While the SEC urges that a defendant need not know every aspect of a fraudulent scheme to be liable for aiding and abetting it the complaint fails to allege that [defendant] knew of any part of the scheme apart from his own actions.").

For example, Paragraph 51 of the Complaint alleges that HMNY formed "MoviePass Ventures LLC ("MPV"), a wholly owned subsidiary, as a purported vehicle for distributing films produced by others; acquired MovieFone ("MF"), an entertainment information and marketing service; and entered into a joint venture with Emmett Furla Oasis Films to form MoviePass Films LLC ("MPF"), a film production company."  Compl. ⁋ 51.  The SEC alleges that HMNY and Mr. Farnsworth falsely proclaimed that "these companies were generating ancillary revenues for MoviePass and were helping to push MoviePass along its path to profitability" in statements to the SEC (such as a July 31, 2018 HMNY Form 8-K) and in public broadcast interviews, including in interviews with Proactive Investors and Fox Business.  *Id.* ⁋ 52.  The Complaint goes on to allege that the suggestion by Mr. Farnsworth and HMNY that "MPF, MPV, and MF were contributing to MoviePass's revenues in the third quarter of 2018 . . . was false and misleading" insofar as, according to the SEC, these three companies "made no payments to MoviePass in 2018" and no such revenues were accrued on MoviePass's books.  *Id.* ⁋ 53.  Nowhere does the SEC allege that Mr. Lowe was aware of these statements—let alone the existence of MPF, MPV, and MF or HMNY's (a legally distinct entity) affiliations with these entities.

Thus, the Complaint is devoid of allegations that Mr. Lowe had knowledge of the alleged violations of Exchange Act 10(b), Rule 10b-5 thereunder, and Securities Act 17(a) on part of HMNY and Mr. Farnsworth, and therefore, Mr. Lowe's motion to dismiss the aiding and abetting claims in Counts Three and Four should be granted.

### C.  <u>Failure to Allege Mr. Lowe Substantially Assisted in Alleged Violations</u>

In addition to failing to allege a primary violation and knowledge on the part of Mr. Lowe, the Complaint fails to allege that Mr. Lowe substantially assisted in the purported violations as required to state a claim for aiding and abetting.

To state a claim for aiding and abetting, the SEC must show that Mr. Lowe provided substantial assistance to the alleged primary violators—Mr. Farnsworth and HMNY. "The aider and abettor's substantial assistance must be a proximate cause of the primary violation." *S.E.C. v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) (internal citations and quotation marks omitted). "Thus, mere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance." *Id.*

The Complaint does not allege that Mr. Lowe was involved in many of the statements. *See* Compl. ¶¶ 33, 40, 42, 50, 52, 55, 62, 67, 71 (in part), 72, and 78. Even where the Complaint attempts to attach liability to Mr. Lowe's mere presence during an allegedly misleading statement, this alone cannot establish substantial assistance. Indeed, "[i]naction on the part of an aider and abettor is not sufficient to satisfy the substantial assistance prong of the standard unless it was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act." *Treadway*, 430 F. Supp. 2d at 339 (internal citations and quotation marks omitted). The Complaint fails to allege that Mr. Lowe engaged in conduct designed to intentionally aid the primary fraud or that Mr. Lowe had a duty to act under the circumstances—let alone was in conscious or reckless violation of such a duty. The allegations in the Complaint are thus insufficient to plead that Mr. Lowe's affirmative conduct or inaction was the proximate cause of the primary violation.

As such, Counts Three and Four of the Complaint should be dismissed for failure to state a claim for aiding and abetting securities fraud violations under Exchange Act Section 10(b), Rule 10b-5, and Securities Act 17(a).

### III.  THE SEC FAILS TO STATE A CLAIM AGAINST MR. LOWE FOR ALLEGED VIOLATIONS OF SECTION 13 OF THE EXCHANGE ACT.

The SEC fails to state a plausible claim for relief against Mr. Lowe arising out of Kaleidoscope's allegedly false invoices.  As an initial matter, the SEC conceded in its response to Mr. Lowe's pre-motion letter that its books and records claims against him arise solely out of the MoviePass Invoice.[3]  *See* SEC Ltr. at 3 (Nov. 29, 2022), ECF No. 37.  Accordingly, this discussion will focus on just the MoviePass Invoice. Mr. Lowe also joins in the arguments to dismiss these claims raised in his co-Defendants' briefs and, per the Court's instruction at the pre-motion conference, incorporates them by reference and does not repeat them herein.  Specifically: (1) the Complaint does not identify any supposedly false book, record, or account at HMNY, but instead makes only vague references to HMNY's "books," which is insufficient under Rule 9(b); and (2) the Complaint fails to plead that Mr. Lowe had any control over HMNY's books and records or that he otherwise participated in their preparation in any way.

#### A.  <u>Section 13(b)(5)</u>

The Complaint alleges that Mr. Lowe violated Section 13(b)(5) of the Exchange Act, which provides, in relevant part, that "[n]o person shall . . . knowingly falsify any book, record, or account" of an issuer with a class of securities registered under Section 12(g) of the Exchange Act. 15 U.S.C. § 78m(b)(5), (b)(2).  Only HMNY is alleged to have common stock registered under Section 12(g); MoviePass is a privately held corporation.  Compl. ¶¶ 17, 19.  Thus, to survive a motion to dismiss, the Complaint must allege with particularity that Mr. Lowe knowingly falsified HMNY's books and records.

---

[3] Even if the SEC had not so conceded, the Complaint is entirely devoid of allegations tying Mr. Lowe to the Sundance and Coachella-related invoices and, accordingly, any claims against him arising out of those invoices would be wholly deficient.

The Complaint contains no such allegations.  In fact, the Complaint does not contain any allegations concerning HMNY with respect to the MoviePass Invoice. It does not allege that HMNY recorded the MoviePass Invoice in its books, let alone that it *falsely* recorded the MoviePass Invoice in its books.  While the Complaint does allege that the MoviePass Invoice was recorded falsely in MoviePass's books, MoviePass, as a privately held company, is not an issuer subject to Section 13(b)'s recordkeeping requirements.  Further, even if the MoviePass Invoice had been falsely recorded in HMNY's books, which is not alleged, the Complaint fails to plead any facts suggesting that Mr. Lowe had the requisite scienter.  It alleges that Kaleidoscope did not provide production services to MoviePass, but it does not allege that Mr. Lowe knew this at the time he approved the invoice.[4]  Nor does the Complaint allege that Mr. Lowe was involved in HMNY's recordkeeping or otherwise dictated how the invoice should be recorded in HMNY's books.  Accordingly, Mr. Lowe is not liable under Section 13(b)(5), and this claim must be dismissed.

## B. Rule 13b2-1

The Complaint alleges that Mr. Lowe violated Rule 13b2-1, which states that, "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Exchange Act." 17 C.F.R. 240.13b2-1.  While the Complaint arguably alleges that Mr. Lowe caused *MoviePass's* records to falsely account for the MoviePass Invoice, it is devoid of any allegations concerning whether or how this caused *HMNY's* records to be false. This is insufficient under Rule 9(b), *see, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)

---

[4] The Complaint does state that Mr. Lowe did not believe that Mr. Itum was entitled to a bonus payment but approved of one anyway.  Compl. ¶ 108-09.  But the MoviePass Invoice was not from Mr. Itum for a bonus but rather from Kaleidoscope for production services.  And the Complaint is devoid of any allegations concerning what Mr. Lowe did or did not know about Kaleidoscope's work for MoviePass.

(Rule 9(b) requires that a complaint "specify the statements that the plaintiff contends were fraudulent," "where and when they were made," and "why the statements are fraudulent"), and accordingly, the Rule 13b2-1 claim must be dismissed.

## C.  Rule 13b2-2

The Complaint further alleges that Mr. Lowe violated Rule 13b2-2, which states that "[n]o officer or director of an issuer shall, directly or indirectly . . . make or cause to be made a materially false or misleading statement to an accountant in connection with" any audit, review, or examination of financial statements or preparation of any SEC filings.  17 C.F.R. 240.13b2-2(1).  *First*, Mr. Lowe is not an officer or director of an issuer.  As the Complaint alleges, he was the CEO of MoviePass, a privately held corporation. Compl. ¶¶ 14, 19.  He had no role at HMNY.  *Second*, the Complaint fails to plead what false or misleading statement was allegedly made by Mr. Lowe or otherwise to HMNY's accountants concerning the MoviePass Invoice (or that any statement was made to HMNY's accountants concerning the MoviePass Invoice for that matter).  This is again insufficient under Rule 9(b), and accordingly the Rule 13b2-2 claim must be dismissed.

## D.  Aiding and Abetting HMNY Violation of Section 13(b)(2)(A)

Finally, the Complaint alleges that Mr. Lowe aided and abetted HMNY's violation of Exchange Act Section 13(b)(2)(A), which provides, in relevant part, that HMNY is required to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A).  To state a claim for aiding and abetting, the Complaint must allege: (1) "the existence of a securities law violation" by HMNY; (2) "knowledge of this violation" by Mr. Lowe; and (3) "substantial

assistance by the aider and abettor in the achievement of the primary violation." *S.E.C. v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (internal quotation marks and citations omitted).

The Complaint fails to state a plausible claim against Mr. Lowe for aiding and abetting an HMNY recordkeeping violation. *First*, the Complaint does not allege a primary violation by HMNY related to the MoviePass Invoice. The Complaint does not state that HMNY received the MoviePass Invoice or detail how it accounted for it inaccurately (if at all). *Second*, the Complaint does not allege that Mr. Lowe had knowledge of how HMNY accounted for the MoviePass Invoice (again, if it accounted for it at all), let alone that he knew that such accounting was inaccurate. *Finally*, the Complaint fails to plead that Mr. Lowe substantially assisted HMNY in inaccurately accounting for the MoviePass Invoice, because, again, it does not allege that he provided it to HMNY or was in any way involved in the preparation of HMNY's records. Accordingly, the aiding and abetting claim against Mr. Lowe arising out of HMNY's recordkeeping must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, and the reasons articulated in Defendant Farnsworth's and Defendant Itum's contemporaneously filed motions, the SEC's Complaint against Mr. Lowe must be dismissed.

29

Dated: New York, New York
      January 24, 2023

Respectfully submitted,

/s/ William F. McGovern
William F. McGovern
Kelly Spatola
Rachel K. Warren
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022

Adriana Riviere-Badell (admitted *Pro Hac Vice*)
Kobre & Kim LLP
201 South Biscayne Boulevard
Suite 1900
Miami, Florida 33131

*Counsel for J. Mitchell Lowe*