**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-8226-KPF |
| THEODORE J. FARNSWORTH, *et al.*, | ) ) | |
| *Defendants*, | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT THEODORE J. FARNSWORTH'S MOTION TO DISMISS**
**THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ......................................................................................................... 1

COMPLAINT ALLEGATIONS AGAINST FARNSWORTH ..................................... 4

LEGAL STANDARD................................................................................................... 6

ARGUMENT ............................................................................................................... 7

I. The Complaint Fails to Allege that Farnsworth Made Any Misstatement or Obtained Money or Property in the Offer or Sale of Any Security. ................................ 7

II. The Complaint Fails to Allege Any Actionable Misstatements. .................................... 11

 A. The Complaint Fails to Plead Materiality. ............................................................ 12

  1. Farnsworth's Statements Did Not Alter the Total Mix of Information Available to Investors. ......................................................... 13

  2. Farnsworth's Statements Were Puffery or Opinion Statements, Bespoke Caution, or Were Statements of Corporate Motive.................. 19

   a. Farnsworth's Statements Were Puffery and Statements of Opinion. ...................................................................................... 19

   b. Farnsworth's Statements in HMNY's SEC Filings Are Immaterial Because They Bespoke Caution. ............................... 21

   c. Farnsworth's Statements of Corporate Motives Are Immaterial. ................................................................................... 22

 B. The Complaint Fails to Allege Scienter. ............................................................... 23

  1. The Complaint Lacks Allegations of Motive and Opportunity. ............. 24

  2. The Complaint Lacks Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness. ............................................... 25

 C. The Complaint Fails to Specify Any Allegedly False Statements for Paragraphs 42, 52, and 72. ................................................................................... 28

III. The Complaint Fails to Plead Scheme Liability. ......................................................... 29

 A. The Complaint Fails to State a Claim For Scheme Liability Because the Complaint Alleges Only Misstatements. ............................................................... 29

 B. The Complaint Forces Farnsworth to Piece Together the Puzzle of What Conduct the SEC Alleges Supports Scheme Liability. .......................................... 30

IV. The Complaint Fails to State a Claim Against Farnsworth Under Section 13(b) Arising Out of Kaleidoscope's Allegedly False Invoices. .............................................. 31

 A. The Four Alleged Invoices.................................................................................... 31

 B. Farnsworth Did Not Aid and Abet HMNY's Alleged Record Keeping Violations. ........................................................................................................... 32

C.      Farnsworth Did Not Knowingly, Directly, or Indirectly Falsify Any Books or Records, Cause Any Books or Records to Be Falsified, or Make Any Misleading Statements to Any Accountant.......................................................... 34

CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. S.E.C.*,
    446 U.S. 680 (1980)...........................................................................................................10, 23

*Acito v. IMCERA Group*,
    47 F.3d 47 (2d Cir. 1995)............................................................................................23, 24, 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................................6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................................................6, 7

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)...............................................................................14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................................14

*Birnbaum v. Newport Steel Corp.*,
    193 F.2d 461 (2d Cir. 1952)...............................................................................................8

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) .........................................................................................20

*Born v. Quad/Graphics, Inc.*,
    521 F. Supp. 3d 469 (S.D.N.Y. 2021)...............................................................................31

*Buford White Lumber Co. Profit Sharing & Sav. Plan & Tr. v. Octagon Properties, Ltd.*,
    740 F. Supp. 1553 (W.D. Okla. 1989) .............................................................................9

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)...........................................................................................8

*In re Carter-Wallace, Inc., Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000).................................................................................................26

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)...............................................................................................6

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014).......................................................................................19, 20, 21

*In re Dynagas LNG Partners LP Sec. Litig.*,
   504 F. Supp. 3d 289 (S.D.N.Y. 2020).......................................................................12

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...........................................................................12, 18

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)......................................................................................10

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................26

*Gross v. Diversified Mortgage Investors*,
   431 F. Supp. 1080 (S.D.N.Y. 1977)......................................................................28

*Hahn v. Breed*,
   587 F. Supp. 1369 (S.D.N.Y. 1984)......................................................................23

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)....................................................................12, 19, 22

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
   723 F. Supp. 976 (S.D.N.Y. 1989) ......................................................................14

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
   No. 11-CV-5881 CS, 2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012).......................................6

*IBEW Local v. Royal Bank of Scotland Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015)............................................................................20

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)..............................................................24, 25, 26

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)........................................................................24, 25

*Lallave v. Martinez*,
   No. 22-CV-4136, 2022 WL 7578794 (E.D.N.Y. Oct. 13, 2022)...........................................8

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)............................................................................29

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021)............................................................25, 26, 27

*McGann v. Ernst & Young*,
   102 F.3d 390 (9th Cir. 1996) ...........................................................................9

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)....................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)...................................................................................14, 18, 20

*In re Pareteum Sec. Litig.*,
No. 19 CIV. 10460, 2020 WL 3448526 (S.D.N.Y. June 23, 2020)...........................31

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)...................................................................21

*Robbins v. Moore Med. Corp.*,
894 F. Supp. 661 (S.D.N.Y. 1995) .......................................................................14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...........................................................7, 27, 29, 32

*S.E.C. v. Cedric Kushner Promotions, Inc.*,
417 F. Supp. 2d 326 (S.D.N.Y. 2006)..............................................................33, 34

*S.E.C. v. Czarnik*,
No. 10 CIV. 745 PKC, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) ......................24

*S.E.C. v. DiBella*,
587 F.3d 553 (2d Cir. 2009)................................................................................33

*S.E.C. v. DiMaria*,
207 F. Supp. 3d 343 (S.D.N.Y. 2016)...................................................................11

*S.E.C. v. Espuelas*,
698 F. Supp. 2d 415 (S.D.N.Y. 2010)...................................................................35

*S.E.C. v. Fraser*,
No. CV 09-00443, 2009 WL 2450508 (D. Ariz. July 29, 2010) ............................31

*S.E.C. v. Frohling*,
851 F.3d 132 (2d Cir. 2016)................................................................................12

*S.E.C. v. Ginder*,
752 F.3d 569 (2d Cir. 2014)................................................................................12

*S.E.C. v. Jankovic*,
No. CV15CIV1248KPF, 2017 WL 1067788 (S.D.N.Y. Mar. 21, 2017) ...................8

*S.E.C. v. Kameli*,
373 F. Supp. 3d 1194 (N.D. Ill. 2019) ...................................................................7

*S.E.C. v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)..................................................................29

*S.E.C. v. Lucent Techs., Inc.*,
    No. 04-2315, 2005 WL 1206841 (D.N.J. May 20, 2005)........................................24

*S.E.C. v. Miller*,
    2017 WL 5891050 .................................................................................................33

*S.E.C. v. MiMedx Grp., Inc.*,
    No. 19 CIV. 10927, 2022 WL 902784 (S.D.N.Y. Mar. 28, 2022) ..........................34

*S.E.C. v. Patel*,
    No. 07-cv-39, 2008 WL 782465 (D.N.H. Mar. 24, 2008)......................................33

*S.E.C. v. Patel*,
    No. CIV. 07-CV-39-SM, 2008 WL 781914 (D.N.H. Mar. 24, 2008) ...............7, 35

*S.E.C. v. Rio Tinto*,
    41 F.4th 47 (2d. Cir. 2022) ...............................................................................29, 30

*S.E.C. v. Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012)...................................................................8

*S.E.C. v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013)..............................................................10, 11

*S.W. Airlines Co. v. Saxon*,
    142 S. Ct. 1783 (2022).........................................................................................8

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015).....................................................................21

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)....................................................................24, 25, 27

*Starr ex rel. Est. of Sampson v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005)..................................................................................14

*Steinberg v. PRT Group, Inc.*,
    88 F. Supp. 2d 294 (S.D.N.Y. 2000).....................................................................22

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008).............................................................................26, 28

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)..................................................................................20

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   No. 20-CV-08585, 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022).............................................20

*U.S. v. Naftalin*,
   441 U.S. 768 (1979)............................................................................................................8

*Ward v. Succession of Freeman*,
   854 F.2d 780 (5th Cir. 1988) ............................................................................................23

**Statutes and Rules**

Federal Rule of Civil Procedure 9(b)................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) ......................................................................6, 12

Securities Exchange Act Section 10(b) [15 U.S.C. 77j(b)] ............................................ *passim*

Securities Act Section 17(a) [15 U.S.C. § 77q(a)]......................................................... *passim*

Securities Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)]......................5, 32, 33

Securities Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] .................................5, 32, 35

SEC Rule 10b–5 [17 C.F.R. § 240.10b–5] ..................................................................... *passim*

SEC Rule 13b2–1 [17 C.F.R. § 240.13b2–1] .......................................................5, 32, 34, 35, 36

SEC Rule 13b2–2 [17 C.F.R. § 240.13b2–2] ................................................................35, 36

**Other Authorities**

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*
   170–74 (2012)....................................................................................................................8

Business Insider (April 17, 2018), https://www.businessinsider.com/moviepass-
   owner-going-concern-doubt-raised-by-auditor-in-10-k-2018-4 ...........................................18

Insider (Jan. 26, 2018), https://www.insider.com/moviepass-kicks-10-amc-
   theaters-off-service-analysis-2018-1...................................................................................17

## <u>INTRODUCTION</u>

Theodore Farnsworth did not violate any securities law.  Farnsworth is the former CEO of Helios and Matheson Analytics Inc., a publicly traded information technology and data analytics company that was focused on consumer-centric technology ("HMNY").  The Complaint broadly relates to the period of approximately August 2017 to March 2019 during which HMNY made an initial investment and ultimately acquired a majority interest in MoviePass, Inc., a leading movie theater subscription service led by former Netflix co-founding executive Mitch Lowe.  MoviePass was among the most exciting companies in the country and was compared to other disruptive technology companies such as Uber and Airbnb.  Farnsworth, an energetic, motivated, and experienced executive, was optimistic about MoviePass's outlook and often expressed his belief in the company.  Although MoviePass subscribers grew exponentially in 2017 and forward, it ultimately was unable to generate enough revenue, and HMNY and MoviePass filed for bankruptcy in January 2020.

Farnsworth addresses the allegations in the Complaint and explains why they utterly fail to state a claim for securities fraud.  But what is absent from the Complaint is as important as what is present.  For example, there is no allegation that HMNY filed incorrect financial statements with the SEC.  In fact, while HMNY and Movie Pass ultimately failed, as many companies do, HMNY's financial performance was accurately reported to the investing public.  There is no allegation that any of Farnsworth's statements were made in the offer or sale of an HMNY security.  Finally, there is no allegation that Farnsworth personally sold any shares during the alleged scheme, strongly undermining any claim of scienter.  Instead, the Complaint seeks to convert, without legal basis, the open and very widely covered failure of a business into a securities fraud scheme.

In support of this flawed theory, the Complaint marshals a grab bag of 26 statements—17 that the Complaint identifies, and 9 that it does not—Farnsworth made in various fora at various points over an 18-month period.  Many of these statements were made in interviews or other unscripted environments.  Most of the statements do not concern HMNY at all, but rather do little more than express optimism for MoviePass and its business model.  Additionally, each of these statements was made with the backdrop of HMNY's complete and accurate SEC filings discussing HMNY's investment in MoviePass and the myriad risks associated with the venture. The Complaint collects these statements, aggregates them, and then declares that somewhere within them there is securities fraud on HMNY investors.  In so doing, the SEC overreaches and fails to satisfy the general notice pleading standard, much less the heightened pleading standard applicable to allegations of securities fraud under Federal Rule of Civil Procedure 9(b).

Moreover, none of these statements are tethered to a fraudulent offering of HMNY securities as required by Section 17(a).  Unlike Section 10(b)'s broader "in connection with" language, Section 17(a) requires that the statement actually be "in" the offer or sale of a security. It does not reach statements offered in interviews and other diverse environments wholly unconnected to the offer or sale of securities.  Without any alleged misstatement in the offer or sale of any HMNY security, the SEC's allegations invoking Section 17(a) must be dismissed.

Even under the broader "in connection with" standard of Section 10(b), the Complaint is woefully inadequate.  Farnsworth's statements were immaterial as a matter of law, especially given the contemporaneous risk disclosures that provided investors an accurate picture of HMNY's present and prospective performance.  When viewed, as they must be, in the context of these disclosures, no reasonable investor could have been swayed by Farnsworth's often off-hand limited comments featured in the Complaint.  Aspirational statements about MoviePass's potential

for success are precisely the kind of statements that this Court and the Second Circuit have held are beyond the reach of the securities laws.

The Complaint fares no better when it comes to pleading scienter.  Receiving bonus payments and other executive compensation are not enough to plead scienter.  Absent are any allegations that Farnsworth sought to personally enrich himself.  In fact, there is no allegation that Farnsworth sold a single share of HMNY stock.  To fill this void, the SEC stoops to pulling Farnsworth's statements out of context and seeking to change their meaning in service to its efforts to paint Farnsworth as a bad actor.  On several occasions the SEC fails to include the full context of Farnsworth's statements, and when viewed in that appropriate context, it is clear the statements do not say what the SEC alleges.

Farnsworth's statements were not the stuff of securities fraud when they were spoken, and the fact that MoviePass failed cannot turn them into such retroactively.  Yet that is precisely what the SEC seeks to do through this Complaint, throwing 26 statements against the wall and hoping something sticks.[1]  The Complaint fails in totality and must be dismissed in its entirety.

---

[1] To organize and simplify the issues for the Court, Farnsworth has prepared an Appendix and attached it as Exhibit A, that lists each of the 17 identified statements and 9 unidentified statements along with notations regarding the basis for why each statement is non-actionable.  Farnsworth uses the notation "Ex. A #" to identify the statement as laid out in the Appendix.  For the Court's ease of reference, Exhibits A-1 through A-13, attached as a single PDF, are all documents cited by the SEC in which it specifically identified a statement by Farnsworth.  Finally, Exhibits B through H are materials Farnsworth includes to support of his Motion.  All Exhibits are listed in the simultaneously filed Declaration of E. Andrew Southerling.

## COMPLAINT ALLEGATIONS AGAINST FARNSWORTH

The SEC filed its Complaint on September 26, 2022.[2]  The Complaint alleges that Farnsworth violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act [15 U.S.C. § 77j(b)] and Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5] by making 26 misstatements in various fora.  These 26 statements are about five aspects of MoviePass and HMNY's investment in MoviePass.[3]

*First*, the Complaint alleges that Farnsworth made two misstatements that MoviePass's $9.95 subscription price was sustainable.  Compl. ¶ 33 (statement in September 22, 2017 Pipeline Data interview), ¶ 34 (statement in January 9, 2018 Yahoo Live interview).

*Second*, the Complaint alleges that Farnsworth made six misstatements about HMNY's data analytics and artificial intelligence capabilities, related to HMNY's analysis of MoviePass's user data.  The Complaint identifies two statements.  Compl. ¶ 40 (statement in press release filed alongside a September 14, 2017 Form 8-K); Compl. ¶ 43 (statement in January 9, 2018 Yahoo Live interview).  The Complaint leaves four statements unidentified.  *See* Compl. ¶ 42 (alleging Farnsworth made misstatements in "an October 24, 2017 Form 8-K; a January 25, 2018 Form S-3; an April 17, 2018 Form 10-K; and a May 15, 2018 Form 10-Q").

*Third*, the Complaint alleges that Farnsworth made five misstatements about MoviePass's potential to generate non-subscription revenue from deals with other studios and from other MoviePass-related subsidiaries.  The Complaint identifies three statements.  Compl. ¶ 47

---

[2] On November 4, 2022, the Department of Justice (Fraud Section) unsealed an indictment returned in the Southern District of Florida against Farnsworth and Lowe, alleging criminal violations of securities fraud and wire fraud based on substantially the same factual allegations.

[3] The SEC has confirmed that it does not seek to hold Farnsworth liable for statements made by Mr. Lowe and therefore Farnsworth does not address Mr. Lowe's statements herein.  SEC Ltr. (Dkt. No. 31) at 1.

(statement in January 9, 2018 Yahoo Live interview); Compl. ¶ 50 (statement in April 12, 2018 Yahoo Finance interview); Compl. ¶ 52 (statement in July 31, 2018 Form 8-K). The Complaint leaves two statements unidentified. *See* Compl. ¶ 52 (alleging Farnsworth made misstatements in "a July 25, 2018 interview with Proactive Investors and an August 15, 2018 interview with Fox Business").

*Fourth*, the Complaint alleges that Farnsworth made ten misstatements that the decreased usage rate of MoviePass subscribers was attributable to normal user behavior—*i.e.*, subscribers choosing to use MoviePass less over time—rather than because of HMNY's business decisions to remove certain theatres from MoviePass and to allegedly prevent heavy usage to reduce cash burn. Seven statements are identified in the Complaint. *See* Compl. ¶ 55 (statement in September 22, 2017 Pipeline Data interview), ¶ 62 (statement released on January 26, 2018 and quoted by several publications), ¶ 67 (statement in April 9, 2018 Yahoo Finance interview); ¶¶ 67, 71 (statement in 2018 Q1 Form 10-Q filed on May 15, 2018), ¶ 68 (statement in May 16, 2018 HMNY–MoviePass joint press release); ¶ 68 (statement in November 15, 2018 HMNY–MoviePass joint press release); ¶ 71 (statement in press release attached to July 31, 2018 Form 8-K). The Complaint leaves three statements unidentified. *See* Compl. ¶ 72 (alleging Farnsworth made misstatements in interviews "with Proactive Investors on January 23, 2019 and March 21, 2019 and with Fox Business on March 22, 2019").

*Fifth*, the Complaint alleges that Farnsworth made three misstatements about HMNY's ability to cover MoviePass's costs. *See* Compl. ¶ 77 (statement in 2017 Form 10-K filed on April 16, 2018), ¶ 78 (statement in April 17, 2018 *Variety* interview); ¶ 78 (statement in May 13, 2018 *Variety* interview).

The Complaint also alleges that Farnsworth aided and abetted HMNY's alleged violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which requires issuers to make and keep accurate books and records (Fifth Claim).  The Complaint further alleges that Farnsworth violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], and Rules 13b2–1 [17 C.F.R. § 240.13b2–1] and 13b2–2 [17 C.F.R. § 240.13b2–2], which prohibit falsification of books and records and false statements to accountants arising out of allegedly false invoices submitted to HMNY and MoviePass (Sixth Claim).  *See* Compl. ¶¶ 81–144.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the Court must take as true all factual allegations in the Complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation" or a "naked assertion[s] devoid of further factual enhancement."  *Id.* at 678 (internal quotation marks omitted).  The Court also may consider certain materials outside the Complaint at this stage for purposes of a motion to dismiss, including news articles and public disclosure documents filed with the SEC.  *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (SEC filings); *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881 CS, 2012 WL 4477552, at *4 (S.D.N.Y. Sept. 27, 2012) (news articles).

To survive a motion to dismiss, a complaint containing allegations of securities fraud or falsities must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements.  *See, e.g.*, *ATSI*, 493 F.3d at 99.  Rule 9(b) requires the plaintiff to plead the circumstances constituting fraud or mistake "with particularity."  Fed. R. Civ. P. 9(b); *see Chill v. Gen. Elec. Co.*,

101 F.3d 263, 267 (2d Cir. 1996) ("[T]he actual fraudulent statements or conduct and the fraud alleged must be stated with particularity.").  The Second Circuit holds that Rule 9(b) requires a securities-fraud complaint to (1) specify the fraudulent statements, (2) identify the speaker, (3) state where and when statements were made, and (4) explain why the statements were fraudulent. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  Thus, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient," *ATSI*, 493 F.3d at 99, and the Court should dismiss any complaint that "simply offers a generalized allegation," *id.* at 106.  Rule 9(b)'s pleading requirements apply with equal force to a complaint brought by the SEC.  *See S.E.C. v. Patel*, No. CIV. 07-CV-39-SM, 2008 WL 781914, at *3 (D.N.H. Mar. 24, 2008) (motion to dismiss granted where SEC failed to satisfy Rule 9(b)); *S.E.C. v. Kameli*, 373 F. Supp. 3d 1194, 1205 (N.D. Ill. 2019) (same).

## ARGUMENT

I.    **The Complaint Fails to Allege that Farnsworth Made Any Misstatement or Obtained Money or Property in the Offer or Sale of Any Security.**

The Complaint fails to state a claim against Farnsworth for violations of Section 17(a) because it does not allege that any of his alleged misstatements were made in the offer or sale of HMNY securities.[4]  Therefore, the Court should dismiss the First Claim in its entirety.  *See generally* Ex. A.

This result is clear based on the plain language of Section 17(a) in contrast to that of Section 10(b) and Rule 10b-5 thereunder.  Section 17(a) is in the Securities Act, which regulates new offerings and requires the fraud to occur in the offer or sale of securities.  Section 10(b) and Rule 10b-5 reside in the Securities Exchange Act, which regulates securities exchanges and over-the-

---

[4] To the extent the Complaint alleges scheme liability under Sections 17(a)(1) and (a)(3), it also does not state a viable claim under these provisions because misstatements are insufficient to form the basis of a scheme under the antifraud provisions.  *See infra* Part III.

counter markets.  Consistent with its purpose, Section 10(b) reaches intentional wrongdoing beyond new offerings, including those that affect trading on the secondary market.  Rule 10b–5 was drafted to be broader than Section 17(a) and to cover post-offering securities trading as Section 17(a) was understood to apply only to sellers of securities.  *See Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463 (2d Cir. 1952); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997) ("Section 10(b) and Rule 10b–5 reach[] beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." (footnote omitted)).[5]

Even when the Supreme Court has applied Section 17(a) to frauds in the aftermarket, it involved an individual who actually offered to sell securities.  *See U.S. v. Naftalin*, 441 U.S. 768, 774 (1979).  The defendant in *Naftalin* falsely represented that he owned the stocks he wished to sell.  *See id.* at 770, 778.

Likewise, this Court's prior Section 17(a) cases support the commonsense proposition that this provision applies only to misstatements made in the course of offering or selling securities.  *See, e.g.*, *S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 462 (S.D.N.Y. 2012) (applying Section 17(a) to a defendant who fraudulently marketed collateralized debt obligations); *S.E.C. v. Jankovic*, No. CV15CIV1248KPF, 2017 WL 1067788, at *1 (S.D.N.Y. Mar. 21, 2017) (applying Section 17(a) to a defendant who made fraudulent statements in a Preliminary Information Memorandum used

---

[5] Courts presume that a material variation in terms indicates a variation in meaning when different sections of similar acts are at issue.  *See Lallave v. Martinez*, No. 22-CV-4136, 2022 WL 7578794, at *9 (E.D.N.Y. Oct. 13, 2022) ("When Congress repeats words, phrases, or structures from one statutory provision to another, we presume that variations among the instances are meaningful."); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 170–74 (2012); *see also S.W. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (applying the "well-settled . . . meaningful-variation canon").

at an investors' meeting to pitch shares of a corporation).  And several courts have held that Section 17(a) does not apply when there is no securities transaction.  *See McGann v. Ernst & Young*, 102 F.3d 390, 394 (9th Cir. 1996) (Section 17(a) "impose[s] liability only where the fraud is part of a securities transaction."); *Buford White Lumber Co. Profit Sharing & Sav. Plan & Tr. v. Octagon Props., Ltd.*, 740 F. Supp. 1553, 1568 (W.D. Okla. 1989) ("Section 17(a), as Defendant notes, applies to those who offer or sell securities.").

The Complaint makes no allegation that Farnsworth engaged in any securities transaction or made material misstatements in the offer or sale of any security.  The Complaint plucks 17 statements by Farnsworth (and leaves 9 statements unidentified) in various fora over 18 months and broadly alleges that those statements violate Section 17(a), Section 10(b), and Rule 10b–5 equally.  The Complaint identifies three offerings HMNY engaged in during the relevant time period—private placements of notes on November 7, 2017 and January 11, 2018, and an offering of warrants and stock on February 13, 2018.  But the Complaint does not allege that the stock purchase agreements or prospectus for those offerings contain a materially false or misleading statement as is required to state a claim under Section 17(a).  *See* Compl. ¶ 29.

What is more, *seventeen of the statements listed in the Complaint were made after the last offering* and therefore could not have been made "in" the offering or sale of HMNY securities.[6] *See* Ex. A (Appendix) at # 8–17, 20–26.  Further, three of the statements were made almost two months before the first offering and three months before HMNY took a majority interest in MoviePass in December 2017.  *See* Ex. A at # 1–3.  Those statements cannot reasonably be said to have been made "in" that or the later offerings.  Even the statements made closer in proximity

---

[6] The SEC asserted in its pre-motion letter, without citation, that any statement concerning a publicly traded security is "in the offer or sale for the purposes of Section 17(a)."  SEC Ltr. (Dkt. No. 31) at 3.  We have found no support for such a drastic expansion of Section 17(a).

to the offerings were not made in the offer or sale of the securities in those offerings and include statements in general interviews that were not part of any offering materials.  For example, four statements were in interviews about subjects unrelated to any HMNY securities offering (or sale), *see* Ex. A # 4 (statement on Yahoo Live: "[But is it too low of a price point I guess.] No."), *id.* # 7 (statement that MoviePass was saving a declining industry and that AMC was never interested in collaborating with MoviePass); *see also id.* # 5–6.  The Complaint alleges only that the three HMNY securities offerings "coincided" with Farnsworth's statements, *see* Compl. ¶ 29, but that is not what the statute requires—it requires the statements to be made *in* an offer or sale of securities.  15 U.S.C. § 77q(a).

Violations of Section 17(a)(2) and (3) may be established by a showing of negligence, *Aaron*, 446 U.S. at 701, whereas Section 10(b) and Rule 10b–5 may be violated only when the defendant acted with scienter.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 215 (1976) (holding that Section 10(b) and Rule 10b–5 do not allow liability for negligence and defining scienter as an "intent to deceive, manipulate, or defraud").  The SEC cannot sidestep Section 10(b)'s higher burden by simply taking the same grab-bag collection of statements over the same period and claiming ipso facto that they also violate Section 17(a)(2) and (3).

The Complaint also fails to state a claim under Section 17(a)(2) because there is no allegation that Farnsworth "obtain[ed] money or property by means of" a material misrepresentation or omission.  *See* 15 U.S.C. 77q(a)(2).  The SEC must allege that Farnsworth personally gained money or property from the fraud; that gain cannot be based on his executive compensation unless the SEC connects that compensation to the alleged fraud.  *See S.E.C. v. Syron*, 934 F. Supp. 2d 609, 637, 640 (S.D.N.Y. 2013) ("The SEC's failure to allege that [defendants] personally gained money or property from [their company's] stock offerings thus means that the

SEC has not stated a claim under Section 17(a)(2)").  The Complaint makes no attempt of showing that Farnsworth obtained any money by means of a fraud, cursorily alleging only that Farnsworth received bonus payments and special compensation.  *See* Compl. ¶ 80.  Courts in this district have dismissed Section 17(a) claims when the SEC has failed to tie defendants' receipt of money to their alleged fraudulent acts.  *See, e.g.*, *Syron*, 934 F. Supp. 2d at 640; *S.E.C. v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016) (dismissing Section 17(a)(2) claim when "the SEC d[id] not allege any chain of events" showing the defendant "obtained money or property by means of the alleged misstatements").[7]

Because the Complaint does not—and cannot—allege that Farnsworth made any statements or engaged in any conduct in the offer or sale of any HMNY security, the Court should dismiss the First Claim.

## II.      The Complaint Fails to Allege Any Actionable Misstatements.

Additionally, the First and Second Claims should be dismissed because the Complaint fails to adequately allege any actionable misstatements.  To state a claim under Section 10(b) and Rule 10b–5(b), the SEC must allege that a person "(1) made a material misrepresentation or a material omission as to which he had a duty to speak"; (2) "with scienter"; (3) "in connection with the purchase or sale of securities."  *S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016).  To state a

---

[7] In *Syron* and *DiMaria*, courts in this District found that, while the SEC failed to state a claim under Section 17(a), it stated a claim under Section 10(b) and Rule 10b–5.  However, the facts in those cases demonstrate the feeble nature of the SEC's case against Farnsworth.  *Syron* involved Freddie Mac's former CEO who publicly stated that Freddie Mac didn't participate in any subprime business while allegedly knowing, based on internal reports and projections, that Freddie Mac faced significant exposure because of high-risk, subprime loan.  *See* 934 F. Supp. 2d at 617, 619, 632.  *DiMaria* involved a CFO of a company who, among other actions, told a vice president to book audit fees to an improper account and to tell the auditors "it was a mistake" if they complained, 207 F. Supp. 3d at 348, and sold \$2M worth of stock within two weeks of signing a Form 10-Q that the SEC alleged contained several false statements, *id.* at 351.  Even with those facts, this Court held that the SEC failed to state a claim under Section 17(a).

claim under Section 17(a)(2), the SEC must show a defendant: (1) made an "untrue statement of a material fact or an[] omission to state a material fact necessary" "in the offer or sale of any securities" (2) acted with negligence; and (3) "obtain[ed] money or property by means of" that statement. *See* 15 U.S.C. § 77q(a)(2); *S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

### A. The Complaint Fails to Plead Materiality.

None of the statements in the Complaint are material.[8]  Nineteen statements did not significantly alter the total mix of information available to investors, *see* Ex. A # 2–4, 6–15, 17, 22–26; twelve are puffery or opinion statements, *see id.* # 1–5, 8, 10–11, 18–21; nine are covered by the common law bespeaks caution doctrine, *see id.* # 1, 11, 13, 15–16, 18–21; and five are non-actionable statements of corporate motive, *see id.* # 13, 16, 24–26.  Claims based on such statements are subject to dismissal pursuant to Rule 12(b)(6).[9]

As a threshold matter, the Complaint misstates what Farnsworth and HMNY actually said with regard to three statements—the context of those statements makes clear that none of the

---

[8] Though nine statements are not identified and therefore fail under Rule 9(b), *see infra* Part II.C, the statements are also non-actionable for the same reasons as those statements that the Complaint alleges are "similar."  Complaint ¶ 42 says that Farnsworth made "similar false or misleading statements" as the alleged misstatement in ¶ 40, so Farnsworth relies on the same defenses. *Compare* Ex. A # 1, *with id.* # 18–21.  The same is true for Complaint ¶ 52, which specifies one alleged misstatement and leaves two unidentified.  *Compare* Ex. A # 15, *with id.* # 22–23.  And Complaint ¶ 71 says that HMNY's SEC filings misstated that MoviePass instituted polices to fix fraud, while Complaint ¶ 72 says that Farnsworth made similar misstatements in several interviews.  *Compare* Ex. A # 13, *with id.* # 24–26.

[9] *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197, 202 (2d Cir. 2009) (affirming motion to dismiss where alleged misstatements were "obviously unimportant to a reasonable investor" and where statements were puffery); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020) (granting a motion to dismiss where defendant's on-point disclosures negated any inference that allegedly misleading statements altered the total mix of information available to investors); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (granting a motion to dismiss on materiality grounds because accompanying cautionary language rendered statements "immaterial as a matter of law").

statements were false or misleading and that the Complaint's allegations related to those statements are unsupported.  *First*, the Complaint alleges that Farnsworth misleadingly said that $9.95 was not "too low of a price point," Compl. ¶ 34.  However, this statement followed an extended comment from Lowe describing MoviePass's *future* business plans involving non-subscription revenue which itself followed an introductory comment from the interviewer that "once MoviePass approaches breakeven on the subscription fees, it can start generating income from other sources." *See* Ex. A # 4; Ex. A-3 (January 9, 2018 Yahoo Live Interview).  *Second*, the Complaint misrepresents the manner in which Farnsworth said "right now" to allege that he said MoviePass could receive $6 "right now" when the statement was made.  Compl. ¶ 50.  In context, it's clear that what Farnsworth actually said was that the projections "right now" were that MoviePass could eventually make $6 per customer on ancillary revenues.  *See* Ex. A # 9; Ex. A-6 (April 12, 2018 Yahoo Finance article).  *Third*, the Complaint leaves out the statement "we believe" in ¶ 77 to frame HMNY's statement in its Form 10-K as a statement of fact rather than a statement of opinion. *See* Ex. A # 11; Ex. A-8 at 28 ("*[W]e believe* as a result of our shelf registration in February, the Company has adequate access to capital to fund our operations and capital investment needs for the foreseeable future." (emphasis added)).  The context surrounding each of these statements renders the Complaint's interpretation of Farnsworth's words entirely untenable.[10]

### 1.  Farnsworth's Statements Did Not Alter the Total Mix of Information Available to Investors.

Nineteen statements identified in the Complaint are immaterial because there is no substantial likelihood that the mostly single sentence comments about MoviePass would have been

---

[10] Other allegations make no sense.  For example, the Complaint alleges that a press release attached to HMNY's Form 8-K filed on July 31, 2018 was false because MoviePass's goal was to save cash, Compl. ¶ 74, but the Form 8-K itself says that the company made the "strategic move" to "limit cash burn."  Compl. ¶ 71; Ex. A # 16.

viewed by a reasonable investor as having significantly altered the total mix of information with respect to an investment decision in HMNY securities.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–232 (1988) (citation omitted); *see* Ex. A # 2–4, 6–15, 17, 22–26.  The total mix of information includes "all information 'reasonably available to the shareholders,' including 'data sent to shareholders by a company.'"  *Starr ex rel. Est. of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005).  It also includes information in the public domain, *see Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 986 (S.D.N.Y. 1989), such as facts disseminated by news media, *see, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 290 (S.D.N.Y. 2010).

It is presumed that SEC filings and other formal documents are more important to reasonable investors than off-the-cuff statements or statements made in an informal setting.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (noting that reasonable investors consider SEC filings to contain more reliable information than "off-the-cuff statements"); *see also Robbins v. Moore Med. Corp.*, 894 F. Supp. 661, 670 (S.D.N.Y. 1995) ("In analyzing the materiality element, the Court must consider the context in which the statements were made . . . . The statements objected to by Plaintiffs were brief expressions of enthusiasm contained in one-page press releases . . . [they] could not be found to have significantly altered the 'total mix' of information.").

HMNY's public SEC filings provided clear and fulsome disclosures that directly address these nineteen statements in the Complaint, which can be grouped into three general categories: (1) MoviePass's price point of $9.95, (2) HMNY's ability to fund MoviePass, and (3) MoviePass's non-subscription revenue.

MoviePass's Price Point.  HMNY's SEC filings provide fulsome and accurate disclosures of information related to whether MoviePass was or could be profitable at $9.95.  For example, HMNY's fiscal year Q3 2017 Form 10-Q (filed Nov. 14, 2017) and 2017 Form 10-K (filed Apr. 17, 2018) explain that (1) "MoviePass currently spends more to retain a subscriber than the revenue derived from that subscriber;" (2) "MoviePass expects its negative gross profit margin to remain significant until MoviePass can sufficiently increase its other sources of revenues to offset the losses or achieve substantial economies of scale;" and (3) "increased movie viewing by subscribers results in significant and increasing losses per subscriber and negative cash flow and adversely affects our financial condition and results of operations."  Ex. A-8 (2017 Form 10-K) at 10; Ex. B (Q3 2017 Form 10-Q) at 32–33.  Such disclosures are throughout HMNY's public filings during the entire relevant period. *See, e.g.*, Ex. A-1 (Sept. 14, 2017 Form 8-K) at 2 (stating that there is "no assurance that the MoviePass business model will lead to profitability"); Ex. A-12 (July 31, 2018 Form 8-K) at 3 (containing similar disclosures). These filings provide fulsome information to investors concerning the obvious risks associated with MoviePass's subscription model such that Farnsworth's response "no" to a reporter's question as to whether $9.95 was too low a price point did not (and obviously could not) significantly alter the total mix of information available to investors assessing the company's performance with respect to this price point.

HMNY's Ability to Fund MoviePass.  HMNY's ability to meet MoviePass's funding needs was also the subject of full and accurate disclosures.  The company's Form 10-K for fiscal year 2017 disclosed the results of the February 2018 shelf registration and said HMNY believed it had adequate access to capital to fund operations for the foreseeable future, Ex. A-8 (2017 Form 10-K) at 28 (filed April 16, 2018), while expressly noting that management has determined that HMNY will require outside funding within a year in order to continue operations.  *Id.* at 29.  It

also specifically warned that there is no assurance that the company's plans for raising those funds will manifest.  *Id.*  The HMNY Q1 and Q2 2018 Form 10-Qs continue to include disclosures about HMNY's available cash and expected expenditures, noting that "[t]he Company expects to continue to incur net losses and have significant cash outflows for at least the next 12 months."  Ex. A-10 (Q1 2018 Form 10-Q) at 11, 39; Ex. C (Q2 2018 Form 10-Q) at 12, 46; *see also* Ex. A-8 (2017 Form 10-K) at 29; Ex. B (Q3 2017 Form 10-Q) at 8.  All the relevant documents also disclosed HMNY's cash on hand and working capital deficit.  Ex. A-8 (2017 Form 10-K) at 29; Ex. B (Q3 2017 Form 10-Q) at 8; Ex. A-10 (Q1 2018 Form 10-Q) at 38–39; Ex. C (Q2 2018 Form 10-Q) at 4, 45.  What is more, HMNY's Form 8-K filings contained periodic updates regarding the company's cash on hand and cash burn.  For example, the company's May 8, 2018 Form 8-K contains a detailed disclosure regarding the company's cash on hand and average cash burn.  Ex. D (May 8, 2018 Form 8-K) at 1.

MoviePass's Non-Subscription Revenue.  MoviePass's potential alternative revenue streams were also the subject of full and accurate risk factors and forward-looking disclosures. HMNY's Q3 2017 Form 10-Q filed on November 14, 2017 disclosed that for MoviePass to succeed, it would need to "secur[e] additional sources of revenue and economies of scale" while also noting that "MoviePass currently does not have other sources of revenue" and that "[t]here is no assurance MoviePass will be able to generate other sources of revenue or be able to achieve economies of scale that would reduce the cost of revenue sufficiently to generate a positive gross profit margin."  Ex. B (Q3 2017 Form 10-Q) at 32.  Later, in April 2018, HMNY's 2017 Form 10-K said, "MoviePass['s] other sources of revenue are currently inadequate to offset or exceed the costs of subscriber retention.  This results in a negative gross profit margin.  MoviePass expects its negative gross profit margin to remain significant until MoviePass can sufficiently increase its

16

other sources of revenues to offset the losses or achieve substantial economies of scale." Ex. A-8 (2017 Form 10-K) at 10.  The Form 10-K also disclosed that its alternative revenue streams could face stiff competition, saying, "MoviePass Ventures will have competitors with longer operating histories in the distribution of independent films, deeper ties with industry executives and film producers, and greater financial, marketing and other resources than MoviePass Ventures." *Id.* at 7.

In addition to HMNY's SEC filings, information about the risks of MoviePass's business model was widely reported in the news media.  Starting on the day that the $9.95 price point was announced, media publications pointed out that MoviePass would lose money on each ticket sold.[11] This kind of reporting continued throughout the life of MoviePass, often echoing HMNY's disclosures.  For example, news media reported that MoviePass would need to obtain ticket discounts or other revenue sources to become profitable,[12] and that MoviePass's need for constant funding placed its future in doubt.[13]  These reports further added to the total mix of information at

---

[11] *See* Ex. E, Brian Barrett, *MoviePass Wants to Save Moviegoing—If Theaters Will Let It*, Wired (Aug. 17, 2017), https://www.wired.com/story/can-moviepass-save-movieging/ ("The first thing to understand about how MoviePass makes money: It doesn't.  The previous pricing system didn't turn a profit.  *And while making everything cheaper will draw more users, each user represents additional potential losses, assuming they go to more than one movie per month.  This seems, to put it kindly, unsustainable.*" (emphasis added)).

[12] *See* Ex. F, Nathan McAlone, *MoviePass is likely playing hardball by kicking 10 big AMC theaters off its service, and what happens next could have big implications for its business*, Insider (Jan. 26, 2018), https://www.insider.com/moviepass-kicks-10-amc-theaters-off-service-analysis-2018-1.

[13] *See* Ex. G, Tali Arbel, *Movie-theater deal could be too good to survive*, The Seattle Times (Feb. 20, 2018), https://www.seattletimes.com/business/unlimited-movie-theater-deal-could-be-too-good-to-survive/; Ex. H, Jason Guerrasio, *MoviePass' auditor says there's 'substantial doubt' about its ability to stay in business — as it reports a $150.8 million loss (HMNY)*, Business Insider (April 17, 2018), https://www.businessinsider.com/moviepass-owner-going-concern-doubt-raised-by-auditor-in-10-k-2018-4.

the time Farnsworth made his statements and provided investors with the information that Farnsworth allegedly misstated.  Any off-the-cuff statements would be "obviously unimportant" to investors who would have placed far greater significance on disclosures in HMNY's SEC filings and other press reports and analyses.  *See ECA, Loc. 134 IBEW*, 553 F.3d at 202; *Omnicare*, 575 U.S. at 190 (Investors pay attention more to "formal documents[] filed with the SEC" than "off-the-cuff judgments[] of the kind that an individual might communicate in daily life.").

Viewed in light of the robust mix of information available to investors regarding HMNY and MoviePass, the informal, single-sentence statements made in interviews or similar settings featured in the Complaint were not material.  These impromptu one-off statements make up the majority of the Complaint.  *See* Ex. A # 2–6, 8–10, 12.  Additional examples of HMNY's fulsome disclosures around the statements the Complaint alleges are misleading include:

| Alleged Misstatement | Corresponding Disclosure |
|---|---|
| **Para. 50.** April 12, 2018 statement that MoviePass can make $6 per subscriber in non-subscription revenue "right now." Compl. ¶ 50. | HMNY's SEC filings specifically disaggregated the company's revenue to show the amount of non-subscription and subscription revenue. *See, e.g.*, Ex. A-10 (Q1 2018 Form 10-Q) at 2, 6 (filed on May 15, 2018); *see also supra* p. 13 (explaining the Complaint's mischaracterization of Farnsworth's statement). |
| **Para. 33.** September 22, 2017 statement that Farnsworth was "confident" that MoviePass could break even on subscriptions. Compl. ¶ 33. | "Because the MoviePass $9.95 per month subscription pricing model is new, HMNY is providing the information in this communication to update investors regarding the resulting rate of increase in MoviePass subscribers . . . . [T]he increase in the number of MoviePass subscribers provides no assurance that the MoviePass business model will lead to profitability." Ex. A-1 (Sept. 14, 2017 Form 8-K) at 2.<br><br>"MoviePass expects its negative gross profit margin to remain significant until MoviePass can generate other sources of revenues to offset the losses or achieve substantial economies of scale.  There is no assurance MoviePass will be able to generate other sources of revenue or be able to achieve economies of scale that would reduce the cost of revenue |

| | sufficiently to generate a positive gross profit margin." Ex. B (Q3 2017 Form 10-Q) at 32 (filed on November 14, 2017). |
|---|---|
| **Para. 78.** May 13, 2018 statement that "We've got 17 months' worth of cash without further raises of capital." Compl. ¶ 78. | HMNY's disclosure explicitly disclosed its cash on hand. *See* Ex. D (May 8, 2018 Form 8-K) at 1. Additionally, both the Form 10-Q in effect at the time of the statement and the Form 10-Q for the second quarter of 2018 state that HMNY will require additional outside funding to continue operating for more than a year and warn that such funding is not guaranteed. *See* Ex. A-10 (Q1 2018 Form 10-Q) at 10; Ex. C (Q2 2018 Form 10-Q) at 12 (filed on August 14, 2018). |

Each of these statements, and sixteen others identified in the Complaint, *see* Ex. A (Chart) at # 2–4, 6–15, 17, 22–26, has a counterpart in the public domain that is more specific and more detailed. Farnsworth's statements were not material in light of all the information available to investors at the time of those statements.

### 2. Farnsworth's Statements Were Puffery or Opinion Statements, Bespoke Caution, or Were Statements of Corporate Motive.

Additionally, the Complaint identifies eighteen statements that are immaterial as a matter of law. *See Pontiac*, 752 F.3d at 183; *see also Halperin*, 295 F.3d at 357; Ex. A (Chart) at # 1–5, 8, 10–11, 13, 15–16, 18–21, 24–26. As a result, the First and Second Claims should be dismissed to the extent they rely on these statements.

### a. Farnsworth's Statements Were Puffery and Statements of Opinion.

Twelve statements are puffery and statements of opinion, Ex. A # 1–5, 8, 10–11, 18–21, and therefore are immaterial as a matter of law. Puffing statements, or puffery, are those statements which are "too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citation omitted). Puffery comes in many varieties, including "open-ended and subjective" statements, *id.* at 186, and "[s]tatements of general corporate optimism," *IBEW Local v. Royal Bank of Scotland*

*Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015). Genuinely held statements of opinion are also generally not actionable unless they contain embedded statements of fact that were not true or imply that the speaker knew facts not disclosed to the public that would justify his opinion when no facts existed. *Omnicare*, 575 U.S. at 185, 191; *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). Three examples illustrate this point here:

**Paragraph 33: "[Based on] a wealth of historical data . . . we think we can be profitable on the subscriptions at $9.95. . . . I'm confident that we will [break even on the subscriptions alone]."** This statement is a general statement of expecting business success that does not give a reasonable investor meaningful information on which to rely. *See Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019). Courts regularly dismiss claims where defendants have used similar language. *See, e.g., Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (puffery where defendant claimed "[t]he integrity, reliability and credibility of [a company subunit] has enabled us to compete successfully in an increasingly global and complex market, and that is true today and we are confident it will be so in the future"); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-CV-08585, 2022 WL 4085677, at *33 (S.D.N.Y. Sept. 2, 2022) (speaker engages in puffery when he says he is "pretty confident" about the future).

**Paragraph 34: When asked, "[b]ut is [$9.95 per month] too low of a price point I guess?" Farnsworth responded "no."** This statement is the kind of "open ended" statement that is "too general to cause a reasonable investor" to rely upon it. *Pontiac*, 752 F.3d at 183, 186. In *Pontiac*, the Second Circuit held a corporation's statements that it engaged in "*adequate*

20

diversification of risk" and "avoidance of *undue* concentrations" were too subjective to be material. *Id.* at 186.

**Paragraph 55: Statement reciting historical data and concluding with "So we think we can be profitable on the subscriptions at $9.95 and then make the real money from the additional revenue sources."** This statement is a projection and an opinion based on the data that Farnsworth discussed in the interview, and his statement that "we think we can be profitable" is an opinion about how he thinks MoviePass will make money. *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 477 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) (projections regarding a project's "future productivity and profitability [were] statements of opinion since they d[id] not express presently existing objective facts"); *In re Sanofi Sec. Litig*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) (expressions of "expectations for the future" are opinions).

### b.  Farnsworth's Statements in HMNY's SEC Filings Are Immaterial Because They Bespoke Caution.

Farnsworth's nine statements in SEC filings are non-actionable because they bespeak caution. *See* Ex. A # 1, 11, 13, 15–16, 18–21.  Statements accompanied by adequate cautionary language are said to "bespeak caution" and are immaterial as a matter of law.  This doctrine applies where "it cannot be said that any reasonable investor could consider [the statements] important in light of adequate cautionary language set out in the same offering."  *Halperin*, 295 F.3d at 357. For cautionary language to offset an alleged misstatement, the language must "precisely address the substance of the specific statement or omission that is challenged."  *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 300–01 (S.D.N.Y. 2000).

As addressed above, HMNY's SEC filings were suffused with cautionary language addressing the precise topics identified in the Complaint.  HMNY's Form 10-K and Form 10-Qs

contain cautionary language regarding HMNY's working capital position, the risks of MoviePass's business model, and detailed disclosures regarding HMNY's liquidity, cash on hand, and cash burn. *See supra* part II.A.1. HMNY's filings warned that the company's plans to raise capital may not come to fruition, *see, e.g.*, Ex. A-8 (2017 Form 10-K) at 29 ("While management plans to raise additional capital . . . there is no assurance that management's plans will be successful."), that there was a risk that MoviePass could not generate the economies of scale needed to become profitable, *id.* at 10, and that if MoviePass could not negotiate discounted ticket rates, it could be unable to "sustain its operations," *id.* These disclosures "precisely address the substance of the specific statement or omission that is challenged," *Steinberg*, 88 F. Supp. 2d 294 at 301 (citation omitted), and render the statements in HMNY's SEC filings immaterial as a matter of law.

### c. Farnsworth's Statements of Corporate Motives Are Immaterial.

Five statements identified in the Complaint are non-actionable because they address the motivations for certain actions taken by MoviePass. *See* Ex. A # 13, 16, 24–26. Corporate motives are not material where, as here, all relevant facts and circumstances have been fully disclosed. "The unclean heart of a director is not actionable, whether or not it is 'disclosed,' unless the impurities are translated into actionable deeds or omissions both objective and external." *Hahn v. Breed*, 587 F. Supp. 1369, 1376 (S.D.N.Y. 1984). Put more simply, "a defendant's motive is not a material 'fact.'" *Ward v. Succession of Freeman*, 854 F.2d 780, 791 (5th Cir. 1988).

The Complaint alleges that Farnsworth misrepresented the company's motivations in undertaking efforts to reduce cash burn and prevent fraud, *see* Compl. ¶¶ 65–74, but the Complaint does not allege that Farnsworth failed to disclose its efforts to reduce subscriber usage. In April 2018, HMNY disclosed that it had "implemented certain measures to promote the fair use of our MoviePass subscription product." Ex. A-10 (Q1 2018 Form 10-Q) at 33. HMNY disclosed that

it added new features to: (1) allow subscribers to log in on only one mobile device; (2) allow subscribers to see a movie title only once; and (3) require ticket verification.  *Id.*  And it said the reasons for those were to "improve our cash flow," "reduce cash burn," to "eliminat[e] suspected fraud and reselling of tickets," and to "reduce usage and our ticket costs."  *Id.*; *see also* Ex. A-12 (July 31, 2018 Form 8-K) (explaining that HMNY was implementing efforts to cut monthly cash burn by 60%).  Investors possessed every relevant fact; they simply were not privy to his alleged motivations, which are immaterial under the law.

## B.  The Complaint Fails to Allege Scienter.

The Complaint fails to allege scienter for any statement by Farnsworth and therefore the Second Claim should be dismissed.  *See generally* Ex. A.  Section 10(b) and Rule 10b–5 claims require factual allegations demonstrating that the defendant acted with scienter.  *Acito v. IMCERA Group*, 47 F.3d 47, 53 (2d Cir. 1995).[14]  "[S]peculation and conclusory allegations" are not enough: plaintiffs must allege facts giving rise to a "strong inference of fraudulent intent."  *Id.* at 52.  A "strong inference" of scienter may be alleged by either: (a) alleging facts showing the defendant "had both motive and opportunity to commit fraud"; or (b) alleging facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  The Complaint must plead specific facts alleging scienter for each statement.  *See S.E.C. v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *8 (S.D.N.Y. Nov. 29, 2010) (dismissing claims for several statements when the SEC failed to allege scienter); *S.E.C. v. Lucent Techs., Inc.*, No. 04-2315, 2005 WL 1206841, at *5

---

[14] Section 17(a)(1) also requires scienter, *Aaron v. S.E.C.*, 446 U.S. 680, 697 (1980), but it covers only scheme liability.  For the reasons discussed *infra* Part III, the Complaint fails to plead a viable Claim based upon scheme liability.

(D.N.J. May 20, 2005) (dismissing complaint where there were no factual allegations regarding a defendant's knowledge).

### 1. The Complaint Lacks Allegations of Motive and Opportunity.

As to motive, the Complaint alleges that Farnsworth profited from his alleged misconduct by "receiv[ing] bonus payments and/or other special compensation" without specifying the nature of this "special compensation."  Compl. ¶ 80.  This threadbare allegation is insufficient to allege motive and opportunity to commit fraud.

To allege motive, the Complaint must allege facts showing that Farnsworth received "a concrete and personal benefit from the alleged fraud."  *Shields*, 25 F.3d at 1130; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 619 (S.D.N.Y. 2005).  Keeping a job, receiving bonuses, and other executive compensation—generalized benefits sought by all corporate directors and officers—do not suffice to allege a motive to commit fraud.  *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *Acito*, 47 F.3d at 54 ("executive compensation dependent upon stock value does not give rise to a strong inference of scienter"; otherwise, a downturn in stock price alone could justify a securities fraud action); *In re JP Morgan*, 363 F. Supp. 2d at 620 ("earning significant performance-based bonuses" is not a "legally sufficient" motive).

What is required is an allegation, tied to the pleaded facts, showing a motive unique to the defendant that could have resulted in his personal benefit, such as allowing him to sell shares at a profit or to delay his criminal prosecution.  *See Acito*, 47 F.3d at 54 ("The fact that the . . . defendants did not sell their shares during the relevant class period undermines plaintiffs' claim" and does not give rise to a "strong inference of intent to deceive."); *Shields*, 25 F.3d at 1130.  There are no such allegations here.

### 2.   The Complaint Lacks Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

A complaint that fails to allege motive and opportunity must plead "strong circumstantial evidence of conscious misbehavior or recklessness"—the strength of the factual allegations containing circumstantial evidence "must be correspondingly greater" than allegations showing a motive and opportunity. *See Kalnit*, 264 F.3d at 142 (citation omitted). The Complaint does not allege circumstantial evidence of conscious misbehavior or recklessness, much less does it allege strong evidence.

*First*, there are no allegations of conscious misbehavior, which is intentional misconduct that encompasses "deliberate illegal behavior such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 780 (S.D.N.Y. 2021) (citation omitted). The Complaint does not contain any allegations of the sort here.

Curiously, the Complaint alleges that Farnsworth's alleged efforts to invalidate users' passwords support an inference of scienter. *See* Compl. ¶¶ 65–69. The Complaint alleges that Farnsworth agreed for MoviePass to implement tactics to disrupt user access by adding "password disruption" and "ticket verification" features for heavy users, *id.* at ¶¶ 65–66, and that he later attributed the reduction in subscribers' consumption to a natural decrease by users instead of a forced reduction in use, *id.* at ¶¶ 67–69. The Complaint does not allege that this conduct, curbing MoviePass subscriber usage, was in any way illegal. Certainly, any allegations in the Complaint are nothing like the kinds of actions courts in this Circuit have found constitute conscious misbehavior—"securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount," *see, e.g.*, *Maloney*, 518 F. Supp. 3d at 780—so there is no allegation of conscious misbehavior.

*Second*, there are no allegations of recklessness, which involves conduct that is "highly unreasonable and [] represents an extreme departure from the standards of ordinary care" so that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). To allege recklessness, the complaint must specifically allege the defendant "knew facts or had access to information suggesting that [his] public statements were not accurate." *In re JP Morgan*, 363 F. Supp. 2d at 623–24; *see Rombach*, 355 F.3d at 176. If a plaintiff contends a defendant "had access to contrary facts, [the plaintiff] must specifically identify the reports or statements containing this information," *Maloney*, 518 F. Supp. 3d at 780 (citation omitted), or identify "any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements," *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (citation omitted); *see Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("Plaintiffs must *specifically identify* the reports or statements that are contradictory to the statements made, or must provide specific instances in which Defendants received information that was contrary to their public declarations." (citation omitted)).

The Complaint is devoid of such allegations—it does not identify specific reports or statements of which Farnsworth was aware and that contained information contrary to Farnsworth's statements. Instead, the Complaint paints with a broad brush. Its only allegations—other than those related to "password disruption" and "ticket verification" features for heavy users, discussed above—that could possibly relate to scienter are the following:

| SEC's Allegation | Why the Allegation Does Not Support Scienter |
|---|---|
| **Para. 32–33.** Farnsworth allegedly knew or recklessly disregarded the "$9.95 price had to be | The Complaint fails to allege how or why Farnsworth knew the price must be temporary |

| | |
|---|---|
| a temporary, unprofitable measure," when he said, on September 22, 2017, that he was "confident" MoviePass could break even on subscriptions alone and that "we think we can be profitable on the subscriptions at $9.95." Compl. ¶¶ 32–33. | or what reports said the price was unsustainable. The allegations do not point to any report that Farnsworth ignored or explain why Farnsworth was wrong to believe MoviePass could be profitable on subscriptions alone when he spoke shortly after HMNY invested in MoviePass. |
| **Para. 40–41.** On September 14, 2017, Farnsworth allegedly knew or recklessly disregarded that HMNY was not analyzing consumer trends or incorporating artificial intelligence into MoviePass when he made statements in a press release regarding HMNY's use of technology on September 14, 2017. Compl. ¶¶ 40–41. | The Complaint does not reference any reports or statements from before September 14, 2017 containing contrary information or suggesting Farnsworth's statements about consumer trends and incorporating artificial intelligence were incorrect. |
| **Para. 47–48.** On January 9, 2018, Farnsworth allegedly knew or recklessly disregarded that MoviePass would not be self-sufficient in 60 days, when he said that would be the case, because MoviePass was not receiving enough revenue from studios or enough discounts from movie theater chains yet. Compl. ¶¶ 47–48. | The Complaint doesn't specify what information Farnsworth failed to take into account or where this information was located when he said that he expected MoviePass to be self-sufficient in 60 days. |
| **Para. 50.** In April 2018, Farnsworth allegedly knew or recklessly disregarded that MoviePass could not generate $6 per month in non-subscription revenue "right now" because internal projections said that MoviePass could generate only $0.50 to $2. Compl. ¶ 50. | There are two problems with the allegation: *first*, the Complaint inaccurately describes what Farnsworth said, *see supra* at p. 13 and *second*, the Complaint doesn't specify what "internal projections" it references.   *See Dynex*, 531 F.3d at 196. |
| **Para. 52–53.** In July 2018, Farnsworth allegedly knew or recklessly disregarded that MoviePass's subsidiaries were not generating ancillary revenues—when he said that was the case in HMNY's Form 8-K filed on July 31, 2018—because those entities made no payments to MoviePass in 2018 and their revenues were allegedly never realized. Compl. ¶¶ 52–53. | The Complaint fails to allege any concrete facts regarding these revenues or why Farnsworth was not right to believe the subsidiaries were generating ancillary revenues. In fact, information with respect to those revenues were publicly disclosed in the 2017 Form 10-K (Ex. A-8), the 2018 Q1 Form 10-Q (Ex. A-10), and the 2018 Q2 Form 10-Q (Ex. C). |
| **Para. 58.** On September 22, 2017, when he stated that MoviePass would be like a "buffet" so the average user would decrease usage over time, Farnsworth allegedly knew or recklessly disregarded that MoviePass did not gather historical data showing that usage decreased over time and that average users did not balance out heavy users. Compl. ¶ 58. | This is an allegation of falsity, not scienter. The Complaint makes no allegations regarding Farnsworth's state of mind in September 2017 right after HMNY had bought MoviePass, what facts demonstrated usage did not decrease, or where those facts were recorded. |

| | |
|---|---|
| **Para. 79.** In April 2018, Farnsworth allegedly knew that HMNY could not access enough funding to sustain MoviePass when he signed HMNY's 2017 Form 10-K on April 16, 2018 that stated "as a result of our shelf registration in February, the Company has adequate access to capital to fund our operations and capital investment needs for the foreseeable future" and when he told *Variety* on April 17, 2018 that capital was not an issue. *See* Compl. ¶¶ 75–78. The lone support for this allegation is a single text message from HMNY's CFO opining that "[s]omething ha[d] to change . . . to curtail spending and usage." Compl. ¶ 79. | One person's opinion that HMNY needed to stop burning cash on a specific date doesn't satisfy the Second Circuit's standard for scienter, especially because that text was sent the same week that HMNY filed its Form 10-K, in which HMNY provided all available cash and all expenses and describes the Company's access to funds. *See* Ex. A-8 (2017 Form 10-K); *cf. Shields*, 25 F.3d at 1129 (no circumstantial evidence of conscious misbehavior or recklessness because the plaintiff "d[id] not allege that the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made"). |

### C. The Complaint Fails to Specify Any Allegedly False Statements for Paragraphs 42, 52, and 72.

Nine statements in three paragraphs of the Complaint—paragraphs 42, 52, and 72—fail to meet Rule 9(b)'s requirement that a complaint alleging fraud specify the allegedly fraudulent statements. *See* Ex. A # 18–26. Those paragraphs merely list documents allegedly containing false or misleading statements without specifying what statements were allegedly false and why. *See* Compl. ¶¶ 42, 52, 72; *cf. Gross v. Diversified Mortgage Investors*, 431 F. Supp. 1080, 1087 (S.D.N.Y. 1977) (dismissal of Section 10(b) claim when plaintiff failed to provide "specific identification of what statements were made in what reports and in what respects they were false, misleading or inaccurate" or why the misstatements were fraudulent). This is a fundamental failure to meet Rule 9(b), as Farnsworth is left to guess what statements could be the basis for the SEC's claim. Furthermore, the Complaint fails to explain why the statements were fraudulent. *See Rombach*, 355 F.3d at 172 (stating that "this Court has repeatedly required . . . that the pleading explain why the statements were fraudulent"). This complete lack of specificity fails to satisfy Rule 9(b), and the statements contained in these paragraphs should be dismissed as a basis for liability.

**III.    The Complaint Fails to Plead Scheme Liability.**

The Court should dismiss the Complaint's claims under Section 17(a)(1), Section 17(a)(3), Rule 10b–5(a), and Rule 10b–5(c), because the SEC has failed to allege a scheme to defraud HMNY investors.  Scheme liability applies when allegations demonstrate a defendant engaged in deceptive and manipulative acts to defraud investors, not when he is alleged to have made only misstatements and omissions.  *See S.E.C. v. Rio Tinto*, 41 F.4th 47, 49 (2d. Cir. 2022) ("[A]n actionable scheme liability claim requires something *beyond* misstatements and omissions . . . .").

**A.  The Complaint Fails to State a Claim For Scheme Liability Because the Complaint Alleges Only Misstatements.**

The Complaint fails to allege scheme liability because the entirety of the Complaint is about alleged misstatements; there is no allegation as to fraud apart from Farnsworth's alleged misstatements.  The SEC cannot remedy its failure to allege any actionable misstatement by trying to recast their case, grounded entirely on alleged misstatements, as one alleging scheme liability.  *See id.*; *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) ("alleged misrepresentations or omissions," without more, fail to state a claim under Rule 10b–5(a) or (c)).  Instead, the SEC must show that Farnsworth "perform[ed] [] an inherently deceptive act that is distinct from an alleged misstatement," *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011), which it fails to do here.

Apart from the alleged misstatements, the Complaint does not clearly state what deceptive conduct Farnsworth engaged in that was in the offer, purchase, or sale of an HMNY security.  The Complaint appears to allege that the deceptive conduct was Farnsworth's knowledge and approval of MoviePass's alleged blocking of AMC movie theaters and impeding heavy usage of its app.  Compl. ¶¶ 59–62; 65–74; *see also* SEC Ltr. (Dkt. No. 31) at 3.  These policies to reduce usage are not inherently unlawful in the context of securities transactions.  The Complaint's allegations say

29

only that Farnsworth implemented policies to reduce usage by MoviePass *users* and then *made misstatements about those policies*.  *See* Compl. ¶ 2 (alleging a fraud was accomplished by "falsely and misleadingly inform[ing] the public that usage had declined naturally or due to measures the company had employed to combat subscribers' purported violations of MoviePass's terms and conditions of service"); *id.* ¶ 62 ("Farnsworth thereafter made misleading public statements" about MoviePass blocking AMC); ¶ 67 (Farnsworth "falsely and misleadingly stated" that MoviePass would "never get rid of" heavy users."); ¶ 68 (Farnsworth "authorized the issuance of false and misleading joint press releases" about MoviePass subscribers naturally decreasing their usage); ¶ 70 (Farnsworth "publicly stated that the tactics were being employed to address 'fraud' and 'misuse'").  Because the Complaint alleges only fraudulent statements, the First and Second Claims based on scheme liability should be dismissed.

### B. The Complaint Forces Farnsworth to Piece Together the Puzzle of What Conduct the SEC Alleges Supports Scheme Liability.

The Complaint is also unclear about what conduct it alleges constitutes a separate scheme to defraud investors as opposed to making false statements to them.  Thus, the First and Second Claims should be dismissed under Rule 9(b) for failing to plead scheme liability with particularity. For Section 17(a), the Complaint simply alleges the wording of the statute, Compl. ¶ 146, and it "re-alleges and incorporates by reference [] the allegations in paragraphs 1 through 144," *id.* ¶ 145. Likewise, for Section 10(b) and Rule 10b–5, the Complaint alleges the wording of the statute and rule, Compl. ¶ 149, and it "re-alleges and incorporates by reference [] the allegations in paragraphs 1 through 144," *id.* ¶ 148.

That lack of detailing which allegations support scheme liability runs afoul of Rule 9(b)'s requirement that fraud be pled with particularity, and, as to scheme liability, this Complaint is both a shotgun pleading and a puzzle pleading.  *See S.E.C. v. Fraser*, No. CV 09-00443, 2009 WL

2450508, at *14 (D. Ariz. July 29, 2010) (explaining a complaint which relies on shotgun or puzzle pleading does not meet Rule 9(b)'s particularity requirement); *see also Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 479 (S.D.N.Y. 2021) (dismissing a "puzzle pleading" where the Court had "to sort out the alleged misrepresentations and [] match them with the corresponding adverse facts" (citation omitted)); *In re Pareteum Sec. Litig.*, No. 19 CIV. 10460, 2020 WL 3448526, at *2 (S.D.N.Y. June 23, 2020) (dismissing a complaint for being a puzzle and shotgun pleading).

The Complaint is a puzzle pleading because it is not clear what allegations relate to the scheme claim or why Farnsworth's conduct meets those elements, leaving Farnsworth to piece together its 144 fact-related paragraphs to speculate what scheme it alleges exists. It is also a shotgun pleading. In the First and Second Claims, the Complaint merely incorporates all preceding paragraphs and states the elements of the claims. *See* Compl. ¶ 145–46, 148–49. The Court should, therefore, dismiss the scheme liability claims in the First and Second Claims for failing to comply with Rule 9(b).

## IV.   The Complaint Fails to State a Claim Against Farnsworth Under Section 13(b).

The Complaint fails to state a claim against Farnsworth for allegedly aiding and abetting HMNY's alleged violation of Exchange Act Section 13(b)(2)(A), or for any primary violation of Section 13(b)(5) and Rules 13b2–1 and 13b2–2.[15]

### A.  The Four Alleged Invoices.

The Complaint's allegations against Farnsworth apparently stem from four invoices submitted by Khalid Itum, a MoviePass employee, on behalf of his marketing firm, Kaleidoscopic

---

[15] Like the claims of securities fraud, the Complaint's claims related to supposedly false invoices and related submissions sound in fraud, so this Court applies Rule 9(b)'s heightened pleading standard to Claims Five and Six as well. *See Rombach*, 355 F.3d at 171 (holding that Rule 9(b) applies when securities violations are predicated on allegations of fraud, even if fraud is not a required element of the claim). The Complaint does not meet that standard.

Ventures, LLC, which had performed business development services for MoviePass.   The Complaint alleges that those invoices did not accurately reflect funds spent on event planning services.  Compl. ¶¶ 87–88.

Three invoices were submitted to HMNY's CFO, not Farnsworth.  With respect to these invoices (one of which the Complaint alleges was recorded on MoviePass's books and records, Compl. ¶ 104), there are no allegations that Farnsworth reviewed or approved two of the invoices or knew that they were allegedly overstated or false.  As to the third invoice, there is no allegation that Farnsworth received or reviewed it; the only allegation is that he approved a transfer of funds to Kaleidoscope that was requested by the HMNY CFO for event planning expenses.  Compl. ¶ 114.  There is no allegation that Farnsworth knew that the funds transferred would allegedly be misused by Itum.  As to all of them, there are no allegations that Farnsworth knew how, if at all, the invoices were recorded on HMNY or MoviePass's books and records.  The Complaint does not identify which HMNY or MoviePass book or record was allegedly false and why.

The fourth allegedly false invoice was submitted to MoviePass CEO Lowe, who approved it; the invoice was then recorded by MoviePass on its books.  *Id.* at 113.  There is no allegation that Farnsworth knew of or reviewed the invoice (indeed, it was submitted to Lowe and MoviePass), knew the invoice allegedly was false, knew Lowe would allegedly approve that invoice, or knew that MoviePass's books would allegedly mischaracterize it.  *See id.* at 107–13.

These alleged facts fall woefully short of stating a claim of any kind under Section 13(b) against Farnsworth, and, therefore, the Fifth and Sixth Claims should be dismissed.

### B.  Farnsworth Did Not Aid and Abet HMNY's Alleged Record Keeping Violations.

There are no facts supporting the assertion that Farnsworth knew of and substantially assisted HMNY in any alleged Section 13(b)(2)(A) violation.  Under Section 13(b)(2)(A), a company must "make and keep books, records, and accounts, which, in reasonable detail,

accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A).  To state a claim for aiding and abetting a company's violation of Section 13(b)(2)(A), the Complaint must allege: (1) the existence of a securities law violation by the company; (2) the aider and abettor knew of that violation; and (3) the aider and abettor "substantially assisted" in the primary violation.  *S.E.C. v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009); *S.E.C. v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334, 336–37 (S.D.N.Y. 2006).  "[L]iability for aiding and abetting requires allegations of affirmative conduct, rather than mere awareness and approval."  *S.E.C. v. Patel*, No. 07-cv-39, 2008 WL 782465, at *17 (D.N.H. Mar. 24, 2008) (citations and footnote omitted).

The Complaint does not come close to alleging a violation under these provisions for several reasons.  To start, the Complaint does not even identify any supposedly false book, record, or account at HMNY and therefore does not establish a primary violation.  *See S.E.C. v. Miller*, 2017 WL 5891050, at *7 (dismissing Rule 13b2–1 cause of action because complaint "fails to specif[y] exactly which books, records, or accounts failed to accurately reflect" transactions). There is no allegation that Farnsworth knew of the allegedly false invoices or knew how HMNY or MoviePass recorded them.  *See Cedric Kushner*, 417 F. Supp. 2d  at 337; *see also Patel*, 2008 WL 782465, at *18 ("[T]he complaint [] fails to allege facts that adequately connect [the defendant] with the preparation of [the company's] corporate books, records, and accounts."). Further, there are no allegations that Farnsworth approved any invoice—all invoices were approved by Lowe or HMNY's CFO, Compl. ¶¶ 91, 103, 112, 114—much less that he approved one he knew to be false.  There is no allegation that Farnsworth knew how the invoices were recorded either at HMNY or MoviePass or knew they were inaccurate.  *See* Compl. ¶¶ 89–124. The Complaint does not allege that Farnsworth knowingly and substantially participated in any

failure by HMNY to keep accurate books and records.  *See Patel*, No. CIV. 07-CV-39-SM, 2008 WL 782465, at *17.  Therefore, the Fifth Claim should be dismissed.

### C.  Farnsworth Did Not Knowingly, Directly, or Indirectly Falsify Any Books or Records, Cause Any Books or Records to Be Falsified, or Make Any Misleading Statements to Any Accountant.

The Complaint also fails to allege a violation of Section 13(b)(5) or Rule 13b2–1.[16]  There is no violation of Section 13(b)(5) because there are no facts alleging that Farnsworth knowingly circumvented, failed to implement a system of internal accounting controls, or falsified any book, record, or account.  *See* 15 U.S.C. § 78m(b)(5).  There is no violation of Rule 13b2–1 because there are no facts alleging that Farnsworth directly or indirectly falsified or caused a book, record, or account to be falsified.  17 C.F.R. § 240.13b2–1.

In fact, there are no allegations as to any of this.  The only facts alleged are that Farnsworth instructed HMNY's CFO and Lowe to pay Itum bonuses, Compl. ¶¶ 97, 108; that Farnsworth approved a wire to Kaleidoscope for production services related to an event it was managing, Compl. ¶ 114; and that in April 2018, Farnsworth told Itum that auditors were looking at Sundance Event expenses.  Compl. ¶ 129.  These allegations do not show that Farnsworth knowingly circumvented, failed to implement a system of internal controls, or directly or indirectly falsified any book, record, or account.

Finally, there are no facts alleging that Farnsworth directly or indirectly contributed to the issuance of any materially misleading statement or omission to any accountant in connection with any SEC filing, so there is no claim under Rule 13b2–2.  17 C.F.R. § 240.13b2–2.  There are no allegations that Farnsworth made any statement to any accountant, or that Farnsworth made any

---

[16] Section 13(b)(5) requires alleging scienter, while Rule 13b2–1 requires alleging the defendant's direct involvement.  *S.E.C. v. MiMedx Grp., Inc.*, No. 19 CIV. 10927, 2022 WL 902784, at *5 (S.D.N.Y. Mar. 28, 2022).

misstatement in a document he knew would go to an accountant.  *Cf. S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 436 (S.D.N.Y. 2010) (plaintiff stated a claim that defendant violated Rule 13b2–2 when the defendant was "alleged to have made materially misleading statements" in several letters sent to accountants).  The only factual allegation relating to an action taken by Farnsworth and to auditors is his telling Itum that auditors were reviewing the Sundance Event expenses.  *See* Compl. ¶ 129.  That does not show that Farnsworth acted in any way to deceive auditors or that he made misstatements to auditors.  *See Patel*, 2009 WL 3151143, at *31 (dismissing Rule 13b2–2 claim where SEC failed to allege that the defendant made a statement to any auditor).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety against Farnsworth with prejudice.

Dated: January 24, 2023                           Respectfully submitted,


                                                  */s/ E. Andrew Southerling*
                                                  George James Terwilliger
                                                  Edward Andrew Southerling (*pro hac vice*)
                                                  Louis D. Greenstein
                                                  Benjamin Almond O'Neil (*pro hac vice*)
                                                  **MCGUIREWOODS LLP**
                                                  888 16th Street N.W., Suite 500
                                                  Black Lives Matter Plaza
                                                  Washington, DC 20006
                                                  Telephone: (202) 857-1700
                                                  Fax: (202) 857-1737
                                                  gterwilliger@mcguirewoods.com
                                                  asoutherling@mcguirewoods.com
                                                  lgreenstein@mcguirewoods.com
                                                  boneil@mcguirewoods.com

                                                  Jason H. Cowley
                                                  **MCGUIREWOODS LLP**
                                                  201 N. Tryon St.
                                                  Suite 3000
                                                  Charlotte, NC 28202

Telephone: (704) 343-2000
Fax: (704) 343-2300
jcowley@mcguirewoods.com

***Counsel for Defendant***
***Theodore J. Farnsworth***

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 24, 2023.

/s/ *Edward Andrew Southerling*
Edward Andrew Southerling