UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                                    Plaintiff,

                    -v.-

THEODORE J. FARNSWORTH, J. MITCHELL
LOWE, and KHALID ITUM,

                                    Defendants.

---

22 Civ. 8226 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

MoviePass, Inc. ("MoviePass") is a subscription service that, during the relevant time period, allowed subscribers to pay a fixed monthly fee to see multiple movies per month at participating theaters.  In August 2017, Helios and Matheson Analytics Inc. ("HMNY," and together with MoviePass, the "Companies") acquired MoviePass.  Unfortunately for HMNY and its investors, HMNY was not able to make MoviePass profitable following the acquisition, and HMNY, along with MoviePass and its other subsidiaries, ultimately filed Chapter 7 liquidation petitions in January 2020.  The United States Securities and Exchange Commission (the "SEC" or "Plaintiff") brought this enforcement action against Theodore J. Farnsworth and J. Mitchell Lowe, alleging that between 2017 and 2019 — when Farnsworth and Lowe were Chief Executive Officers ("CEOs") of HMNY and MoviePass, respectively — they made material misstatements about MoviePass and engaged in a fraudulent scheme to deceive HMNY investors, in violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), and Rule 10b-5 promulgated thereunder.  Additionally, the SEC claims that Farnsworth and Lowe participated in the falsification of HMNY's books and records in conjunction with another former MoviePass employee, Khalid Itum (together with Farnsworth and Lowe, "Defendants"), in violation of Section 13(b) of the Exchange Act and Rules 13b2-1 and 13b2-2 promulgated thereunder.  Before the Court are Defendants' motions to dismiss. For the reasons set forth in the remainder of this Opinion, the Court grants in part and denies in part Defendants' motions.

BACKGROUND[1]

## A.    Factual Background

### 1.    The Parties

HMNY is a Delaware corporation with its principal place of business in New York, New York.  (Compl. ¶ 16).  HMNY's common stock is registered pursuant to Section 12(g) of the Exchange Act and was traded on the NASDAQ exchange until January 2019.  (*Id.* ¶ 17).  The company filed a bankruptcy

---

[1]    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declarations of William F. McGovern ("McGovern Decl., Ex. [ ]" (Dkt. #49)) and Andrew Southerling ("Southerling Decl., Ex. [ ]" (Dkt. #54)), each of which is incorporated by reference in the Complaint.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Farnsworth's memorandum of law in support of his motion to dismiss as "Farnsworth Br." (Dkt. #53); to Lowe's memorandum of law in support of his motion to dismiss as "Lowe Br." (Dkt. #48), to Itum's memorandum of law in support of his motion to dismiss as "Itum Br." (Dkt. #51); to the SEC's consolidated memorandum of law in opposition to Defendants' motions to dismiss as "Pl. Opp." (Dkt. #57); to Farnsworth's reply memorandum of law as "Farnsworth Reply" (Dkt. #63); to Lowe's reply memorandum of law as "Lowe Reply" (Dkt. #60); and to Itum's reply memorandum of law as "Itum Reply" (Dkt. #58).

petition in January 2020.  (*Id.* ¶ 18).  Farnsworth, a resident of Miami, Florida, was the Chairman and CEO of HMNY from January 2017 until September 2019.  (*Id.* ¶ 13).

MoviePass is a privately held Delaware corporation with its principal place of business in New York, New York.  (Compl. ¶ 19).  Lowe, a resident of Miami Beach, Florida, and Puerto Vallarta, Mexico, was the CEO of MoviePass from 2016 to 2020.  (*Id.* ¶ 14).  MoviePass's primary product offering was a movie subscription service, whereby subscribers could pay a fixed monthly fee to see a certain number of movies each month.  (*Id.* ¶ 20).  Subscribers were issued a debit card through which they could purchase one ticket for a specific movie, theater, and show time selected through the MoviePass application on their phones.  (*Id.*).

On August 15, 2017, HMNY announced its intention to acquire MoviePass (the "Announcement"), which it completed in December 2017 (the "Acquisition").  (Compl. ¶¶ 26-28).  MoviePass then became a subsidiary of HMNY.  (*Id.* ¶ 19).  Prior to the Acquisition's closing, in November 2017, HMNY issued $100 million in convertible notes, and in February 2018, just two months after the closing, HMNY conducted a public offering of warrants that raised approximately $97 million.  (*Id.* ¶ 29).  Both of these offerings, the SEC contends, coincided with, and were impacted by, Farnsworth's and Lowe's materially false and misleading statements regarding MoviePass.  (*Id.*).

By the time HMNY filed its Form 10-K for the 2017 fiscal year in April 2018, it owned approximately 92% of MoviePass's outstanding common stock;

MoviePass became HMNY's core business and its primary source of revenue. (Compl. ¶ 28). While MoviePass's subscription model was HMNY's primary source of revenue, Farnsworth publicly identified other ancillary sources of potential revenue, including data analytics (*id.* ¶ 43), studio and exhibitor partnerships (*id.* ¶ 49), an associated film production company (*id.* ¶ 51), and entertainment information and marketing (*id.*), none of which the SEC contends generated meaningful revenue for the Companies (*id.* ¶¶ 52-53). Both HMNY and MoviePass filed Chapter 7 petitions in January 2020. (*Id.* ¶¶ 3, 18, 21).

Khalid Itum, a resident of Los Angeles, California, was hired by MoviePass as Vice President for Business Development in October 2017, and was promoted to Executive Vice President in October 2018. (Compl. ¶ 15). As Executive Vice President, Itum was responsible for MoviePass's day-to-day operations. (*Id.*). Itum resigned from MoviePass effective March 19, 2019. (*Id.*). Separately, Itum founded Kaleidoscopic Ventures, LLC (known through 2021 as Kaleidoscope Productions LLC) ("Kaleidoscope"), an experiential marketing firm, in March 2017. (*Id.* ¶¶ 22-24). Itum is the sole owner, officer, and employee of Kaleidoscope. (*Id.* ¶¶ 24-25).

### 2. Farnsworth's and Lowe's Public Statements and Ticket Usage Control Measures

Prior to the Announcement, the price point of MoviePass's monthly subscription had fluctuated between $12.95 and $89.95, depending on time and geographic location. (Compl. ¶ 30). Concurrent with the Announcement, and at Farnsworth's and Lowe's direction, HMNY and MoviePass publicized

4

that all subscribers would pay $9.95 per month irrespective of their location, and could see "[a]ny movie; any theater; any day." (*Id.*).  Farnsworth and Lowe made various statements regarding the profitability of the Company while offering the service at this price point, each time affirming that the price point was viable.  Farnsworth and Lowe did so in joint interviews conducted on August 16, 2017, with Variety.com (*id.* ¶ 32), and on January 9, 2017, with Yahoo Finance (*id.* ¶¶ 34-35).  Farnsworth also did so in a September 25, 2017 interview with Pipeline Data (*id.* ¶ 33), and Lowe did so in a February 18, 2018 appearance on an episode of the Recode Media podcast (*id.* ¶ 36).  In the February 18, 2018 interview, Lowe stated that the price point had been "tested like crazy" (*id.*), and Farnsworth similarly declared that "historical data" supported the price point in the September 25, 2017 interview (*id.* ¶ 33). However, according to the SEC, Farnsworth and Lowe knew at the time of these statements that the price point was not based on data or market testing, and that MoviePass could not become profitable based on subscriber revenue at that price point alone.  (*Id.* ¶ 31).

Farnsworth and Lowe made multiple public statements vaunting HMNY's data analytics capabilities and its ability to use MoviePass's subscriber data to generate additional revenue, despite the fact that such tools were not actually integrated into the Companies' business models.  (Compl. ¶ 41).  These statements were made not only in press releases approved by Farnsworth, but also in multiple filings with the SEC, including an October 24, 2017 Form 8-K, a January 25, 2018 Form S-3, an April 17, 2018 Form 10-K, and a May 15,

2018 Form 10-Q, each of which was approved by Farnsworth.  (*Id.* ¶¶ 40-42).

Consistent with those statements, Farnsworth stated in the January 2018

Yahoo Finance interview that "data analytics [is] how we're driving the revenues

of the company right now."  (*Id.* ¶ 43).  Lowe similarly characterized HMNY as a

"data analytics firm" in an October 2017 CNBC interview.  (*Id.* ¶ 44).  However,

by February 2018, HMNY still lacked the data analytics capabilities described

in such statements and was not monetizing subscriber data.  (*Id.* ¶ 45).  In a

March 2, 2018 speech, Farnsworth similarly claimed that MoviePass collected

an "enormous amount of information regarding" its subscribers, but Lowe later

walked the statement back in an apology email to stakeholders that

acknowledged that MoviePass did not track its subscribers.  (*Id.* ¶ 46).

Farnsworth then sent Lowe a text message stating that HMNY's stock price was

"tanking" due to the situation and that "investors were 'saying the exact thing I

was afraid of[,] that we are not a big data company and we just admitted it.'"

(*Id.* ¶ 46).

Relatedly, Farnsworth and Lowe made misstatements regarding the

amount of revenue the Companies were receiving from MoviePass's ancillary

non-subscription model business.  In the January 2018 Yahoo Finance

interview, Farnsworth stated that MoviePass would be profitable "within the

next sixty days" due to "multiple revenue streams."  (Compl. ¶ 47).  At that

time, however, the Companies' non-subscription revenue streams were

generating minimal income.  (*Id.* ¶ 48).  And in March 2018, the Companies

stated in a press release that they were lowering the subscription price due to

partnerships that did not in fact exist.  (*Id.* ¶ 49).  In point of fact, the decision to lower the subscription price was due to a need for a short-term cash injection.  (*Id.*).  In an April 12, 2018 joint interview, Farnsworth stated, with Lowe in agreement, that MoviePass could already generate $6 per month in non-subscription revenue, when in reality the figure was closer to $0.50.  (*Id.* ¶ 50).  Similar mischaracterizations about the Companies' potential revenue streams were also made in certain SEC filings in 2018.  (*Id.* ¶ 52).

In many of their interviews, Farnsworth and Lowe addressed investor concerns regarding the ticket usage rates of subscribers.  In particular, the two executives sought to mollify concerns that the high usage rates of subscribers would render MoviePass unprofitable, explaining that there was a natural drop-off in usage the longer customers were subscribed.  Farnsworth and Lowe repeatedly drew an analogy to consumption patterns at an "all-you-can-eat buffet," where customers would first gorge themselves on movies, and then decrease their usage significantly as the novelty wore off.  (Compl. ¶¶ 55-58).  According to the SEC, any drop-off in usage rates was actually due to a coordinated campaign by the Companies to suppress subscribers' ticket usage rates.  These efforts included the blocking of certain theaters (*id.* ¶¶ 60-64), as well as the changing of passwords and the implementation of ticket-verification protocols for heavy users (*id.* ¶¶ 65-67).  Farnsworth and Lowe publicly stated that these efforts were designed to test user behavior and to prevent fraud (*id.* ¶¶ 62-63, 68, 71-73), but in fact they were employed to suppress ticket usage and thereby alleviate MoviePass's cash flow issues (*id.* ¶ 74).

Finally, Farnsworth and Lowe made false public statements that MoviePass had adequate access to capital.  In a January 2018 interview with the Hollywood Reporter, Lowe stated that MoviePass had "plenty" of cash (Compl. ¶ 75), and during the February 2018 Recode Media podcast he stated that MoviePass had a "deep-pocketed backer" (*id.* ¶ 76).  However, during this same time, Lowe was asking HMNY to inject cash into MoviePass on a weekly basis and knew that their funding was at risk.  (*Id.*).  Furthermore, Farnsworth signed an April 2018 Form 10-K stating that HMNY had "adequate access to capital … for the foreseeable future" (*id.* ¶ 77), and he made similar statements contemporaneously to Variety.com that "capital is not an issue" and that he was "sitting on hundreds of millions of dollars of dry powder" (*id.* ¶ 78).  That same month, however, HMNY's Chief Financial Officer ("CFO") told Farnsworth and Lowe that "[w]e cannot survive at this level of burn," and that "[n]ext week is going to be a challenge, not sure how we get there."  (*Id.* ¶ 79).

### 3. Kaleidoscope's Relationship with MoviePass and HMNY

Kaleidoscope was also engaged in a business relationship with the Companies during the relevant period.  In essence, Kaleidoscope acted as a middleman, hiring other contractors to provide planning and production services on behalf of MoviePass and HMNY, and then paying for the third-party contractors' services through funds from HMNY.  (Compl. ¶¶ 81-83).  There was no formal agreement between the Companies and Kaleidoscope for any of these events, and Kaleidoscope was not contractually entitled to fees for its services.  (*Id.* ¶¶ 84-85).  As the SEC alleges, Itum, with the help of Farnsworth and

Lowe, siphoned approximately $310,000 in funds from MoviePass and HMNY for Itum's own personal benefit using fraudulent invoices for funds he falsely claimed were advanced by Kaleidoscope.  (*Id.* ¶¶ 86-88).  These funds were provided to Itum as part of four separate transactions, each of which is described below.

> ### a.   The First Sundance Invoice

On January 8, 2018, Itum, through Kaleidoscope, entered into a contract with an event production company.  (Compl. ¶ 81).  Pursuant to that contract, the event production company would provide event planning and production services for a MoviePass event in connection with the Sundance Film Festival (the "Sundance Event").  (*Id.*).  While Kaleidoscope was the signatory to the contract, HMNY provided funds to pay for the events, including by providing payments to MoviePass.  (*Id.* ¶ 83).  On January 3, 2018, Itum sent HMNY an invoice from Kaleidoscope for $137,250 so that he could pay vendors in full in advance of the Sundance Event (the "First Sundance Invoice").  (*Id.* ¶¶ 89-90).  HMNY's CFO approved the payment, and HMNY, through a subsidiary, wired the money to Kaleidoscope that same day.  (*Id.* ¶ 91).

The SEC alleges that Itum used approximately $10,000 of the advanced funds to pay for non-Sundance expenses, but fraudulently created an itemized final budget that made it appear as though every dollar of the $137,250 had been used for Sundance expenses.  (Compl. ¶¶ 92-94).  Indeed, the final budget overstated the Sundance payments by at least $10,000, noting that Kaleidoscope had used the funds advanced by HMNY to directly pay for

$41,659.17 of Sundance expenses, and had remitted the remainder of the advanced funds to the event producer to pay for other Sundance expenses. (*Id.* ¶ 95).

### b.   The Second Sundance Invoice

On January 30, 2018, Farnsworth emailed HMNY's CFO, instructing him to pay Itum a $25,000 bonus. (Compl. ¶ 97). The CFO responded that HMNY could not pay Itum a bonus because he was a MoviePass employee. (*Id.* ¶ 98). That same day, Itum emailed Farnsworth's chief of staff with a $25,000 invoice from Kaleidoscope labeled Invoice #006.002 and dated January 30, 2018, for "Overages and Performance Bonus," stating that it was being sent "per [Farnsworth]'s direction." (*Id.* ¶ 99). Farnsworth was copied on the email. (*Id.*).

Two weeks later, on February 16, 2018, Itum emailed HMNY's CFO an invoice from Kaleidoscope with the same invoice number and date (the "Second Sundance Invoice"), seeking $25,000 for expense "overages — Sundance Film Festival," and removing the reference to a bonus. (Compl. ¶ 100). The SEC alleges that no such overages existed, and that the invoiced $25,000 was solely for purposes of paying Itum a bonus. (*Id.* ¶¶ 101-102). After receiving the overages invoice, HMNY's CFO instructed that the $25,000 be wired to Kaleidoscope. (*Id.* ¶ 103).

Both Farnsworth and Itum were copied on emails discussing the HMNY accountants' requests for Sundance-related expenses leading up to the filing of the company's upcoming Form 10-K. (Compl. ¶ 105). The $25,000 payment

was memorialized in MoviePass's books as a marketing expense, and was not included on the list of bonuses that the HMNY CFO provided to HMNY's auditor in April 2018.  (Id. ¶¶ 104, 106).

### c.     The February 26, 2018 Invoice

In February 2018, Itum informed Farnsworth that he owed personal debts to two individuals in the amounts of $150,000 and $100,000, respectively.  (Compl. ¶ 107).  On February 9, 2018, Itum texted Farnsworth about his second debt, at which time Farnsworth told Itum to "relax" and that Itum had Farnsworth's "word" that "we will get [Itum] paid."  (Id.).  Later that same day, Itum texted and emailed Farnsworth about the first of the debts, asking if Farnsworth could write to the creditor "let[ting] him know that you've scheduled his payment of $150,000 for no later than Friday?" and that such a notice would get the creditor "off [Itum's] neck."  (Id.).  Shortly thereafter, Farnsworth instructed Lowe to pay Itum a $150,000 bonus.  (Id. ¶ 108).

On February 26, 2018, Itum sent MoviePass a $150,000 invoice from Kaleidoscope for "Production Services" (the "February 26, 2018 Invoice"), which invoice Lowe approved despite Kaleidoscope providing no services to MoviePass.  (Compl. ¶¶ 110-112).  The funds were wired to Kaleidoscope that same day, and Itum then wired the funds to his creditor.  (Id. ¶ 112).  The payment was memorialized in MoviePass's books as "MP Consulting — outside services."  (Id. ¶ 113).

11

### d.  The Coachella Invoice

On April 2, 2018, Itum, through Kaleidoscope, entered into a second contract with the event producer that handled Sundance, this time for production and event planning services for a MoviePass event in connection with the Coachella Music Festival (the "Coachella Event").  (Compl. ¶ 82).  On March 29, 2018, Itum sent HMNY's CFO an invoice seeking an advance of $350,000 for production expenses relating to the Coachella Event.  (*Id.* ¶ 114).  As the SEC alleges, however, Itum actually intended to use $110,000 of the invoiced funds to repay his second debt, which was unrelated to the Coachella Event.  (*Id.* ¶ 115).  Farnsworth authorized the payment, knowing that Itum owed the second creditor $100,000; that Itum had previously asked Farnsworth for funds to repay the creditor; and that Farnsworth had previously assured Itum that the creditor would be paid.  (*Id.* ¶ 116).  At the conclusion of the Coachella Event, Itum and the event producer prepared an itemized budget and other accounting that listed a $110,000 "Hotel Buy-Out Fee" as part of the Event expenses.  (*Id.* ¶¶ 119-120).  The SEC alleges that no such fee was incurred, and that Itum used the funds to satisfy his personal debt.  (*Id.* ¶ 121).  The budget also overstated the expense of Coachella tickets by $16,733, which amount the SEC alleges Itum used for his personal benefit. (*Id.* ¶¶ 122-123).

### 4.  Defendants' Direct and Indirect Communications with HMNY's Auditors

According to the Complaint, Defendants both disseminated false and misleading information and caused others to disseminate such information

about the Companies.  On the latter point, the SEC alleges that Defendants knew that the services and expenses described in the invoices and related documents did not reflect actual services provided or production expenses incurred by Kaleidoscope for the benefit of HMNY or MoviePass, and yet allowed HMNY's auditor to rely on the false information contained in these documents in connection with HMNY's securities filings.  (Compl. ¶¶ 125-126).

In January 2018, HMNY personnel, with Farnsworth copied, emailed Itum requesting information relating to the Sundance Event expenses on behalf of HMNY's auditor.  (Compl. ¶ 127).  Itum, through the contracted event producer, then sent HMNY and Farnsworth the inaccurate itemized budget described above, which overstated the Sundance Event expenses by at least $10,000.  (*Id.* ¶ 128).  In April 2018, Farnsworth texted Itum, advising him that the auditors were reviewing the Sundance Event expenses.  (*Id.* ¶ 129). Separately, Itum received a request from HMNY on behalf of the auditors in April 2018, asking him for a detailed breakdown of how Kaleidoscope spent the $350,000 it was given for the Coachella Event, with Farnsworth again copied on the email.  (*Id.* ¶ 130).  The email made clear that the information was being requested because HMNY's CFO and auditor needed substantiation for the production expenses that Kaleidoscope claimed to have paid for the Coachella Event.  (*Id.*).  Itum again provided the inaccurate itemized budget and accounting described above, both of which indicated that Kaleidoscope had used $110,000 of the advanced funds to pay a "Buy-Out Fee" purportedly charged by the venue.  (*Id.* ¶ 131).

In early 2019, HMNY's newly-appointed CFO also asked for information regarding the $350,000 Coachella invoice, and told Itum that the information was needed to prepare HMNY's Form 10-Q for the third quarter of 2018. (Compl. ¶¶ 132-133).  Itum responded, falsely stating that Kaleidoscope had been used merely as a payment vehicle to pass through production expenses owed by MoviePass, and that neither Kaleidoscope nor Itum had received any compensation for the Coachella Event.  (*Id.* ¶ 134).  This statement, the SEC notes, neglected to mention that Itum had used $110,000 of the advanced funds to pay off his personal debt, or that Itum had retained nearly $17,000 that he purportedly spent on tickets to Coachella for his personal benefit.  (*Id.* ¶ 135).[2]

## B.   Procedural Background

The SEC initiated this case by filing the Complaint on September 26, 2022.  (Dkt. #1).  On October 21, 2022, Farnsworth filed a pre-motion letter regarding his anticipated motion to dismiss the action (Dkt. #26), to which the SEC filed its response on October 28, 2022 (Dkt. #31).  Pursuant to the Court's October 28, 2022, and November 15, 2022 endorsements (Dkt. #30, 34), Itum and Lowe filed their respective pre-motion letters on November 21, 2022 (Dkt. #35-36; *see also* Dkt. #39-40 (same, correcting filing error)).  The SEC filed separate responses to each on November 29, 2022 (Dkt. #37-38), and the Court held a pre-motion conference on December 1, 2022 (December 1, 2022 Minute

---

[2]    Lowe also received emails reflecting requests from HMNY's auditor for information concerning MoviePass's related-party transactions and bonus payments.  (Compl. ¶ 143).

Entry).  At the conference, the Court set forth a briefing schedule for

Defendants' respective motions and allowed the SEC to file a single omnibus

response.  (*Id.*).  Defendants filed their respective motions to dismiss on

January 24, 2023 (Dkt. #47-49 (Lowe); Dkt. #50-51 (Itum); Dkt. #52-54

(Farnsworth)), and the SEC filed its omnibus opposition brief on March 27,

2023 (Dkt. #57).  Defendants filed their reply briefs on May 1, 2023, and

May 2, 2023.  (Dkt. #58 (Itum); Dkt. #60 (Lowe); Dkt. #63 (Farnsworth)).

## DISCUSSION

### A.    The Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), the plaintiff must plead sufficient factual allegations "to state a claim

to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544,

570 (2007).  A claim is facially plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft* v. *Iqbal*, 556 U.S. 662,

678 (2009).  In other words, a "complaint [will not] suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (quotation marks

omitted and alteration adopted).  Instead, a complaint's "[f]actual allegations

must be enough to raise a right to relief above the speculative level," *Twombly*,

550 U.S. at 555, although "once a claim has been stated adequately, it may be

supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563.  In considering a Rule 12(b)(6) motion, a court must

accept as true all well-pleaded factual allegations in the operative complaint. *Id.* at 555.

The Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Becker* v. *Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted). In addition, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotation marks and citations omitted).

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on complaints alleging fraud. *Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Under Rule 9(b), parties alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). More specifically, "a plaintiff alleging fraudulent misstatements satisfies Rule 9(b) by:

16

[i] specifying the fraudulent statements, [ii] identifying the speaker, [iii] stating where and when the statements were made, and [iv] explaining why the statements were fraudulent." *SEC* v. *Wey*, 246 F. Supp. 3d 894, 909 (S.D.N.Y. 2017) (citing *Novak*, 216 F.3d at 306).  Despite those additional requirements, under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

**B.    The Complaint Adequately Pleads Certain Claims Against Farnsworth and Lowe Under Section 10(b), Rule 10b-5, and Section 17(a)**

The SEC first brings a series of claims against Farnsworth and Lowe under Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for fraudulent and material misstatements.  The SEC also brings aiding and abetting claims against Lowe for knowingly and recklessly providing substantial assistance to HMNY and Farnsworth in connection with their primary violations.  (*See* Compl. ¶¶ 145-168). Farnsworth and Lowe move to dismiss all of these claims.  For the reasons set forth in this section, the Court grants in part and denies in part the two Defendants' motions.

**1.    Applicable Law**

Section 10(b) of the Exchange makes it unlawful "for any person … [t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78(j)(b).  Section

17

10(b) "serv[es] as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." *SEC* v. *China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014) (quoting *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007)). Rule 10b-5, the implementing regulation corresponding to Section 10(b), provides that it shall be unlawful:

> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "[T]o establish a defendant's liability under Section 10(b) or Rule 10b-5, the SEC must prove that the defendant '[i] made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; [ii] with scienter; [iii] in connection with the purchase or sale of securities.'" *SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *9 (S.D.N.Y. Mar. 21, 2017) (quoting *SEC* v. *Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016)).

Separately, under Section 17(a) of the Securities Act, it is "unlawful for any person in the offer or sale of any securities"

> (1)  to employ any device, scheme, or artifice to defraud, or;

18

(2)     to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  "The Second Circuit has explained that 'essentially the same elements' are required to prove fraud under Section 17(a) as are required under Section 10(b), 'though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3) [of Section 17]."  *SEC* v. *Svoboda*, 409 F. Supp. 2d 331, 342 (S.D.N.Y. 2006) (quoting *SEC* v. *Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).  Additionally, under Section 17(a)(2), the "plaintiff must allege that defendant actually obtained money or property by means of the untrue statements."  *SEC* v. *Glantz*, No. 94 Civ. 5737 (CSH), 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995) (internal citations omitted).

## 2.     Farnsworth's and Lowe's Arguments Against Primary Liability

Farnsworth and Lowe each move to dismiss the SEC's Section 17(a), Section 10(b), and Rule 10b-5 claims on several grounds:

- *First*, they allege that the SEC fails to plead that any of the statements at issue was material (Farnsworth Br. 12-23; Lowe Br. 19-20);

- *Second*, they claim that the SEC fails to plead scienter (Farnsworth Br. 23-28; Lowe Br. 16-19);

- *Third*, Farnsworth contends that the SEC fails to allege any false statements in paragraphs 42, 52, and 72 of

the Complaint (Farnsworth Br. 28), while Lowe contends that the SEC fails to allege that certain statements attributed to him in paragraphs 36 and 71 of the Complaint were in fact false (Lowe Br. 20-22); and

- *Fourth and finally*, Farnsworth and Lowe claim that the SEC fails to allege that the statements were made either in connection with the purchase or sale of a security (as required by Section 10(b)), or in the offer or sale of a security (as required by Section 17(a)).

(Farnsworth Br. 7-11; Lowe Br. 11-12).[3]  The Court considers each category of challenges in turn.

### a.    The Complaint Adequately Alleges Materiality

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 [and Sections 10(b) and 17(a)] by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988)).  In other words, there must be a "substantial likelihood" that the misstated or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *IBEW Loc. Union No. 58 Pension Tr. Fund and Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) ("*IBEW*") (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 U.S. 187, 197 (2d Cir. 2009) ("*ECA*")).  Stated differently, "[a] fact is to be considered material if there

---

[3]    The Court accepts the SEC's clarification that the Complaint does not allege primary liability against Lowe for statements that were personally made by Farnsworth or vice versa.  (*See* Pl. Opp. 50-52).  As such, the Court will not address the concerns Lowe raises in his motion concerning such liability.  (*See* Lowe Br. 12-15).

is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock]." *Operating Loc. 649 Annuity Tr. Fund* v. *Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quoting *Azrielli* v. *Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)).

Defendants face a high bar in seeking dismissal on materiality grounds, because "[o]n a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Wey*, 246 F. Supp. 3d at 914 (quoting *Ganino*, 228 F.3d at 162 (internal quotation marks omitted)). After all, "[m]ateriality is a mixed question of law and fact." *Ganino*, 228 F.3d at 162. As explained herein, the Court finds that the SEC has adequately pleaded that Farnsworth and Lowe made material misstatements.

### i.    Importance to the Reasonable Investor

The Complaint alleges numerous misstatements that a reasonable investor could find to be important. The Court highlights here only those that it finds to be most potentially significant to an investor based on the allegations of the Complaint. These include representations that:

> ▪    Based on historical data and/or market testing, the $9.95 price point would be profitable or break-even for the company (Compl. ¶¶ 32-33, 36);[4]

---

[4]    Lowe challenges paragraphs 36 and 71 of the Complaint on the grounds that the statements attributed to him are not false. (Lowe Br. 20-21). The fact remains that the SEC alleges that the statements contained in those paragraphs were false, and that Defendants' disclaimers or surrounding comments would have misled a reasonable

▪ HMNY possessed significant data analytics and artificial intelligence capabilities that allowed it to improve MoviePass's service and, when applied to the data MoviePass collected on its subscribers, could generate significant revenues for MoviePass beyond subscription revenue (*id.* ¶¶ 39-46);

▪ MoviePass would be self-sufficient within sixty days of January 2018 (*id.* ¶¶ 47-48);

▪ MoviePass could generate $6 per subscriber in monthly, non-subscription revenue as of April 12, 2018 (*id.* ¶ 50);

▪ A drop-off in ticket demand rates was occurring naturally, when in fact the drop-off was the product of measures taken by Defendants to artificially restrict usage by high-activity subscribers (*id.* ¶¶ 54-74); and

▪ MoviePass had more funding and capital access than it actually did (*id.* ¶¶ 75-79).

The Court finds each of the above statements to be material at this stage of the litigation because, taken as true and drawing all reasonable inferences in the SEC's favor, they are statements that a "reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 161. Indeed, misrepresentations about whether a company is in fact profitable or likely to become so — which all of the above-listed statements ultimately distill to — are almost always material to investors. *See Lematta* v. *Casper Sleep, Inc.*, No. 20 Civ. 2744 (MKB), 2022 WL 4637795, at *9 (E.D.N.Y. Sept. 30, 2022) (finding that "Plaintiff has sufficiently alleged that Defendants'

---

investor. (*See* Compl. ¶¶ 36, 70, 74). Whether the statements are in fact false is a question of fact ill-suited for a motion to dismiss.

Similarly, Farnsworth asks this Court to "dismiss" certain paragraphs in the Complaint as "a basis for liability" — specifically, paragraphs 42, 52, and 72 — ostensibly because they fail to allege false statements with the specificity required under Fed. R. Civ. P. 9(b). (Farnsworth Br. 28). The Court finds that, in context, the misstatements in those paragraphs are alleged with the requisite specificity.

misstatements and omissions about its ability to gain and sustain profitability were materially misleading").  This is the case for each of the above statements in isolation, but also considered together and in context.  *See Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("[W]hether an omission makes an expression of opinion misleading always depends on context.").

Farnsworth and Lowe both face an uphill battle in explaining why their statements about the Companies' profitability would not have been material to a reasonable investor, but they persist.  To begin, the two allege that many of the challenged statements are not actionable as statements of opinion. Whether a statement is a fact or an opinion is determined by the "everyday ways of speaking and thinking."  *Omnicare*, 575 U.S. at 183.  Defendants are correct that, in general, statements of opinion are not misleading as a matter of law, because the securities laws prohibit only misstatements of material *fact*. *Id.*  That said, as the Supreme Court clarified in *Omnicare*, a speaker may not absolve himself of responsibility by incanting some version of "I think" in front of what would otherwise be a misleading statement.  *Id.* at 183-84.  Rather, "[a] statement of opinion gives rise to liability where [i] the speaker does not hold the professed belief; [ii] the supporting facts supplied are untrue; or [iii] the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *In re Dentsply Sirona, Inc. Sec. Litig.*, No. 18 Civ. 7253 (NG) (PK), 2023 WL 2682905, at *18 (E.D.N.Y. Mar. 29, 2023) (citing *Omnicare*, 575 U.S. at 185-86).

The misstatements alleged in the Complaint that are linguistically structured as statements of opinion all fall into one of these three categories. For example, the Complaint points to Farnsworth's statement that based on "a wealth of historical data … *we think* we can be profitable on the subscriptions at $9.95" (Compl. ¶ 55 (emphasis added)), which is semantically an opinion, but is buttressed by allegations that the data to which Farnsworth had access would have made his statement unreasonable (*id.* ¶ 58). By misrepresenting the historical data, whether shaped in opinion form or not, Farnsworth supplied a "supporting fact … [that was] untrue," at least at the pleading stage. *Omnicare*, 575 U.S. at 186. Moreover, Farnsworth's statement "convey[s] facts about how [he had] formed the opinion," *id.* at 188, and given his position as CEO of HMNY, a reasonable investor would assume that Farnsworth had done the requisite research — research that, the SEC alleges, would have caused him to realize that the company would not in fact be profitable at that price point (*see, e.g.*, Compl. ¶ 58). Indeed, as the *Omnicare* Court noted, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion — or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." 575 U.S. at 188. Moreover, "[w]hen a company does not have an obligation to speak but does so anyway, it assumes 'a duty to be both accurate and complete.'" *Lematta*, 2022 WL 4637795, at *8 (quoting *Caiola* v. *Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)); *see also In re Morgan Stanley*

*Info. Fund Sec. Litig.*, 592 F.3d at 366 (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate").

This same analysis applies to many of Farnsworth's and Lowe's other alleged misstatements, because they coalesce around a similar fact pattern: Farnsworth represented or implied that the data he possessed about MoviePass indicated positive projections, when in fact the data either did not support that proposition or did not exist at all. (*See* Compl. ¶¶ 33, 34, 55, 62, 68, 71). *See, e.g.*, *Operating Loc. 649 Annuity Tr. Fund*, 595 F.3d at 92 (recognizing that the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 343 (S.D.N.Y. 2004) (denying motion to dismiss a complaint that alleged that defendants knew "there would be no increase in demand for [their] products and services")).

As another example, Farnsworth contends that the statement in HMNY's Form 10-K that it "has adequate access to capital to fund our operations and capital investment needs for the foreseeable future" (Compl. ¶ 77), was a non-actionable statement of opinion. (*See* Farnsworth Br. 13 (noting that "the Complaint leaves out the statement 'we believe' in ¶ 77 to frame HMNY's statement in its Form 10-K as a statement of fact rather than a statement of opinion")). Significantly, however, the statement in this public filing implies facts about how HMNY (and Farnsworth as signatory to the filing) formed the opinion — namely, that it had evaluated the company's financials and made a

reasonable determination about its capital access.  The SEC has pleaded that around the same time, Farnsworth and Lowe were aware that the company had serious cash-flow problems.  (*See, e.g.*, Compl. ¶ 79).  As such, the SEC has sufficiently alleged that the statements — even those phrased as opinions or prefaced with "we believe" — related to factual statements such that they are actionable, and thus survive Defendants' Rule 12(b)(6) motions.

The same holds true for Lowe's statements.  For example, in an August 16, 2017 interview with Variety.com, in response to a question about whether MoviePass would eventually need to raise the subscription price, Lowe stated that people who suggested as much "don't understand [MoviePass's] business model."  (Compl. ¶ 32).  While perhaps in isolation this response could be perceived as a non-actionable statement of opinion, two sentences later Lowe explains: "We surveyed and tested every price down to $14.95.  Even active moviegoers had to think is $14.95 really worth it?  At $9.95, even people who rarely go say I'd be crazy not to do that."  (McGovern Decl., Ex. 1).  As discussed, context is critical, and "a reasonable investor may, *depending on the circumstances*, understand an opinion statement to convey facts about how the speaker has formed the opinion."  *Omnicare,* 575 U.S. at 188 (emphasis added).[5]

---

[5]    Farnsworth suggests that there is a separate category of non-actionable statements called "statements of corporate motive."  (Farnsworth Br. 22-23).  He has failed to cite any convincing precedent that such a recognized category exists.  Furthermore, statements about what corporate executives are thinking would seem to be a type of opinion, and as such does not warrant additional analysis because the same rules for liability would apply regardless.

Lowe also made an October 13, 2017 statement that MoviePass and HMNY "actually want you to go a lot to the movies." (Compl. ¶ 38 (alteration omitted)). The statement was made in response to a question that asked, in essence, whether MoviePass required a reduction in ticket usage rates to be profitable. In such a context, a reasonable investor could understand Lowe's statement to mean that based on his knowledge of the company's business model, MoviePass could become profitable even if subscriber ticket usage rates remained high. However, the Complaint alleges that even as he made that statement, Lowe was trying to lower the average ticket usage rate, suggesting that he, as the speaker, "did not hold the belief [he] professed." *Omnicare*, 550 U.S. at 186. As such, Lowe's arguments for dismissal on this basis fail.

Similarly, despite Farnsworth's and Lowe's contentions, none of the statements constitutes puffery as a matter of law. (*See* Farnsworth Br. 19-22; Lowe Br. 20). Puffery consists of statements that are "too general to cause a reasonable investor to rely upon them." *ECA*, 553 F.3d at 206; *see also City of Sterling Heights Police and Fire Ret. Sys.* v. *Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 89 (S.D.N.Y. 2022) ("A speaker engages in puffery when he claims to be 'pretty confident' and 'pretty positive' about the future, or makes '[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices[.]'" (alterations in original) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021))).

Viewing the statements in context and drawing all reasonable inferences in favor of the SEC, the Court finds that the identified statements are attempts

27

to address concerns about specific elements of the Companies' financial situation and business model, rather than general boasting of generic characteristics about the business.  They are simply too specific to be classified as non-actionable puffery.  *Compare Freudenberg* v. *E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010) (finding statements such as "we enter 2007 ideally positioned to capitalize on secular growth trends in the industry" to be material), *and In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022) ("*Turquoise Hill*") (finding statement that "lateral development [of construction site] has progressed well" to be actionable), *with ECA*, 553 F.3d at 205-06 (finding statements that company "had risk management processes [that were] highly disciplined and designed to preserve the integrity of the risk management process," that it "set the standard for integrity," and that it would "continue to reposition and strengthen [its] franchises with a focus on financial discipline" to be puffery (internal citations and quotation marks omitted)), *and Kusnier* v. *Virgin Galactic Holdings, Inc.*, No. 21 Civ. 3070 (ARR) (TAM), 2022 WL 16745512, at *12 (E.D.N.Y. Nov. 7, 2022) (finding that statements that company was "light years ahead of the competition" and that boasted its "uncompromising commitment to safety and customer satisfaction" to be puffery (internal quotation marks omitted)).

Even the more general of Farnsworth's statements — such as his observation that "[HMNY] is really a data analytics company, which really made the perfect marriage of MoviePass and the data analytics of how we're driving the revenues of the company right now" (Compl. ¶ 43), are much more specific

than the statement at issue in *ECA*.  Indeed, not only did Farnsworth's statement positively characterize HMNY's data analytics capabilities as "driving revenue," a specific factual claim, but the SEC also alleges that Farnsworth knew that "HMNY did not possess the type of analytics capabilities that it described."  (*Id.* ¶ 41).  Similarly for Lowe, even statements like the above-quoted "they don't understand our business model" do more than make generalizations about the general quality of the company, given that Lowe is responding to a specific criticism about whether the $9.95 price point would be viable long-term.  *See Turquoise Hill,* 625 F. Supp. 3d at 223 ("[W]here a company makes a statement in direct response to concerns raised by investors about a specific risk, it is fair to read the statement in context … [and so] the statement is no longer the general one … it is a statement about a distinctive risk." (internal citations omitted)).

Stated differently, the SEC has adequately pleaded statements by Farnsworth and Lowe that "were not mere rosy predictions … [i]nstead, they were directed at [the Companies'] then-existing financial condition and made at a time when defendants were aware or should have been aware of contrary information."  *Freudenberg*, 712 F. Supp. 2d at 190 (quoting *City of Sterling Heights Police & Fire Ret. Sys.* v. *Abbey Nat'l, PLC,* 423 F. Supp. 2d 348, 359-60 (S.D.N.Y. 2006)).  This Court cannot conclude that "[n]o investor would take such statements seriously in assessing a potential investment."  *ECA*, 553 F.3d at 206.

29

### ii.   Altering the Total Mix of Information

Farnsworth and Lowe next argue that regardless of the actionability of
the individual statements, taken in their broader context, no reasonable
investor would find them to have substantially altered the total mix of
information available.  (*See* Farnsworth Br. 13-19; Lowe Br. 19-20).  For the
SEC's misstatement claims to survive a motion to dismiss, the Court must find
"a 'substantial likelihood' that the misstated or omitted fact 'would have been
viewed by the reasonable investor as having significantly altered the total mix
of information made available.'" *Wey*, 246 F. Supp. 3d at 914 (quoting *IBEW*,
783 F.3d at 390).  And as suggested by these two Defendants' arguments, "[i]n
evaluating whether the alleged misstatements and omissions were 'material'
and would be viewed by the reasonable investor as 'significantly altering the
total mix of information available,' the Court must first examine whether the
existence of 'information already in the public domain' obviated any duty to
otherwise disclose." *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL
4471265, at *32 (S.D.N.Y. Sept. 28, 2012) (first quoting *In re Fuwei Films Sec.
Litig.*, 634 F. Supp. 2d 419, 439 (S.D.N.Y. 2009), then quoting *Garber* v. *Legg
Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (summary order) (internal
citations omitted)), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret.
Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014).

Farnsworth has identified various places in HMNY's public filings that
warn investors of the risks associated with its investment in MoviePass.  (*See*
Farnsworth Br. 21-22).  He is correct that many of these disclosures appear to

address the very risks about the business that the SEC alleges were misstated or omitted in other statements by Farnsworth and Lowe.  Therefore, the Court must compare the timing of the alleged misstatements with these disclosures to determine how, at the time the misstatements were made, a reasonable investor might have understood them.  As it happens, this comparison actually strengthens the SEC's argument that they are material.

The first public disclosure of speed bumps in MoviePass's road to profitability was in HMNY's Form 8-K filed September 14, 2017.  (Southerling Decl., Ex. A-1 (the "2017 Q3 8-K")).  In the 2017 Q3 8-K, HMNY discloses that MoviePass "currently spends more to retain a subscriber than the revenue derived from that subscriber," and that it had a "negative gross profit margin." (2017 Q3 8-K at 85).  HMNY further discloses other potential adverse conditions facing MoviePass, including its limited operating history, risk of non-acceptance by market participants and studios, risks regarding ticket usage patterns, and scaling issues.  (*Id.*).  As for the alleged misstatements, one was made in a press release associated with the 8-K, and the rest were made subsequent to the 2017 Q3 8-K disclosure.  (*See* Compl. ¶¶ 40-46).

As an initial matter, the existence of countervailing information in securities filings does not render extrinsic statements immaterial as a matter of law.  Rather, the Court must still evaluate the statements at issue in the context of the other publicly available information to determine whether they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197.

31

Adopting the perspective of a reasonable investor at the time, the Court finds that the proffered misstatements are not fixed by the public disclosures. Indeed, given that many of the statements at issue followed the risk disclosures, a reasonable investor could interpret Farnsworth's and Lowe's public statements to mean that they were speaking with knowledge of additional information of which they were personally aware, but which was not included in the prior filings.

For example, Farnsworth's September 22, 2017 statement regarding the viability of the $9.95 price point in which he referenced the "wealth of historical data" is not obviated by the disclosure.  (Compl. ¶ 55).  Although the Q3 2017 8-K includes disclosures about MoviePass's historical performance, it does not directly provide any historical data.  Therefore, a reasonable investor could understand Farnsworth's statement to imply additional information about data that investors did not have, and that indicated MoviePass could be profitable at that price point.  For the same reasons, the September 22, 2017 statement that historical data supports an inference that usage rates would naturally wane, would have altered the total mix of information provided to investors.  (*Id.*).  On this point, the Court reiterates the Second Circuit's admonitions that "[a] statement is materially misleading when the defendants' representations, taken together and in context, would have misled a reasonable investor," *Altimeo Asset Mgmt.* v. *Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021), and that "when a company does not have an obligation to speak but does so anyway, it

assumes a duty "to be both accurate and complete," *Lematta*, 2022 WL 4637795, at *8 (quoting *Caiola*, 295 F.3d at 331).

Similarly, the Court cannot conclude that Farnsworth's January 9, 2018 statement that multiple revenue streams would make MoviePass profitable was properly contextualized by the publicly available information. Such a statement could appear to an investor to be the dissemination of information about the company, separate and apart from that available in the disclosures. The Court finds that even given the disclosures regarding the lack of current revenue streams in HMNY's November 14, 2017 Form 10-Q (*see* Southerling Decl., Ex. B at 32), a reasonable investor could still find that the statement included an implied fact that Farnsworth had knowledge of incoming revenue streams (streams that the SEC alleges he knew did not exist). Stated differently, a reasonable investor could understand Farnsworth's statement to communicate that increases in ancillary revenue had occurred since the last disclosure was filed on November 14, 2017, especially because that disclosure highlighted that it was a priority of HMNY's to "secur[e] additional sources of revenue and economies of scale." (*Id.*). The same applies to Farnsworth's statement on May 13, 2018, that HMNY had "17 months' worth of cash without further raises of capital." (Compl. ¶ 78). Even given the other publicly available information, a reasonable investor hearing this statement at the time that it was made could assume that HMNY had obtained additional funding sources that it did not have at the time of its then-most-recent SEC filings.

Lowe's statements also could have altered the total mix of information for a reasonable investor.  For much the same reasons just discussed, countervailing information in any securities filings did not obviate the potential relevance of his statements that "MoviePass had 'plenty of cash'" (Compl. ¶ 75), or that "MoviePass could generate $6 a month in non-subscription revenue from each subscriber 'right now'" (*id.* ¶ 50).  A reasonable investor could understand those statements to reflect changes in circumstances since the time of the most recent filings, or information not captured in those filings.

Put simply, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."  *Va. Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1097 (1991).  A reasonable investor could read the auditor's statements and contemplate the disclosed risks as having been reduced pursuant to Farnsworth's and Lowe's later statements.  *See IBEW*, 783 F.3d at 391 (considering proportionality of misstated facts to key aspects of the business relevant to the materiality); *Freudenberg*, 712 F. Supp. 2d at 185-86 ("Even if [general] statements about 'discipline' ... [in risk management] might not be actionable in another context, it is claimed that the glaring disparity between [the company's] operations and Defendants' statements makes the statements actionable here." (collecting cases)).

The perceived change of circumstances that could be inferred from such a posturing by the CEOs of the Companies could be material to a reasonable

investor's decision.  For that reason, the Court finds that there is a substantial likelihood that the statements referenced above and identified in the Complaint could have significantly altered the total mix of information available to investors, and denies dismissal on that basis.

### iii.     The Bespeaks Caution Doctrine

Farnsworth argues alternatively that some of the statements — in particular, those contained in the public filings — are immaterial due to the "bespeaks caution" doctrine.  "It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking."  *Iowa Pub. Employees' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (citing *P. Stolz Family P'ship L.P.* v. *Daum*, 355 F.3d 92, 96-97 n.3 (2d Cir. 2004)).  "A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction."  *Id.* at 143.

Here, all of the alleged statements fall into the latter category, and thus do not fall within the doctrine.  For example, a statement in an HMNY Form 10-K that the company "believe[s] as a result of our shelf registration in February, [that it] has adequate access to capital to fund our operations and capital investment needs for the foreseeable future," provides a verifiable basis for the Company's prediction.  (Farnsworth Br. 13).  The same applies to statements about HMNY's data capabilities in the 2017 Q3 Form 8-K; in that case, the verbs used were even present tense.  (*See Compl.* ¶ 40 ("[HMNY]

analyzes consumer trends … [and] is incorporating advertising models[.]")). Accordingly, none of Farnsworth's statements is immaterial as a matter of law under the "bespeaks caution" doctrine.

### b. The Complaint Adequately Pleads Scienter

Farnsworth and Lowe also seek to dismiss many of the misstatement claims on the theory that the SEC has failed to adequately plead scienter. (*See* Farnsworth Br. 25-28; Lowe Br. 16-19). In the context of securities fraud violations, "[a] false statement was made with the requisite scienter if it was made with the 'intent to deceive, manipulate, or defraud.'" *Sourlis*, 851 F.3d at 144 (quoting *SEC* v. *Obus*, 693 F.3d 276, 286 (2d Cir. 2012)). Scienter is adequately pleaded when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Varghese* v. *China Shenghou Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). "The requisite 'strong inference' of fraud may be established either by [i] alleging facts to show that the defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

The Court agrees with Farnsworth and Lowe in part, insofar as it concludes that the SEC has failed to plead facts supporting a strong inference of scienter under a motive and opportunity theory. Doing so would require the

SEC to show that Farnsworth and Lowe "benefitted in some concrete and personal way from the purported fraud." *China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d at 388 (quoting *ECA*, 553 F.3d at 198).  For the reasons explained in the Court's analysis of the Section 17(a)(2) claim below, the SEC has failed to allege that Farnsworth and Lowe benefitted from any alleged fraud.

That said, the SEC has adequately pleaded scienter under the alternate evidentiary scheme by showing strong circumstantial evidence of Farnsworth's and Lowe's misbehavior or recklessness.  Under such a theory, "[s]cienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Sourlis*, 851 F.3d at 144 (alteration in original) (quoting *Obus*, 693 F.3d at 286).  As relevant here, "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *SEC* v. *Takeyasu*, No. 17 Civ. 4866 (GHW), 2018 WL 2849777, at *16 (S.D.N.Y. June 11, 2018) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2011)).  "To qualify as reckless conduct, defendants' conduct must have been highly unreasonable and an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re*

*Scholastic Corp.*, 252 F.3d at 76 (internal quotation marks and citation omitted).

The Complaint alleges that for each category of alleged misstatements, Farnsworth and Lowe had "knowledge of facts or access to information contradicting [their] public statements." *Novak*, 216 F.3d at 308. (*See, e.g.*, Compl. ¶ 31 (viability of price point); *id.* ¶¶ 41, 44 (data analytics capabilities); *id.* ¶¶ 48, 50 (alternate revenue streams); *id.* ¶¶ 58, 74 (ticket usage rates); *id.* ¶ 79 (funding)). However, Farnsworth and Lowe contend that the SEC was required to state specific sources that contained information contrary to their public statements, which it failed to do. (Farnsworth Br. 26; Lowe Br. 18).

Even if true, this failure is not fatal to the SEC's case, as the factual allegations of the Complaint generally support an inference that Farnsworth and Lowe did or should have possessed the contrary information that the SEC alleges existed. Farnsworth was the CEO of HMNY and Lowe was the CEO of MoviePass during the relevant time period. The Companies possessed information indicating that there were significant risks contrary to Farnsworth's and Lowe's public statements; this is obvious from the various warnings about the same topics located in HMNY's securities filings, and even in the text messages between the two. (Compl. ¶ 46). Indeed, the correct information appears to have been readily available, and "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." *Novak*, 216 F.3d at 308 (internal quotation

marks and citation omitted).  More will be revealed in discovery, but the SEC
has sufficiently alleged the existence of this contrary information at this stage.

Furthermore, Farnsworth was the executive of a publicly traded
company, and as such had a duty to "familiarize himself with the … core
operations of the company."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) ("As signatories to the SEC filings
that contained the company's financials, each individual defendant who served
as a high-level officer had a duty to familiarize himself with the facts relevant to
the core operations of the company and the financial reporting of those
operations.  The individual defendants were not entitled to make statements
concerning the company's financial statements and ignore reasonably available
data that would have indicated that those statements were materially false or
misleading." (internal citation omitted)).  Especially in such a context,
Farnsworth's alleged failure to determine the veracity of his statements before
speaking suffices to demonstrate scienter.  *See Abbondante* v. *SEC*, 209 F.
App'x 6, 7 (2d Cir. 2006) (summary order) ("[Defendant's] failure to investigate
the truth of these assertions satisfies the scienter element of section 10(b) and
Rule 10b-5.").

The same logic applies to Lowe as well.  Although he may not have been
a signatory to HMNY's SEC filings, he was the CEO of HMNY's primary
revenue-generating subsidiary.  It would confound the purposes of the
securities laws to hold that someone with such a critical role in the Companies'
overall operations could make public statements about the subsidiary's

business model and financials — which would have an impact on investors' perceptions of the publicly-traded parent company — yet be shielded from liability simply due to corporate structure.  *Cf. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 491 ("Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." (quoting *Howard* v. *Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000))).  It is difficult to imagine that Lowe would not have had access to or been aware generally of the risk information that was disclosed in the SEC filings, especially given that much of it specifically concerned MoviePass.

The Court finds that the Complaint adequately pleads scienter by alleging that the Companies possessed certain critical and conflicting information that Farnsworth and Lowe were either aware of or had a duty to familiarize themselves with, and that they intentionally or recklessly made statements contradicting that information.  Making statements about core aspects of MoviePass's business and its current or future profitability — while either knowing that the statements were baseless or recklessly failing to investigate those aspects before speaking on them — is not "inconsistent with a state of mind going toward deliberate illegal behavior or conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *Holbrook* v. *Trivago N.V.*, No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *21 (S.D.N.Y. Feb. 26, 2019) (quoting *Footbridge Ltd.* v.

40

*Countrywide Home Loans, Inc.,* No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at

*20 (S.D.N.Y. Sept. 28, 2010)), *aff'd sub nom. Shetty* v. *Trivago N.V.*, 796 F.

App'x 31 (2d Cir. 2019) (summary order).  "[C]redit[ing] the allegations in the

Complaint, … [and c]onsidering 'all of the facts alleged, taken collectively,' [the

SEC] adequately pleaded strong circumstantial evidence of conscious

recklessness 'at least as strong as any opposing inference[.]'"  *Moab Partners,*

*LP* v. *Macquarie Infrastructure Corp.* No. 21-2524, 2022 WL 17815767, at *4 (2d

Cir. Dec. 20, 2022) (summary order) (quoting *Tellabs, Inc.* v. *Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 323, 326 (2007)).

### c. The Complaint Adequately Pleads a Nexus as to Certain of the Challenged Statements

Separately, Farnsworth and Lowe argue that the SEC has failed to state

a claim under Section 17(a) because it has not pleaded that the putative

misstatements were made in the offer or sale of any security.  (Farnsworth Br.

7-11; Lowe Br. 11-12).  In essence, Farnsworth and Lowe argue that

satisfaction of this element requires that the misstatement be made at a time

when they were directly engaged in the sale of a security.  Not so.  Each of

them "misstates the law when he claims that Section 17(a) liability is limited to

sellers."  *SEC* v. *Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *7

(S.D.N.Y. Sept. 19, 2015) (allowing Section 17(a) claim to proceed against

auditor of company's financials).  Instead, the "in the offer or sale of any

securities" requirement was "expressly intended to define broadly" and is

"expansive enough to encompass the entire selling process."  *United States* v.

*Naftalin*, 441 U.S. 768, 773 (1979) (internal citations omitted).

41

The SEC has adequately pleaded that the misstatements occurred with the requisite nexus to the sale of securities because HMNY's stock was publicly traded on the NASDAQ during the relevant period.  (Compl. ¶ 17).  To that end, the Court can take "judicial notice of the fact that [the HMNY] common stock listed on the [NASDAQ] is intended, for the most part, to be sold and exchanged."  *SEC* v. *Mudd*, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012) (finding at motion to dismiss stage that the SEC adequately pleaded a Section 17(a)(2) claim under these circumstances).  Under different (and more direct) circumstances, the *Naftalin* Court found that the "offer or sale" language in that case involved statements made "in the course of an initial distribution or in the course of ordinary market trading."  441 U.S. at 778.  That said, the Court made clear that "[p]revention of frauds against investors was surely a key part of [the Securities Act], but so was the effort to achieve a high standard of business ethics … *in every facet of the industry*."  *Wey*, 246 F. Supp. 3d at 913 (quoting *Naftalin*, 441 U.S. at 775).

The Complaint here alleges facts supporting an inference that Farnsworth and Lowe were aware that the sales of HMNY stock on the secondary market would be ongoing and still made the statements, and thus continued to be part of the "selling process."  Because this Circuit does not require that a party be the seller to be liable, the SEC has adequately pleaded the nexus element of its Section 17(a) claims.  *See, e.g.*, *SEC* v. *Simeo*, No. 19 Civ. 8621 (JPC), 2021 WL 4041562, at *10-11 (S.D.N.Y. Sept. 3, 2021) (granting summary judgment in favor of the SEC in part because discovery

showed that defendant public company "sold, and thus offered, approximately $2 million worth of securities during the relevant period"); *Mudd*, 885 F. Supp. 2d at 670 (holding scienter sufficiently pleaded where stock was publicly traded at the time, although there was no specific offering identified); *SEC* v. *RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 29 (D.D.C. 2017) ("[m]any courts have concluded that an allegation that the company's stock was publicly traded is sufficient to plead this element under Section 17(a)(2)" (citing *Mudd*, 885 F. Supp. 2d at 670; *SEC* v. *Farmer*, No. 14 Civ. 2345 (KPE), 2015 WL 5838867, at *10 (S.D. Tex. Oct. 7, 2015) (holding that the "offer or sale" requirement is met as long as the company's securities were sold and purchased during the time period "in which the fraudulent statements were made"); *SEC* v. *Goldsworthy*, No. 06 Civ. 10012 (JGD), 2008 WL 8901272, at *12 (D. Mass. June 11, 2008) ("[W]here a defendant has made false or misleading statements in materials typically relied upon by investors engaged in the ordinary market trading of securities, the requirement that fraud occur 'in the offer or sale' is satisfied.")).  Whether the SEC can prove Farnsworth's and Lowe's direct involvement in a transaction involving HMNY securities is a different question, but the Court will allow the claims to proceed to discovery.

In light of its comparatively broader standard, the SEC's nexus burden as to its Section 10(b) claims is also satisfied.  *See Wey*, 246 F. Supp. 3d at 913 ("[T]he Supreme Court has espoused a broad interpretation of the phrase 'in connection with' in the context of Section 10(b) and Rule 10b-5." (internal quotation marks omitted)).  In this regard, "[a]ny statement that is reasonably

43

calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b-5." *Simeo*, 2021 WL 4041562, at *10 (quoting *SEC* v. *Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 491-92 (S.D.N.Y. 2002)). "To satisfy the 'in connection with' requirement, '[i]t is enough that the scheme to defraud and the sale of securities coincide.'" *SEC* v. *Wyly*, 788 F. Supp. 2d 92, 120 (S.D.N.Y. 2011) (quoting *SEC* v. *Zandford*, 535 U.S. 813, 821 (2002)). Here, for the reasons discussed with respect to Section 17(a), the factual allegations plausibly indicate that the alleged misstatements coincided with the purchase and sale of securities, and, as such, the SEC has adequately pleaded that element of the Section 10(b) and Rule 10b-5 claims.

### d.    The Complaint Adequately Pleads Scheme Liability

The SEC also adequately alleges scheme liability under Rule 10b-5(a), Rule 10b-5(c), Section 17(a)(1), and Section 17(a)(3). No less an authority than the Supreme Court has observed that the "scheme liability" theory of liability under these provisions "capture[s] a wide range of conduct*." Lorenzo* v. *SEC*, 139 S. Ct. 1094, 1101 (2019). Generally, scheme liability is triggered where the defendant "performed an inherently deceptive act that was distinct from an alleged misstatement: *i.e.*, sham agreements, sham transactions, sham companies, or undisclosed payments to doctors who appeared independent." *Turquoise Hill*, 625 F. Supp. 3d at 253.[6] The above-listed provisions may be

---

[6]    The Court need not address the question the SEC raises of whether the "inherently deceptive" element of the scheme liability analysis was weakened by *SEC* v. *Rio Tinto*, 41 F.4th 47 (2d Cir. 2022) (*see* Pl. Opp. 52-53), because, as explained below, the Court finds that the alleged scheme qualifies as inherently deceptive even under the pre-*Rio Tinto* precedent.

violated where a defendant engages in an "artful stratagem or a plan devised to defraud an investor." *Lorenzo*, 139 S. Ct. at 1101 (internal quotation marks omitted). That said, this Circuit maintains distinctions between the various provisions. *See SEC* v. *Rio Tinto PLC*, 41 F.4th 47, 54-56 (2d Cir. 2022). Rule 10b-5(a) and Section 17(a)(1) make it unlawful "to employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a); 15 U.S.C. § 77q(a)(1); *see also SEC* v. *Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (noting that the same element is required under Section 10(b) and Rule 10b-5). Similarly, it is unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" under Section 17(a)(1) and similarly "upon any person" under Rule 10b-5(a). 15 U.S.C. § 77q(a)(3); 17 C.F.R. § 240.10b-5(a).

In essence, the scheme that the SEC alleges is that Farnsworth and Lowe made public statements alleging a natural drop-off in ticket usage rates, while at the same time artificially restricting users' ticket usage rates through various means. These means included blocking subscribers from accessing certain theaters or films under false pretenses, invaliding their passwords while falsely claiming fraud, and imposing ticket-verification protocols that purported to be random but were in fact targeted at heavy users. (Compl. ¶¶ 59-74). Unlike Farnsworth and Lowe, the Court finds the scheme allegations in the Complaint to be relatively clear and straightforward. (*See* Farnsworth Br. 30-31; Lowe Br. 22 (adopting Farnsworth arguments)). Allegations of such conduct suffice to plead scheme liability, because they allege "'something extra'

45

[beyond misstatements] in order to bring a scheme liability claim." *Turquoise Hill*, 625 F. Supp. 3d at 251.

The Court must take as true the SEC's allegation that these measures were a targeted effort, coordinated by Farnsworth and Lowe, to restrict MoviePass's heavy users. (Compl. ¶¶ 61, 66). As such, the Court finds that these allegations fall comfortably into both forms of scheme liability provided by the relevant statutes and rules. For starters, these allegations describe business practices and operations that deceitfully induced purchasers of MoviePass's service to use the service less than they otherwise would, thus satisfying the language of Section 17(a)(3) and Rule 10b-5(c). Similarly, the allegations describe a coordinated plan executed to artificially suppress ticket usage rates, which plan defrauded investors by creating misleading data about the Companies' business model. Such a coordinated strategy falls within the definition of a "device" or "scheme" for the purposes Rule 10b-5(a) and Section 17(a)(1). *See Rio Tinto PLC*, 41 F.4th at 54-56.

The SEC has pleaded that Farnsworth and Lowe did something more than just engage in misstatements, and further, that they engaged in "inherently deceptive conduct" insofar as Farnsworth's and Lowe's actions were part of "an illegitimate, sham or inherently deceptive transaction where their conduct or role had the purpose and effect of creating a false appearance." *SEC* v. *Sugarman*, No. 19 Civ. 5998 (WHP), 2020 WL 5819848, at *5 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks omitted). For example, resetting customers' passwords or subjecting them to ticket-verification procedures

46

under false pretenses is conduct that creates a false impression for both MoviePass users and investors.  Such deceptive activity directed towards customers — when done in order to manipulate key metrics that would be relevant to investors — presents an adequate scheme allegation.  *See SEC* v. *Fiore*, 416 F. Supp. 3d 306, 321 (S.D.N.Y. 2019) ("[T]he SEC alleges a deceptive scheme involving multiple forms of market manipulation, as well as various misstatements or omissions, which ... were designed to convince the public that there was more market interest in Plandai stock than in fact existed ... [, and which is] sufficient to establish scheme liability in violation of the securities laws." (internal citations and quotations omitted)); *cf. SEC* v. *DiMaria*, 207 F. Supp. 3d 343, 356-57 (S.D.N.Y. 2016) (finding scheme liability pleaded where CEO directed fraudulent accounting scheme intended to artificially inflate revenue figures).

### e.    The Complaint Does Not Adequately Plead a Claim Under Section 17(a)(2)

Section 17(a)(2) requires that a plaintiff plead that the misstatements were made "to obtain money or property."  15 U.S.C. § 77q.  On this front, the SEC's allegations in the Complaint fall short.

There is currently an unresolved split in this District regarding the specificity of the benefit that must be pleaded in order to satisfy this element. Some courts have held that it is sufficient to plead that a defendant "obtained money or property for his employer while acting as its agent," and therefore "personally obtained money indirectly from the fraud."  *SEC* v. *Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012); *see also SEC* v. *MiMedx Grp., Inc.*, No. 19

Civ. 10927 (NRB), 2022 WL 902784, at *10-11 (S.D.N.Y. Mar. 28, 2022); *SEC* v. *Shapiro*, No. 15 Civ. 7045 (RMB), 2018 WL 2561020, at *8 (S.D.N.Y. June 4, 2018).  Other courts have held that the plaintiff must plead that "the defendant personally gains money or property from the fraud," and must allege some chain of events, even if indirect, connecting the money or property to the fraud. *SEC* v. *Syron*, 934 F. Supp. 2d 609, 639-40 (S.D.N.Y. 2013); *see also Wey*, 246 F. Supp. 3d at 913; *DiMaria*, 207 F. Supp. 3d at 358.

The Court need not wade into this dispute, however, because the SEC's pleading fails even under the more liberal line of cases originating in *Stoker*.  In *Stoker*, the complaint alleged that investors made a specific investment due to the misstatements, and further alleged facts sufficient to support an inference that the defendant was rewarded for the fraud through specific increases in compensation.  *Stoker*, 865 F. Supp. 2d at 464.  Here, the SEC has only vaguely alleged that Farnsworth and Lowe obtained "bonus payments" and "increased compensation."  (Compl. ¶ 80).  It has not offered any insight into how the compensation could be linked directly or indirectly to the fraud.  *See DiMaria*, 207 F. Supp. 3d at 358 (dismissing Section 17(a)(2) claim when "the SEC d[id] not allege any chain of events" showing that the defendant "obtained money or property by means of the alleged misstatements").  The SEC would need to plead some qualitative or quantitative facts about Lowe's and Farnsworth's compensation structure or receipt of other personal benefits in the relevant period to support an inference that they benefitted due to the

48

fraud.  The cursory allegations in the Complaint are insufficient and, as such, the SEC's Section 17(a)(2) claims violations are dismissed.

### 3.    Aiding and Abetting Liability

As noted, the SEC also seeks to hold Lowe liable under Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), for aiding and abetting Farnsworth's and HMNY's violations of Section 17(a) and Section 10(b).  (Compl. ¶¶ 151-158).  "To establish liability for aiding and abetting, the SEC must show: '[i] the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; [ii] knowledge of this violation on the part of the aider and abettor; and [iii] substantial assistance by the aider and abettor in the achievement of the primary violation.'"  *Wey*, 246 F. Supp. 3d at 925-26 (quoting *SEC* v. *DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).  Scienter and substantial assistance are to be considered in tandem, as "a high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving scienter."  *SEC* v. *Apuzzo*, 689 F.3d 204, 215 (2d Cir. 2012).

For the reasons described throughout this section, the SEC has adequately pleaded primary violations by both Farnsworth and Lowe.  However, the Court does not find that the SEC has pleaded a primary violation by HMNY. HMNY concededly is not named as a defendant in this action, but the SEC contends that, for the purposes of this claim, Farnsworth's conduct may be imputed to HMNY because he was acting within the scope of his employment as its CEO.  (Pl. Opp. 58-59).  It is true that with regard to scienter, a "strong

inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).  However, the SEC has not identified which specific statements by Farnsworth it believes should be imputed to HMNY, and under Rule 9(b), the SEC is required to specifically connect the speakers and the misstatements.  As such, the Court cannot hold that the SEC has pleaded any primary violations by HMNY.  By extension, the aiding and abetting claims against Lowe based on alleged primary violations by HMNY are dismissed without prejudice.

Turning now to Lowe's liability under an aiding and abetting theory for Farnsworth's statements, the same factual allegations that support an inference that Lowe had scienter for his own statements support an inference for Farnsworth's, and further show that Lowe had a "general awareness of [his] overall role in [Farnsworth]'s illegal scheme." *SEC* v. *Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2023 WL 4507900, at *15 (S.D.N.Y. July 13, 2023).  As discussed above, Lowe had a duty to familiarize himself with the financial information of at least MoviePass.  He also jointly participated in several interviews in which Farnsworth made statements contrary to the information Lowe and Farnsworth possessed.  As such, the Complaint adequately alleges facts supporting an inference that Lowe knew that Farnsworth was making misstatements.  Even if Lowe did not have specific knowledge of every statement that Farnsworth made, he was aware, due to the number of joint interviews, that Farnsworth was engaged in the habitual making of

50

misstatements.  Therefore, the Court finds the level of scienter alleged to be comparatively high, lowering the SEC's burden to plead substantial assistance.

To plead substantial assistance, a plaintiff must allege the defendant "in some sort associate[d] himself with the venture, that [the defendant] participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Apuzzo*, 689 F.3d at 212 (alterations in original) (quoting *United States* v. *Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).  The Court finds this element to be adequately pleaded as to Lowe. Lowe participated in joint interviews with Farnsworth in which he agreed with and supported Farnsworth's alleged misstatements.  (*See, e.g.*, Compl. ¶ 50). With all inferences drawn in favor of the SEC, the pleadings suggest that Lowe wished for others to believe Farnsworth's misstatements and sought to support Farnsworth's credibility.  In other words, the Complaint adequately alleges that in addition to making his own material misstatements, Lowe also made statements that attempted to bolster the material misstatements of Farnsworth.  This is sufficient to plead aiding and abetting liability.[7]

## C.   The Complaint Adequately Pleads Certain Claims Against All Three Defendants Under Section 13(b) and Its Implementing Rules

Separately, the SEC brings claims against all three Defendants for violations of Exchange Act Section 13(b)(5), and Rules 13b2-1 and 13b2-2 promulgated thereunder, and for aiding and abetting violations of Section

---

[7]    Lowe is incorrect that a pleading of proximate cause is required in the context of an SEC enforcement action, as "in an enforcement action, civil or criminal, there is no requirement that the government prove injury, because the purpose of such actions is deterrence, not compensation."  *SEC* v. *Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012).

13(b)(2)(A).  (Compl. ¶¶ 159-168).  Each Defendant seeks dismissal of those claims, and their arguments are discussed in this section.

### 1.  Section 13(b)(5) & Rule 13b2-1

Section 13(b)(2)(A) of the Exchange Act requires every issuer with securities registered under Section 12 to "make and keep books, records, and accounts, which, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A).  Section 13(b)(2)(B), in turn, requires issuers to

> devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... and to maintain accountability of assets; ... and (iii) access to assets is permitted only in accordance with management's general or specific authorization.

*Id.* § 78m(b)(2)(B).

Under Section 13(b)(5), "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" of any issuer required to file reports.  15 U.S.C. § 78m(b)(5).  Similarly, under Rule 13b2-1, "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A)."  17 C.F.R. § 240.13b2-1.  Given that the allegations here center around Defendants' falsification of books and records of HMNY as issuer, the statutes apply in similar ways and may be considered together, except that Section 13(b)(5) contains a scienter requirement, while

Rule 13b2-1 does not.  *China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d at

393.  "Rather, liability is predicated on standards of reasonableness" for

Section 13(b)(5) claims.  *SEC* v. *Espuelas*, 905 F. Supp. 2d 507, 526 (S.D.N.Y.

2012) (internal quotation marks and citations omitted).  Ultimately, the Court

finds that the SEC's Section 13(b)(5) and Rule 13b2-1 claims have been

adequately pleaded as to Farnsworth and Itum, but not as to Lowe.

As a preliminary matter, the Court finds that the SEC has adequately

pleaded that Itum siphoned over $300,000 by creating and submitting false

records related to the Coachella and Sundance Invoices, each of which was a

"book, record or account" of an issuer subject to Exchange Act regulations.

(Compl. ¶¶ 81-88).  The allegedly fraudulent invoices and supporting

documents were issued by Itum to HMNY, and memorialized in MoviePass's

books (*see e.g.*, *id.* ¶¶ 110-113, 118-120, 122-123), and the Complaint alleges

that those invoices and related records were used by HMNY's auditors in the

formation of required disclosure statements, as Defendants were aware, (*id.*

¶¶ 116, 125-135).

Financial instruments such as invoices are part of the accounting system

of a company, and it is thus no surprise that HMNY's auditors requested them.

Falsifying or approving such documents before submitting them to a company's

accountants is plainly a basis for liability under Section 13(b)(5) and Rule

13b2-1.  *See SEC* v. *800america.com, Inc.*, No. 02 Civ. 9046 (HB), 2006 WL

3422670, at *11 (S.D.N.Y. Nov. 28, 2006) (finding Section 13(b)(5) and

Rule 13b2-1 violations for defendant who "falsified bank statements and …

subsequently provided the falsified documents to the accountant"); *see also* *SEC* v. *Rosenberger*, No. 22 Civ. 4736 (DLC), 2023 WL 1928093, at *7 (S.D.N.Y. Feb. 10, 2023) (finding same for allegations that "[defendant] approved several financial statements for [company] that falsely stated … revenue [and] [defendant] approved and signed other allegedly false communications, such as revenue recognition memoranda").

With respect to the February 26, 2018 Invoice, however, the SEC has not adequately pleaded that the invoice was part of HMNY's books and records. That invoice was issued to MoviePass, and the Complaint does not specifically plead that it or its contents were incorporated into HMNY's books and records. The Complaint does reference that "the documents" were "incorporated into HMNY's books and records" (Compl. ¶ 137), but it is not clear from the surrounding paragraphs whether "the documents" mentioned include the February 26, 2018 Invoice. Such an ambiguous statement is "close to stating a claim, but without further factual enhancement it stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 554. Furthermore, while the Complaint states that none of the payments was included in a list of bonuses provided to HMNY's auditors in April 2018, it does not allege that any of the Defendants was involved in the creation of that list. (Compl. ¶ 141). As such, the Court grants Defendants' motions with regard to the February 26, 2018 Invoice, but, as discussed below, the claims are dismissed with leave to replead.

By contrast, the Court finds that the Section 13(b)(5) and Rule 13b2-1 claims are adequately pleaded as to Farnsworth with respect to the Second Sundance Invoice.  The Complaint pleads that the fraudulent Second Sundance Invoice indicated that it was sent "per [Farnsworth's] direction" after a conversation in which Farnsworth discussed with the CFO the possibility of awarding a bonus to Itum.  (Compl. ¶¶ 97-99).  These factual allegations support an inference that Farnsworth directed Itum to submit the fraudulent invoice to Farnsworth's chief of staff and HMNY's CFO because he wanted to award Itum a bonus he legitimately could not, and thus knowingly caused the fraudulent record to be created.

As to the First Sundance and the Coachella Invoices, the Court concludes that the Complaint does not adequately plead that Farnsworth knew that Itum had submitted a fraudulent invoice for the particular event.  That Farnsworth knew that Itum owed a debt and that Itum had submitted a different fraudulent invoice are insufficient allegations to support a plausible inference that Farnsworth knew that these two other invoices were also fraudulent.  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft*, 556 U.S. at 678, which has not been provided here.  Furthermore, the Complaint does not allege that Farnsworth was involved in the creation or approval of the First Sundance Invoice, and so it has not been pleaded that he caused any falsification as required by Rule

13b2-1.[8]  Since the SEC has not pleaded that Farnsworth knew or should have known that the Coachella Invoice was falsified, the Court does not find that any potential approval by Farnsworth was unreasonable, as required by Rule 13b2-1.  As such, the Court grants Farnsworth's motion to dismiss the Section 13(b)(5) and Rule 13b2-1 claims as they relate to those invoices.

Turning to Lowe, the Court finds that the Complaint never specifically alleges how he contributed to the falsification of HMNY's books and records as to either of the Sundance Invoices or the Coachella Invoice.  In fact, the Complaint does not specifically allege that Lowe approved or was aware of the Sundance or Coachella invoices.  As such, Lowe's motion is granted as to the Rule 13(b)(5) and Rule 13b2-1 claims.

And as to Itum, the Court finds that the Complaint adequately pleads that Itum knowingly created all of the inaccurate invoices that he submitted to HMNY and, further, that Itum knew that the expenses listed had not actually been incurred by Kaleidoscope.  Contrary to his argument, nothing in the relevant statutes requires that Itum be an accountant or financial officer of HMNY (*see* Itum Br. 8-9); they only require that he caused a falsification of

---

[8]     In its introduction to these allegations, the Complaint states broadly that "[Farnsworth and Lowe] approved the invoices for payment, allowing Itum to misappropriate approximately $310,000 and causing the true nature of the payments to be misstated in the companies' books and records."  (Compl. ¶ 88).  However, the Court finds that the ambiguity of the term "the invoices," and the general allegation that each Defendant "approved" such invoices, are insufficiently specific, especially given that the SEC does not allege elsewhere that Farnsworth or Lowe approved the First Sundance or Coachella Invoices.

their books.  As such, the Rule 13(b)(5) and Rule 13b2-1 claims against Itum
survive.

### 2.   Rule 13b2-2

Rule 13b2-2 provides that:

> No director or officer of an issuer shall, directly or
> indirectly ... [m]ake or cause to be made a materially
> false or misleading statement to an accountant in
> connection with ... [a]ny audit, review or examination of
> the financial statements of the issuer required to be
> made pursuant to this subpart.

17 C.F.R. § 240.13b2-2.  As noted above, this section lacks a scienter
requirement.  However, Rule 13b2-2 only applies to directors or officers of an
issuer.

On that threshold inquiry, the Court finds that Lowe and Itum were not
officers of HMNY, and, as such, that Rule 13b2-2 cannot apply to them.  The
SEC cites to Improper Influence on Conduct of Audits, Exchange Act Release
No. 47890 (May 20, 2003), 68 FR 31820, at n.13 (May 28, 2003) for support to
the contrary; the release states in relevant part that "[a] person may be an
'officer' . . . regardless of the legal entity with which he or she is associated.
For example, officers of wholly owned subsidiaries of public companies and
promoters may be 'officers' of public companies."  (Pl. Opp. 73).  However, the
Court need not reach the issue of whether this statement is binding, because
the quoted language only states that a person *may* be an officer.

As relevant here, Exchange Act Rule 3b-2 defines an officer to include "a
president, vice president, secretary, treasury or principal financial officer,
comptroller or principal accounting officer, and any person routinely

performing corresponding functions with respect to any organization whether incorporated or unincorporated." 17 C.F.R. § 240.3b-2. In that context, the Court understands the quoted language from Release No. 47890 to refer to the fact that an individual may fulfill functions similar to roles commonly held by those defined in Rule 3b-2, while technically being an employee of a different entity. Here, the Complaint fails to plead that Itum or Lowe had such corresponding functions with regard to HMNY, and the Court grants these two Defendants' motions with respect to the Rule 13b2-2 claims.

A different result obtains as to Farnsworth. The Complaint alleges that Farnsworth knew that the Second Sundance Invoice would be provided to an auditor, and that HMNY's auditor did in fact rely on the invoices and related records in various filings entered pursuant to the Exchange Act. (Compl. ¶ 136). As such, the Complaint has adequately pleaded a Rule 13b2-2 claim as to Farnsworth.

### 3.   Aiding and Abetting HMNY's Section 13(b)(2)(A) Violations

Finally, the SEC alleges that all three Defendants aided and abetted HMNY's Section 13(b)(2)(A) violations. On this point, the Court finds preliminarily that the Complaint adequately alleges a primary violation of Section 13(b)(2)(A) by HMNY. Section 13(b)(2)(A) requires issuers to "make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuers." 15 U.S.C. § 78m(b)(2)(A). The Complaint alleges that HMNY produced, and gave to its auditors, business records that did not accurately reflect the underlying

transactions.  Specifically, it alleges that the fraudulent invoices and financial records were "incorporated into HMNY's books and records" (Compl. ¶ 137), such that HMNY's books did not accurately reflect the underlying transactions (*id.* ¶ 136).  *See SEC* v. *Li*, No. 19 Civ. 10562 (JPO), 2022 WL 2304174, at *2 (S.D.N.Y. June 27, 2022) (finding violation of Section 13(b)(2)(A) to have been adequately pleaded where complaint alleged that "the company mislabeled bribes as legitimate business expenses, gave fake receipts, and incorporated these false expenses into its financial statements" (internal citations omitted)).

As discussed above, aiding and abetting liability requires "knowledge of this violation on the part of the aider and abettor; and substantial assistance by the aider and abettor in the achievement of the primary violation."  *Wey*, 246 F. Supp. at 925-26 (quoting *DiBella*, 587 F.3d at 566).  Here, the SEC has adequately pleaded that Farnsworth and Itum knew that violations were occurring.  The Complaint alleges that Itum was asked to submit various documents to substantiate fraudulent invoices at the behest of HMNY's auditors (Compl. ¶¶ 129-134), and thus clearly knew that such fraudulent documents would be incorporated into the company's books and records and submitted them anyways.  Similarly, the Complaint alleges facts indicating that Farnsworth directed Itum to create the First Sundance Invoice, and that he received emails indicating that HMNY's auditors were using financial information impacted by the inaccurate invoice to prepare for public filings. (*Id.* ¶¶ 127-130, 136, 142).

Similarly, the Complaint alleges that Farnsworth and Itum provided substantial assistance to HMNY's violations.  As stated above, substantial assistance means that a defendant "in some sort associate[d] himself with the venture, that [the defendant] participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed."  *Apuzzo*, 689 F.3d at 212 (alterations in original) (quoting *Peoni*, 100 F.2d at 402).  Here, the Complaint alleges that Itum created the fraudulent invoices, and that Farnsworth directed Itum to create the First Sundance Invoice.  These actions are consistent with an intent to "bring about" the end result of HMNY's books, records, and filings containing inaccurate information regarding the Kaleidoscope transactions.  For those reasons, the Court finds that the SEC has adequately pleaded Farnsworth's and Itum's aiding and abetting of HMNY's Section 13(b)(2)(A) violations.  As to Lowe, however, the SEC's pleading fails for the same reasons as it did for the other Section 13(b) violations, in that it does not allege that Lowe knew or was involved in the Coachella or Sundance invoices, or that the February 26, 2018 Invoice was incorporated into HMNY's books and records.

### D.   The Court Grants Leave to Amend

At the conclusion of its brief, the SEC requests leave to amend any claims dismissed by the Court.  (Pl. Opp. 75 n.19).  Under Federal Rule of Civil Procedure 15, the Court is instructed to "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Given the early stage of the case, and the absence of any demonstration of futility, the Court grants leave to

amend, confident that the SEC will take to heart the Court's rulings and rationales set forth in this Opinion.  The above-mentioned grants of dismissal, therefore, are without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motions are GRANTED IN PART and DENIED IN PART.  Specifically, Farnsworth's motion is DENIED as to the Section 10(b), Rule 10b-5, and Sections 17(a)(1) and 17(a)(3) claims; GRANTED as to the Section 17(a)(2) claims; and DENIED as to the Section 13(b) claims except to the extent that they rely on the February 26, 2018 invoice or the First Sundance Invoice, as to which it is GRANTED.  Lowe's motion is DENIED as to the Section 10(b), Rule 10b-5, and Sections 17(a)(1) and 17(a)(3) claims; GRANTED as to the Section 17(a)(2) and Section 13(b) claims; and DENIED as to the Section 20(e) aiding and abetting claims relating to Farnsworth as primary violator but GRANTED for those relating to HMNY as primary violator. Itum's motion is DENIED, except for claims based on the February 26, 2018 Invoice and the Rule 13b2-2 claim, as to which it is GRANTED.

All dismissed claims are hereby dismissed without prejudice, and the Court grants the SEC leave to replead.  The amended complaint is due on or before **October 6, 2023**.  The Court will schedule Defendants' responses after the SEC files its amended complaint.

The Clerk of Court is directed to terminate the pending motions at docket numbers 47, 50, and 52.

SO ORDERED.

Dated:      September 13, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

62